**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Civil Action No.

EARL FENNER, Jr.

     An individual,

Plaintiff.

v.

UNITED STATES GYPSUM COMPANY

     A Delaware corporation.

L&W SUPPLY

     A business entity.

Defendants.

_____

**COMPLAINT AND REQUEST FOR JURY TRIAL**
_____

     Earl Fenner, Jr. [Fenner], Plaintiff, through his attorney, Steven L. Murray of Murray

Law, LLC, submits his Complaint and Request for Jury Trial against Defendants, United

States Gypsum Company [USG] and L&W Supply.

## I.  <u>INTRODUCTION</u>

     1.  Fenner, a Black man, served as an exemplary employee with Defendant USG

for over twenty-eight years, earning many promotions, pay raises, and awards.

     2.  USG terminated Fenner's employment on January 11, 2022.

1

3. Fenner served as General Manager of the Specialty Business Unit of USG Ceilings Division.

4. Fenner served as USG's only Black General Manager.

5. Fenner was the highest-ranking Black employee in USG.

6. On or about October 19, 2021, Fenner, as the only Black person in a meeting of USG Ceilings leaders, watched a USG presentation from two Directors involving explicit, racially offensive comments and issues.

7. Instinctively, Fenner objected to the racial topics in the presentation.

8. After that, USG subjected Fenner to disciplinary confrontations based on racist stereotypes of a Black man, an attempted transfer to a lesser position, deprivation of equal opportunities, a prejudicial investigation, a flawed performance improvement process, and a race-based decision to separate him from employment.

9. USG effectively separated Fenner from employment on November 29, 2021, within six weeks of the October 19, 2021, meeting.

10. This case is an employment discrimination and retaliation action under Title VII of the Civil Rights Act of 1964 42 U.S.C. § 2000e, as amended; (2) the Civil Rights Act of 1866, 42 U.S.C. § 1981, as amended; and (3) the Civil Rights Act of 1991, 42 U.S.C. § 1981a.

11. Fenner seeks legal and equitable relief against USG for intentional and unlawful retaliation, race discrimination in the termination of his employment, and race discrimination in the form of a hostile work environment based on race.

12.  USG retaliated against Fenner by taking material adverse actions against him, culminating in the termination of his employment, because he lawfully engaged in protected equal employment opportunity activities, meaning, - his repeated complaints to USG about its racially discriminatory actions.

13.  USG discriminated against Fenner based on his race in terminating his employment.

14.  Fenner seeks legal and equitable relief against L&W Supply for unlawful interference with his continuing and prospective business relationship with USG and its racially discriminatory conduct against him.

## II.  PARTIES

15.  Fenner is a United States citizen and resident of Castle Pines, Colorado.

16.  USG is a Delaware corporation with its principal place of business in Chicago, Illinois.

17.  USG manufactures construction materials, primarily drywall, joint compound, ceiling tiles, and specialty ceiling tiles.

18. USG is registered with the Colorado Secretary of State and conducts business in Colorado.

19. L&W Supply, a business entity with the capacity to sue or be sued is a distributor of construction supplies and building materials.

20. L&W Supply's headquarters are in Chicago, Illinois.

21. L&W Supply conducts business in Colorado.

22. Fenner worked for USG throughout the United States, including in Colorado.

### III.   JURISDICTION AND VENUE

23. Jurisdiction is proper under (1) Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e, 2000e-5, and 2000e-5(f)(1)(3), as amended [Title VII]; (2) the Civil Rights Act of 1866, 42 U.S.C. § 1981(a)(b)(c), as amended [Section 1981]; and (3) the Civil Rights Act of 1991, 42 U.S.C. Section § 1981a: and (4) 42 U.S.C. § 1988 (a)(b)(c).

24. This Court has supplemental jurisdiction over Fenner's common law claim against L&W Supply because his state common law claim is so related to his federal question claims under Title VII and Section 1981 that the claims form part of the same case or controversy. 28 U.S.C. § 1367(a)(b).

25. Fenner was an employee of USG, and USG was an employer of Fenner under Title VII.

26. Fenner was an employee under Title VII, and USG is an employer under Title VII.

27. Fenner is a person under Section 1981.

28. USG is an employer and a person under Section 1981.

29. L&W Supply is a person under Section 1981.

30. Venue is proper in this Court under 28 U.S.C. § 1391(a)(1), (b)(1)(2), (c)(2); 42 U.S.C. § 2000e-5(f)(3); and 42 U.S.C. §1988(a).

31. Venue is proper because a substantial part of the events or omissions giving rise to the claim occurred in this Judicial District.

32. Fenner performed his employment duties for USG while living in Colorado, and USG assigned Fenner work and monitored his work from Colorado. USG terminated

Fenner's employment during the time Fenner resided in Colorado and performed services for USG.

33. L&W Supply's actions against Fenner occurred while Fenner resided in Colorado.

34. Defendants' unlawful employment practices were committed in this Judicial District because Fenner would have worked in this District but for the unlawful employment practices.

## IV.  ADMINISTRATIVE PROCEDURES

35. Before filing this action, Fenner timely, properly, and lawfully exhausted all required administrative prerequisites, procedures, and remedies.

36. Fenner filed a timely charge of retaliation and race discrimination against USG, asserting violations of Title VII, with the United States Equal Employment Opportunity Commission. [EEOC] [Charge No. 541-2022-00910]. On January 10, 2023, the EEOC mailed Fenner a Notice of Right to Sue letter. This action is timely filed because it is filed within ninety days of Fenner's receipt of the Notice of Right to sue letter.

## V. GENERAL ALLEGATIONS

### A.  Overview

37. Defendant employed Fenner from May 16, 1994, through January 11, 2022.

38. Defendant terminated Fenner's employment on January 11, 2022.

39. Before May 1994, Fenner worked for USG as a college student intern.

40. USG has been Fenner's only employer since he graduated from college.

41. Fenner is fifty-two years of age. He is married and the father of two young daughters.

42. Fenner earned a Bachelor of Science degree in Mechanical Engineering from the University of Florida in April 1994 and a Master of Business Administration degree from Pepperdine University in April 2000

43. At the time of Fenner's discharge from USG, he was: (1) the highest-ranking Black employee of about six thousand employees; (2) the only Black person serving as a General Manager among four General Managers; (3) the only Black person to ever serve as a General Manager with USG; and (4) serving in the upper 1% of employees in USG's organizational structure.

44. During Fenner's service with USG, he consistently achieved performance ratings of "met or exceeded expectations" in his performance appraisals.

45. In 2017, USG awarded Fenner its CEO Award, the Company's highest employee honor.

46. Fenner was an excellent performer for USG during 2021, his last year of employment. For 2021, Fenner's: (1) total compensation from USG was approximately $402,000.00, including salary and bonus; and (2) operational and financial performance far exceeded his five USG 2021 established metrics/goals, exceeding the goals by 187% to 200%.

**B.   USG Organization**

47. At the time of Fenner's discharge, Diane Earll,[1] a White female, served as the

---

[1] Diane Earll is referenced as "Ms. Earll" to avoid confusion with Plaintiff Earl Fenner, Jr.

President of the USG Ceilings Division.

48.  Previously, Ms. Earll served as Chief of Human Resources.

49.  Ms. Earll reports to the Chief Executive Officer of USG.

50.  Chris Griffin is the Chief Executive Officer of USG.

51.  Ms. Earll became Fenner's direct supervisor on or about January 1, 2021.

52.  Two business units report directly to Ms. Earl: (1) Specialty Business Unit; and (2) Tile and Grid Business Unit.

53.  Fenner served as General Manager for the Specialty Business Unit of the USG Ceilings Division.

54.  Fenner's unit, the Specialty Business Unit, has two business units within its structure: (1) Ceilings Plus; and (2) USG Specialty.

55.  Mark Miklosz, a White male, served as General Manager for the Tile & Grid Business Unit of the USG Ceilings Division.

56.  At the time of Fenner's discharge, he supervised seven direct reports, and these seven employees supervised about sixty employees.

57.  Paul Haney served as USG's Chief Labor Counsel.

58.  L&W Supply is USG Ceilings' largest customer.

59.  Dan Piche, a White male, is President of L&W Supply.

60.  During the events in issue, Joseph Holmes, a White male, served as President of USG's Gypsum Division.

**C.  February 2, 2021:  Video Meeting & Complaints of Racial Stereotype**

61.  On February 2, 2021, USG held a video leadership team meeting for the

Ceilings Division.[2]

62. In the meeting, Ms. Earll gave an update on COVID from a corporate perspective, and Ann Franzen, Vice President of Ceilings Manufacturing, shared a similar update about Ceilings Plus operations.

63. The two presenters essentially stated: all Ceilings Plus operations were normal and COVID had no adverse impact on operations.

64. Fenner complained that Ms. Earll and Franzen ignored two COVID-caused deaths of employees working directly within the Ceilings Plus Business Unit.

65. After the meeting, Ms. Earll confronted Fenner, informing him that his conduct in the forum was angry and disruptive.

66. Fenner's conduct was not angry or disruptive.

67. Fenner complained to Ms. Earll about her admonishing and confronting him with allegations he was angry and disruptive.

68. Fenner complained to Ms. Earll that her comments about his alleged anger were offensive because the statements were based on an offensive and racist stereotype of a Black man.

69. In about 2011, when Ms. Earll was Fenner's direct supervisor, and each held different positions, Ms. Earll made virtually the same criticism of Fenner to him; he was angry and disruptive.

70. Throughout Fenner's employment with USG, he has seen USG White male executives, employees, and White male customers use profanity without being

---

[2] Two members of the team in attendance are no longer USG employees: Fenner and Matt Ackley.

admonished, confronted, or disciplined.[3]

71.  Also, Fenner has seen USG White male executives and employees express anger in meetings without being confronted, disciplined, or terminated.[4]

**D.  February 4-5, 2021: Fenner Complains to HR about the Black Stereotype**

72.  Following the video meeting on February 2, 2023, Fenner complained of race discrimination to Noreen Cleary, USG's Chief Human Resource Officer. Fenner reported his complaints to Ms. Earll to Cleary, and he additional concerns.

73.  Fenner told Cleary he complained to Ms. Earll that her comments about his alleged anger were offensive because the comments reflected the historic and offensive racist stereotype for a Black man – meaning, a Black man is angry and dangerous.

74.  Fenner reported to Cleary he told Ms. Earll he felt strongly about her use of the word angry to describe his response to her questions.

75.  Fenner explained to Cleary that in his complaints to Ms. Earll, he told Ms. Earll she needed to know the stereotypical nature of her comments when describing a Black man's behavior as angry. He asked Ms. Earll if she knew the history of the angry Black male stereotype.

76.  Fenner informed Cleary that Ms. Earll's use of the word angry to describe him, a Black man, was particularly offensive because she held a position of power

---

[3] For example, Alexander Dadakis [Executive], Mark Miklosz [Executive], Richard Murlin [former Executive], Blake Panno [Employee].
[4] For example, Jay King [former Executive], Richard Murlin [former Executive], John Doe [Executive (pseudonym)], and John Doe Two [Executive/Employee (pseudonym)].

within USG.

77.  Fenner complained to Cleary that Ms. Earll applied a double standard to his language because, throughout his USG career, he saw White male executives and employees and White male customers use profanity or a strong tone without being admonished. At times, USG praised such language by White male employees as passionate.

### E.  April-September 2021: Fenner Complaints re: Racially Discriminatory Terms/Conditions

78.  At a Ceilings Division Strategy Session on or about April 7-8, 2021, Fenner complained of race discrimination in the significant disparity in the 2021 capital budget resources given to Miklosz's business unit compared to the fewer financial resources provided to Fenner's unit.[5]

79.  Ms. Earll tried to justify the disparity by stating the Specialty Business Unit General Manager before Fenner, a White female, received significant capital resources. USG did not support Fenner's unit in the same way it supported: (1) Miklosz's business unit; or (2) the Specialty Business Unit under the White female General Manager in the position before Fenner.

80.  On or about June 29, 2021, at a Ceiling Plus meeting, Fenner complained that USG had invited members of Franzen's team and not members of his unit, and refused to give his suggestions for operational improvement any respect or consideration.

---

[5] Jeff White, a former USG executive, attended the meeting.

81. Fenner complained that Ms. Earll and USG gave significant attention and deference to a similar operational complaint/recommendation raised by a newly hired plant manager, a White male.

82. Ms. Earll asked Fenner his thoughts on the issue, despite Fenner raising the same problems for about two years without Ms. Earll or USG respecting and crediting his assessment and recommendations for improvement.

83. Before the September 2021 USG Board of Directors' meeting, Fenner complained about Ms. Earll and USG limiting his participation in the session while permitting Miklosz to participate fully in the forum.

84. At September 2021 USG Board of Directors' meeting, the Ms. Earll and USG did not allow Fenner to (1) sit at the presenters' table like Miklosz; (2) present all the slides Fenner prepared; or (3) run the presentation in the way which would let him present with the highest level of efficiency and effectiveness, as Miklosz was allowed to do.

**F.    October 19 - 20, 2021: USG's Racial Comments at Leadership Meeting**

85. On or about October 19, 2021, two Sales Directors presented to the Ceilings Leadership Team during an offsite meeting of the Ceilings Department, attended by about eleven people.

86. Chris Mandock, a White male, and Megan Jude, a White female, were the two Directors and presenters.

87. The presenters made race-based comments.

88.  The presenters displayed a power point slide describing team members [USG employees] as "White" and "non-White."

89.  Fenner was the only Black person in the room.

90. Fenner objected to and complained about the presentation and the race-based comments.

91. Fenner asked the presenters: "is USG now describing people as White and "non-White?"

92. No person in the room responded.

93.  Fenner asked if the presenters could tell him where they obtained the race-based demographic data.

94.  The two presenters stated they obtained the data from the USG Human Resources [HR] Business Partner; however, the HR Business Partner in the meeting denied she provided the data to the presenters.

95.  Fenner then asked the two presenters who the non-White people were on their team, and both presenters stated they did not know; they could not identify the non-White team members.

96.  About the White/non-White labeling, Miklosz stated: "Earl, you tell us what it should be because we don't know."

97.  At the October 19, 2021, meeting, Fenner complained to the presenters and attendees at the leadership meeting that USG making race-based comments, categorizing USG employees into White and non-White groups, was a personally offensive practice as applied to Fenner's family.

98. Fenner explained/complained he is Black, his wife is White, and his daughters are mixed race: they are not "non-White."

99. The next day, October 20, 2021, Fenner (1) explained how the meeting on the previous day upset him; (2) again complained about USG categorizing team members as "White" and "non-White;" and (2) opposed USG's racial categorization of employees by emphasizing the Ceilings Leadership Team had a responsibility to do better.

100. Never, on or after October 19-20, 2021, did anyone at USG ask Fenner how he felt or explain how racial categorization/labeling could occur.

101. USG never raised or complained about Fenner's conduct at the October 21, 2021, meeting until November 29, 2021.

### G. October 21, 2021: Meeting - USG Intentionally Ignores Fenner's Leadership Contribution

102. On October 21, 2021, Fenner attended an Executive Innovation meeting where Tim Miller, Director of Ceilings, Laboratory, presented to about forty USG executives.

103. Fenner objected to the presenter not mentioning: (1) any part of the Specialty Business Unit; (2) any employee of the unit; or (3) any accomplishment, initiative, project, or resource allocation in the unit.

104. Fenner complained that the presenter did not reference the Specialty Business Unit in the thirteen-fifteen slides. Several executives in the audience laughed when Fenner made this important objection.

**H.     USG Proposes Job Transfer to Lesser Position**

105.  At a break in the meeting on October 21, 2021, Ms. Earll approached
Fenner, referenced his passion for diversity, and asked if he would be interested in the
Senior Director, Talent Management, Diversity & Inclusion position.

106.  Fenner objected to the proposed transfer.

107.  Fenner was not interested in this change of position because he would
leave his role in Senior Leadership.

108. Fenner explained to Ms. Earll he could do greater good for the Company's
diversity profile, as a Black male, by working hard and succeeding as a senior executive.

109. The proposed transfer would have diminished Fenner's status from General
Manager to Senior Director, decreasing his chances of advancement within USG.

110. Fenner viewed the proposed transfer as an action to remove him from Ms.
Earll's team.

**I.     October 21, 2021: L&W Supply's Damaging Comments re: Fenner**

111.  On October 21, 2022, Ms. Earll, Joseph Holmes, USG President of
Gypsum, Chris Griffin, USG's Chief Executive Officer, had dinner with Dan Piche, a
White male and President of L&W Supply.

112.  Fenner did not learn of the dinner on October 21, 2021, until November 29,
2021.

113.  L&W is USG Ceilings Division's largest customer.

114.  At the dinner, Piche told Ms. Earll and the attendees: L&W Supply's leadership team[6] did not like working with Fenner; however, the L&W team liked working with Miklosz, a White male, the other General Manager in the Ceilings Division.

115.  Also, at the dinner (1) Ms. Earll twice asked Piche why the L&W leadership team did not like working with Fenner, and Piche refused to provide any reason in response to each question, and (2) Griffin asked the same question to Piche and received the same answer.

116.  USG, including Ms. Earll and Griffin, did not inform Fenner of the dinner or Piche's comments about Fenner until November 29, 2021.

117.  USG, never in Fenner's employment, criticized his performance, including his attitude and conduct, about: (1) services by Fenner and/or USG to L&W Supply or L&W Supply's customers or (2) his communications or relationships between Fenner and L&W Supply and/or between USG and L&W Supply.

**J.    October 22, 2021: Telephone Call – USG Ignores Fenner's Complaint**

118.  On October 22, 2021, Ms. Earll and Fenner had a telephone conversation, and Ms. Earll did not inform Fenner of the prior evening dinner with Piche or Piche's comments.

119.  Ms. Earll insisted to Fenner: (1) she, Mr. Griffin, and a few USG C-suite executives felt his comments after Miller's presentation were inappropriate; and (2) Fenner should apologize to Miller and his supervisor.

---

[6] Andy Callaway, Mark Sweeney, Jake Gress, and Tim Mahaffey.

120.  Fenner responded: (1) he would not apologize for yet another example of his complaints about being treated differently and significantly more adverse than Miklosz; and (2) the presentation disregarded Fenner's team members' work ethic, with the CEO and his team members sitting in the room.

121.  Fenner and Ms. Earll agreed it was best to end the call and regroup to continue the discussion about the topic which had been planned for this telephone call: a follow-up conversation on the White /non-White issue from the meetings on October 19-20, 2021.

**K.    November 29, 2021, Meeting: USG Informs Fenner of Employment Separation**

122.  On November 29, 2021, Ms. Earll and Paul Haney, USG' s Chief Labor Counsel, met with Fenner.

123.  At the meeting, Ms. Earll informed Fenner an anonymous ethics complaint had been filed against him with USG about Fenner's comments/conduct at the meeting on October 19, 2021.

124.  USG and Haney informed Fenner that USG had investigated the ethics complaint, and USG found Fenner had committed no ethics violation.

125. In the period between October 19, 2021 to November 29, 2021, no one from USG ever: (1) informed Fenner that an ethics complaint had been filed against him; (2) informed Fenner of the allegations of any complaint; (3) provided Fenner an opportunity to respond to the complaint; (4) interviewed Fenner in the investigation; or (5) informed Fenner the USG ethics committee had found in his favor – finding he committed no ethics violation.

16

126.  At the November 29, 2021, meeting, Haney stated to Fenner that some people he interviewed, despite the findings of the USG ethics committee, mentioned his conduct and comments at the October 19-20, 2021, meeting: (1) his comments made the leadership team feel uncomfortable; (2) he was not collaborative; and (3) his comments ruined the meeting.

127.  On November 29, 2021, Fenner objected to Ms. Earll and Haney about (1) Ms. Earll and USG not informing him of any objection by USG management, from October 19, 2021 - November 29, 2021, about his conduct at the October 19, 2021, meeting; and (2) USG not interviewing him in the investigation of the ethics complaint.

128.  Ms. Earll informed Fenner: "there is one more thing," and she described the discussion between Piche and the USG attendees at the October 21, 2021, dinner.

129.  Ms. Earll told Fenner, at the dinner: (1) twice, she asked Piche why the L&W Supply team did not like working with Fenner, and Piche refused to respond to provide an answer, and (2) Griffin asked Piche the same question and received the same response.

130.  On November 29, 2021, Fenner objected to Ms. Earll and Paul Haney about Ms. Earll's and USG's refusal to inform him, for a period over a month, from October 21, 2021 – November 29, 2021, of the L&W Supply dinner on October 21, 2021, including the comments by Piche, Ms. Earll, and Griffin at the dinner.

131.  On November 29, 2021, Fenner objected to USG, Ms. Earll, and Haney, about USG relying on the statement by Piche and L&W Supply and the refusal by Piche and L&W Supply to provide a reason for the statement at the October 21, 2021, dinner,

as a reason for terminating his employment, as USG stated to Fenner on November 29, 2021.

132.  At the November 29, 2021, meeting, Ms. Earll told Fenner: (1) he could retire with a six-month severance package or go through the performance improvement plan [PIP] process; (2) she did not believe he could "survive" the PIP process; and (3) if he failed the PIP process, he would be terminated with no severance payment.

133.  On November 29, 2021, Fenner objected to Ms. Earll and Haney about Ms. Earll and USG: (1) proposing to him and encouraging him to retire; (2) informing him they did not believe he would survive the PIP; and (3) informing him he would receive no severance pay if he failed the PIP.

134.  Ms. Earll told Fenner: "I strongly encourage you to retire."

135.  At the time of Ms. Earll's comment, Fenner was fifty years of age.

136.  Fenner decided not to retire and move forward with the PIP process.

137.  USG, because of its above conduct and comments, effectively separated Fenner from employment on November 29, 2021.

**L.    Discriminatory PIP Process and Termination of Employment**

138.  On or about December 2, 2022, Fenner objected to Ms. Earll about L&W Supply's and Piche's comments and conduct and USG's reliance on those comments and conduct in terminating his employment.

139.  Also, on or about December 2, 2021, Fenner complained to Ms. Earll about USG relying on L&W Supply's remarks at the dinner as a reason to terminate his employment.

140.  USG sent Fenner the PIP on or about December 13, 2021.

141.  Fenner revised the PIP and returned it to Ms. Earll on or about December 21, 2021.

142.  On or about December 14, 2021, Fenner requested the official record from the meeting on November 29, 2921, and USG denied his request.

143.  When USG placed Fenner on a PIP in December 2021, USG informed him Piche's comments at the dinner were a factor in placing him on a PIP.

144.  On January 6, 2022, in the first PIP meeting, Fenner objected to Ms. Earll and a USG HR official about the PIP process lacking transparency and documentation.

145.  Ms. Earll and a representative from HR informed Fenner they could not answer his questions and would stop the meeting, review his questions with USG's Chief Labor counsel, and later contact him.

146.  At the start of the second PIP meeting on January 11, 2022, USG, through Ms. Earll and Haney, terminated Fenner's employment.

147.  As a direct, foreseeable, and proximate result of USG's unlawful, intentional discrimination and retaliation, Fenner suffered compensatory damages and injuries, including but not limited to emotional pain, suffering, inconvenience, mental anguish, and loss of enjoyment of life.

148.  As a direct, foreseeable, and proximate result of USG's unlawful, intentional discrimination and retaliation, Fenner suffered economic damages and losses, including but not limited to lost earnings and potential earnings, including an actual loss of wages, income, benefits, diminution of earning capacity, loss of actual retirement benefits, and

future monetary losses.

149.  As a direct, foreseeable, and proximate result of L&W Supply's intentional and unlawful discrimination and interference discussed, Fenner suffered compensatory damages and injuries, including but not limited to emotional pain, suffering, and related losses.

150.  As a direct, foreseeable, and proximate result of L&W Supply's intentional and unlawful discrimination and interference discussed, Fenner suffered economic damages and losses, including but not limited to lost earnings and potential earnings, including an actual loss of wages, income, benefits, diminution of earning capacity, loss of actual retirement benefits, and future financial losses.

151. USG's unlawful employment practices were willful or done with malice or with reckless indifference to Fenner's rights under the laws of the United States to be free from racial discrimination in employment and retaliation for complaining about discrimination.

152. L&W Supply's unlawful employment practices were willful or done with malice or reckless indifference to Fenner's rights under the laws of the United States to be free from race discrimination in employment.

## VI. <u>CLAIMS FOR RELIEF</u>

### <u>FIRST CLAIM</u>

### [Retaliation - Title VII - USG]

153. Fenner incorporates and restates all allegations previously asserted as though incorporated.

154. Fenner asserts this claim against USG for unlawful retaliation in violation of Title VII, 42 U.S.C. § 2000e-3(a).

155. Title VII prohibits an employer from discriminating against an employee because the individual opposed any unlawful employment practice under the Act or made a charge or participated in any investigation or proceeding under the Act. 42 U.S.C. § 2000e-3(a).

156. Fenner had a good faith belief USG engaged in discriminatory and retaliatory conduct in violation of Title VII.

157. Fenner engaged in protected Title VII activities, and he opposed discriminatory and retaliatory conduct prohibited by Title VII. [Fenner's protected activities].

158. Fenner's internal, informal, and formal complaints to USG supervisors, managers, and officials are protected activities.

159. Fenner's protected activities are previously set forth in the GENERAL ALLEGATIONS.

160. At all times, USG was aware of Fenner's protected Title VII activities.

161. USG intentionally retaliated against Fenner by subjecting him to continual, intentional, cumulative, increasingly severe, and materially adverse employment actions that might deter a reasonable person from engaging in protected activity.

162. USG's adverse material actions against Fenner include but are not limited to the actions below.

163. USG criticized Fenner based on his alleged anger and disruptive conduct, a racist stereotype.

164. USG tried to transfer Fenner to a position with less prestige and opportunity for advancement than his General Manager position.

165. USG encouraged and pressured Fenner to retire.

166. USG effectively separated Fenner from his employment on or before November 29, 2021.

167. USG conducted the PIP in a discriminatory and retaliatory manner.

168. USG prejudged Fenner's performance on the PIP, telling him he was not likely to complete the PIP and keep his job successfully.

169. USG pressured Fenner to retire by informing him he would not receive severance pay if he tried to complete the PIP and failed.

170. USG discriminated against and retaliated against Fenner by terminating Fenner on the second day of the PIP process.

171. In the period between October 19, 2021, to November 29, 2021, USG did not: (1) inform Fenner that an ethics complaint had been filed against him; (2) inform him of the allegations; (3) provide him an opportunity to respond; (4) interview him in the investigation; or (5) inform him the USG ethics committee had found in his favor: he committed no violations.

172. For over one month, from October 21, 2021, through November 29, 2021, USG did not inform Fenner of the dinner with L&W Supply and the damaging content of L&W Supply's statement about Fenner and L&W Supply's refusal to justify its negative

statement about Fenner.

173. USG relied on L&W Supply's statements and conduct at the dinner to terminate Fenner's employment.

174. USG terminated Fenner's employment.

175. USG intentionally took material adverse actions against Fenner because he engaged in lawfully protected conduct under Title VII and opposed race discrimination, an unlawful practice under Title VII.

176. USG, but-for Fenner's protected conduct and his opposition to race discrimination, would not have taken the material adverse employment actions against him, including terminating his employment and denying him his right to be free from retaliation and race discrimination under Title VII.

177. A causal connection exists between Fenner's protected activities and the unlawful materially adverse employment actions taken by USG against Fenner.

178. USG, contemporaneously with and/or right after Fenner's protected activities, engaged in an intentional, calculated, and purposeful campaign of unlawful retaliation, subjecting him to intentional, cumulative, materially adverse actions.

179. The intentional, unlawful retaliation was created, perpetrated, and/or tolerated by USG's officials, managers, and employees.

180. USG's treatment of Fenner, considered in its totality and cumulative manner, is direct, intentional, and materially adverse action constituting unlawful retaliation and discrimination prohibited by Title VII.

181. USG's treatment of Fenner is unlawful intentional retaliation and discrimination in violation of Title VII, 42 U.S.C. § 2000e-3(a), and an intentional, unlawful discriminatory practice in violation of 42 U.S.C. § 1981a.

## SECOND CLAIM

### [Race Discrimination – Title VII – USG]

182. Fenner incorporates and restates all allegations previously asserted as though incorporated.

183. Fenner asserts this claim against USG for unlawful race discrimination in violation of Title VII, 42 U.S.C. § 2000e–2(a)(1) (2).

184. Title VII prohibits employers from discriminating against any employee regarding the terms, conditions, or privileges of employment because of the person's race; or taking any action to deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect one's employee status because of race. 42 U.S.C. § 2000e–2(a)(1) (2).

185. Fenner's performance as General Manager was excellent.

186. Fenner belongs to a protected Title VII class because of his race.

187. Fenner was qualified for his position, and he successfully performed his duties.

188. USG terminated Fenner's employment because of his race.

189. USG intentionally discriminated against Fenner by terminating his employment because of his race.

190. USG's actions occurred under circumstances giving rise to an inference of discrimination.

191. To the extent USG has any justifications for terminating Fenner's employment, the justifications are unworthy of credence and belief, and USG did not act for any asserted non-discriminatory reasons.

192. Defendant's treatment of Fenner is unlawful intentional discrimination based on race in violation of Title VII, 42 U.S.C. § 2000e–2(a)(1)(2), and an intentional, unlawful discriminatory practice in violation 42 U.S.C. § 1981a.

## <u>THIRD CLAIM</u>

### [Retaliation – Section 1981 - USG]

193. Fenner incorporates and restates all allegations previously asserted as though incorporated.

194. Fenner asserts this claim against USG for unlawful retaliation in violation of Section 1981.

195. Section 1981 prohibits race discrimination in all parts of the employment relationship, including all aspects of the contractual relationship, including the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship.

196. Section 1981 prohibits USG from unlawful retaliation and discrimination against Fenner because he engaged in activities protected by Section 1981.

197. USG intentionally retaliated and discriminated against Fenner in violation of Section 1981.

198. Fenner had a good faith belief USG engaged in discriminatory and retaliatory conduct violating Section 1981.

199. Fenner engaged in protected activities by complaining of race discrimination and retaliation and opposing conduct constituting unlawful race discrimination and retaliation. These activities are protected under Section 1981.

200. USG was aware of Fenner's protected activities.

201. USG, contemporaneously with, and/or right after, Fenner's repeated, protected activities, took actions against him that a reasonable employee would have found materially adverse.

202. USG intentionally retaliated against Fenner by subjecting him to intentional, cumulative, and increasingly severe, materially adverse, and discriminatory actions.

203. USG took material adverse actions against Fenner because he engaged in lawfully protected conduct under Section 1981 and opposed race discrimination and retaliation, an unlawful practice under Section 1981.

204. USG, but-for Fenner's protected conduct and opposition to race discrimination and retaliation, would not have taken the material adverse employment actions against him, including terminating his employment and denying him his right to be free from retaliation and race discrimination under Section 1981.

205. A causal connection exists between Fenner's protected activities and the unlawful materially adverse employment actions taken by USG against him.

206. USG's retaliation interfered with Fenner's protected activity of having the right to make or perform a contract in his employment relationship with USG.

207. USG's conduct deprived Fenner of his employment and equal employment opportunities and otherwise harmed his employment status with USG because of his protected activities.

208. USG's treatment of Fenner, considered in its totality and a cumulative manner, constitutes unlawful, direct, intentional, materially adverse, retaliatory, and discriminatory actions prohibited by Section 1981.

209. USG's materially adverse treatment of Fenner is intentional unlawful retaliation and intentional, unlawful discriminatory practices in violation of Section 1981 and 42 U.S.C. § 1981a.

## FOURTH CLAIM

### [Race Discrimination – Section 1981 - USG]

210. Fenner incorporates and restates all allegations previously asserted as though incorporated.

211. Fenner asserts this claim against USG for unlawful race discrimination retaliation in violation of Section 1981.

212. Section 1981 prohibits race discrimination in employment.

213. USG intentionally discriminated against Fenner based on his right in violation of Section 1981.

214. Fenner is a member of a Section 1981 protected group based on his race.

215. USG employed Fenner.

216. Fenner performed all his duties successfully.

217. USG's unlawful discriminatory practices include but are not limited to: (1)

intentionally terminating Fenner from employment because of his race and (2) subjecting him to racially discriminatory disparate treatment.

218. USG, but-for Fenner's race, would not have terminated his employment, denying him his right to be free from race discrimination under Section 1981.

219. USG terminated Fenner under circumstances justifying an inference of race discrimination.

220. USG's racial discrimination interfered with Fenner's protected activity of having the right to make or perform a contract in his employment relationship with USG.

221. USG's racial discrimination deprived Fenner of his employment, equal employment opportunities and otherwise harmed his employment status with USG because of his race.

222. USG's treatment of Fenner is intentional, unlawful race discrimination in violation of Section 1981 and 42 U.S.C. § 1981a.

## FIFTH CLAIM

### [Interference with Continuing Business Relations – L&W Supply]

223. Fenner incorporates and restates all allegations previously asserted as though incorporated.

224. Fenner asserts this claim against L&W Supply for third-party improper and unlawful interference with Fenner's continuing and/or prospective business relationship with USG.

225. USG employed Fenner.

226. Fenner performed all his duties successfully in his business and employment relationship with USG.

227. L&W Supply knew of Fenner's employment and business relationship with USG.

228. In his employment with USG, Fenner performed all his duties successfully in the business relationship between (1) USG and L&W Supply; and (2) the relationship between Fenner and L&W Supply and L&W Supply's customers.

229. Before November 29, 2021, USG referenced no problem with Fenner about his job performance, attitude, conduct, or communications relating to services performed by Fenner and/or USG to L&W Supply, L&W Supply's customers.

230. Also, before November 29, 2021, USG referenced no problem with Fenner about relationships between Fenner and L&W Supply and/or between USG and L&W Supply.

231. In the dinner on October 21, 2022, Piche told Ms. Earll and the attendees that L&W Supply's Leadership team did not like working with Fenner; however, the L&W team liked working with Miklosz, a White male, the other General Manager in the Ceilings Division.

232. At the dinner, (1) twice, Ms. Earll asked Piche why the L&W leadership team did not like working with Fenner, and Piche refused to provide any reason, and (2) Griffin asked the same question to Piche and received the same answer.

233. At the dinner, L&W Supply expressed that it liked working with Miklosz, the White male General Manager, but did not like working with Fenner, the only Black USG

General Manager working with L&W Supply and the highest-ranking USG Black employee working with L&W Supply.

234. Despite three requests by USG, L&W Supply refused to provide any reason to USG for stating it did not like working with Fenner, and therefore refused to provide any legitimate business reason for not liking to work with Fenner and making damaging statements about him.

235. USG effectively separated Fenner from employment on or before November 29, 2021.

236. At the meeting on November 29, 2021, Ms. Earll and USG told Fenner a reason for its decision was the comments/conduct by L&W Supply at the dinner on October 21, 2021.

237. USG relied on L&W Supply's comments and conduct at the dinner to effectively separate Fenner from employment on November 29, 2021.

238. L&W Supply's comments and conduct resulted in USG terminating its employment relationship with Fenner.

239. L&W Supply intentionally, improperly, and unlawfully interfered with Fenner's continuing and prospective business and employment relationship with USG because it had no legitimate reason to inform USG it did not like working with Fenner; a Black man and General Manager, but liked working with Miklosz, a White male and General Manager in the same Division.

240. L&W Supply's intentional, improper, and unlawful interference was a reason for USG terminating Fenner's employment.

241. L&W Supply's intentional and improper conduct and interference occurred under circumstances justifying an inference that its comments and conduct damaging Fenner was taken: (1) because of Fenner's race; or (2) for no legitimate business reason.

## SIXTH CLAIM

### [Race Discrimination – Section 1981 - L&W Supply]

242. Fenner incorporates and restates all allegations previously asserted as though incorporated.

243. Fenner asserts this claim against L&W Supply for race discrimination against Fenner in violation of Section 1981.

244. Fenner is in the protected Section 1981 class based on his race.

245. Section 1981 prohibits racially discriminatory interference by a third party with a person's employment.

246. L&W Supply intentionally discriminated against Fenner because of his race.

247. The unlawful employment practices include but are not limited to, disparate treatment during events leading to Fenner's discharge from employment.

248. Fenner performed all his USG duties successfully.

249. USG terminated Fenner's employment because of L&W's damaging comments and conduct about Fenner.

250. L&W Supply, but-for Fenner's race, would not have made the damaging, unsupported comments about Fenner to USG, causing USG to terminate Fenner's employment, denying him his right to be free from race discrimination under the laws of the United States.

251. Defendant L&W Supply engaged in intentional unlawful, racially discriminatory practices against Fenner, causing him to be terminated from his employment with USG because of his race.

252. L&W Supply's racial discrimination interfered with Fenner's protected activity of having the right to make or perform a contract in his employment relationship with USG within the meaning of Section 1981.

253. L&W Supply's conduct deprived Fenner of his employment and equal employment opportunities and otherwise harmed his employment status with USG because of his race.

254. L&W Supply intentionally discriminated against Fenner because of his race.

255. L&W Supply's conduct was taken under circumstances justifying an inference of race discrimination.

256. L&W Supply's treatment of Fenner is intentional, unlawful race discrimination in violation Section 1981 and 42 U.S.C. § 1981a.

## <u>SEVENTH CLAIM</u>

### [Hostile Work Environment Claim Based on Race – Section 1981]

257. Fenner incorporates and restates all allegations previously asserted as incorporated herein.

258. Fenner asserts this claim against USG for race discrimination, in the form of a hostile work environment based on race, in violation of Section 1981.

259. Racial discrimination and harassment in employment, in the form of a hostile work environment based on race, is prohibited by Section 1981.

260.  USG subjected Fenner to unlawful racial discrimination, in the form of a racially hostile work environment, in violation of Section 1981.

261.  Considering all facts cumulatively, USG intentionally created, tolerated, and perpetuated a hostile and abusive work environment based on race against Fenner.

262.  Fenner is a member of a Section 1981 protected group because of his race.

263.  USG subjected Fenner to racial harassment.

264.  The harassment was racial, specifically, solely, and only directed at Fenner because of his race and Section 1981 protected class.

265.  USG's racial conduct and comments directed at Fenner were unwelcome and offensive.

**A.    Cumulative, Targeted Racial Conduct**

266. USG's racial conduct and comments were severe or pervasive.

267. The totality of targeted racial conduct includes but is not limited to the following.

270.   As discussed, Fenner was singularly situated within the USG organization.

271.   Fenner was: (1) the highest-ranking Black employee of about six thousand employees; (2) the only Black person serving as a General Manager among four General Managers; (3) the only Black person to ever serve as a General Manager with USG; and (4) serving in the upper 1% of employees in USG's organizational structure.

272.  On or about February 2, 2021, USG and Ms. Earll confronted and admonished Fenner by alleging he was angry and disruptive at a meeting on February 2, 2021.

273.  Fenner was not angry or disruptive.

274.  USG and Ms. Earll, by attacking Fenner based on the contention he was angry and disruptive, evaluated his conduct based on an offensive, discriminatory, racist stereotype of Black men.

275. Fenner objected to Ms. Earll and Cleary, the Chief of HR, about Ms. Earll's use of the racial stereotype.

276. Fenner stressed to Ms. Earll and Cleary that Ms. Earll's use of the "stereotype words" was particularly egregious because Ms. Earll held a powerful, high-level executive position within USG.

277. USG and Ms. Earll's actions perpetuated a racist stereotype of Black men as angry and dangerous.

278. Fenner was the only Black person in the meeting on February 2, 2021.

279. Before the events in issue, Ms. Earll made the same allegation against Fenner when she supervised him when they held different positions.

280. At a meeting after the above February 2021 meeting, on October 19, 2021, at a Leadership Team meeting of the Ceilings Department held offsite, USG subjected Fenner to USG's offensive categorization and labeling of employees by designating employees as White and non-White.

281. Like the February 2, 2021, meeting, Fenner was the only Black person in attendance at the October 19-20, 2021, meeting.

282. In the meeting, Fenner objected to USG's race-based categorization/labeling on October 19, 2021, and October 20, 2021.

283. On October 21, 2021, Fenner attended an Executive Innovation meeting where Tim Miller, Director of Ceilings, Laboratory, a White male executive, presented to about forty USG executives. Miller intentionally ignored Fenner's Leadership Contribution.

284. Fenner objected to USG and Miller ignoring his contribution. MS. Earll, in anger, criticized Fenner for objecting.

285. On the day after this meeting, October 21, 2021, USG did not protect Fenner at a dinner with L&W Supply.

286. At the dinner, L&W Supply, USG's largest customer, stated it did not like working with Fenner but liked working with Miklosz, a White General Manager.

287. Despite three requests from USG about why it did not like working with Fenner, L&W Supply provided no explanation. It, therefore, refused to provide any legitimate business reason for not liking to work with Fenner and making the damaging statement about him.

**B.    Tangible Employment Action: Reliance on Race-Based Reasons**

288. USG's subjected Fenner to a racially hostile work environment, culminating in the termination of his employment.

289. Ms. Earll, Fenner's supervisor, initiated, perpetuated, tolerated, and collaborated in the racially hostile work environment imposed on Fenner and the termination of his employment.

290. On November 29, 2021, the date USG informed Fenner he should retire because he was unlikely to succeed on any PIP, USG provided Fenner two alleged

reasons for his discharge, and both reasons are tainted with circumstances supporting an inference of race discrimination.

291. First, on November 29, 2021, for the first time, USG told Fenner that an investigation of his conduct October 19- 20, 2021, revealed: (1) his comments made the leadership team feel uncomfortable; (2) he was not collaborative; and (3) his comments ruined the meeting.

292. These three points support an inference of a racial stereotype of an angry Black man; USG relied on these points: (1) Fenner's comments made the leadership team feel uncomfortable; (2) he was not collaborative; and (3) his comments ruined the meeting on October 19-20, 2021.

293. Fenner's comments at the October 19-20, 2021, meeting addressed a racially offensive practice at USG.

294. Second, on November 29, 2021, USG informed Fenner of L&W Supply's damaging statements for the first time.

295. L&W Supply's harmful statements were made against Fenner, while it  made positive statements about Miklosz, and L&W Supply provided no legitimate business reason for the comments.

296. USG explicitly relied on L&W Supply's statements as a reason to terminate Fenner's employment.

297. From October 19-20, 2021, until November 29, 2021, a period of about six weeks, USG did not protect Fenner from the damaging comments made about him by Piche with L&W Supply.

298. From October 19-20, 2021, through November 29, 2021, USG never: (1) criticized Fenner's conduct at the October 19-20, 2021, or discussed the matter with him to hear his views and explanation of why USG's comments and categorization/labeling practices were offensive; (2) informed him of the L&W Supply comments; and (3) informed him of any complaint against him or any opportunity to participate in the investigation.

299. USG's racial conduct and harassment targeting Fenner altered his employment terms, conditions, or privileges, creating an abusive working environment involving discriminatory intimidation, ridicule, and insult, causing him emotional and/or physical harm.

300. USG, but-for Fenner's race, would not have subjected Fenner to a hostile work environment based on race, resulting in the termination of his employment and the denial of his right to be free from race discrimination under Section 1981.

301. USG acted under circumstances justifying an inference of race discrimination.

302. USG's racially hostile work environment interfered with Fenner's protected activity of having the right to make or perform a contract in his employment relationship with USG.

303. USG's racially hostile work environment deprived Fenner of his employment, equal employment opportunities and otherwise harmed his employment status with USG because of his race.

304.  USG is liable for subjecting Fenner to the racially hostile work environment claim because Ms. Earll was Fenner's supervisor, and she initiated, perpetuated, tolerated, and corroborated the harassment. The harassment resulted in an adverse tangible employment action, the termination of his employment.

305. USG's treatment of Fenner is an intentional, unlawful, hostile work environment based on race and an intentional unlawful discriminatory practice in violation of Section 1981 and 42 U.S.C. § 1981a.

## EIGHTH CLAIM

**[Hostile Work Environment Claim Based on Race – Title VII]**

306. Fenner incorporates and restates all allegations previously asserted as incorporated herein.

307.  Fenner asserts this claim against USG for race discrimination, as a hostile work environment based on race, in violation of Title VII.

308.  Racial discrimination and harassment in employment, in the form of a hostile work environment based on race, is prohibited by Title VII.

309. USG subjected Fenner to unlawful racial discrimination, in the form of a racially hostile work environment, in violation of Title VII.

310. Fenner incorporates all allegations in his above Seventh Claim and asserts the allegations supporting his Title VII claim for a racially hostile work environment.

311. Defendant's treatment of Fenner is unlawful intentional race discrimination in the form of a hostile work environment based on race, in violation of Title VII, 42 U.S.C. § 2000e–2(a)(1)(2); and an intentional, unlawful discriminatory practice in violation of 42

U.S.C. § 1981a.

## VII. REQUEST FOR RELIEF

WHEREFORE, Earl Fenner, Jr., respectfully requests this Court to enter judgment in his favor and against USG and L&W Supply on the claims asserted in this Complaint and Request for Jury Trial, and in addition, for the following relief.

1.  To enter a judgment for Fenner and against USG, finding the acts of USG are continuing and intentional discrimination, as retaliation, in violation of Title VII and Section 1981.

2.  To enter a judgment for Fenner and against USG, finding the acts of USG are continuing and intentional race discrimination in violation of Title VII and Section 1981.

3.  To enter a judgment for Fenner and against USG, finding the acts of USG are continuing and intentional race discrimination in the form of a hostile work environment based on race, in violation of Title VII and Section 1981.

4.  To award Fenner the remedies of damages against USG for back pay, restored benefits, actual monetary damages, loss of wages, salary, retirement contributions, all loss of income, and all loss of monetary damages to which he is entitled under Title VII and Section 1981.

5.  To award Fenner compensatory damages against USG for emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, future monetary losses, and all loss of compensatory damages to which he is entitled under Title VII and Section 1981.

6.   To award Fenner punitive damages against USG to which he is entitled under Title VII and Section 1981.

7.   To award Fenner reinstatement, or in the alternative, front pay, against USG, under Title VII and Section 1981.

8.   To enter a judgment for Fenner and against L&W Supply, finding the acts of L&W Supply are unlawful interference with the continuing and prospective business relationship between Fenner and USG.

9.   To enter a judgment for Fenner and against L&W Supply, finding the acts of L&W Supply are unlawful race discrimination against Fenner under Section 1981.

10. To award Fenner damages against L&W Supply for loss of back pay, economic damages, and compensatory damages for emotional distress and related injuries.

11. To award Fenner punitive damages against L&W Supply on Fenner's race discrimination claim under Section 1981 against Fenner.

12. To award Fenner attorney fees and costs against USG under Title VII, Section 1981, 42 U.S.C. § 1988, and all laws to which he is entitled to receive attorney fees and costs.

13.   To award Fenner attorney fees and costs against L&W Supply under Section 1981, 42 U.S.C. § 1988, and all laws to which he is entitled to receive attorney fees and costs.

14.   To award Fenner, against USG and L&W Supply, to pay pre-judgment and post-judgment interest at the proper rate provided by law.

15.   To direct USG and L&W Supply to take such affirmative relief steps as are necessary to ensure the effects of Defendants' unlawful employment practices are eliminated and do not continue to affect Fenner's employment opportunities.

16.   To award Fenner all other legal and equitable relief to which Fenner is entitled under any law that this Court considers just, equitable, and proper.

## VIII. JURY TRIAL REQUEST

Under Fed.R.Civ.P. 38 (a)(b)(c), 42 U.S.C. § 2000e-5, and 42 U.S.C. § 1981a (c)(1), and all applicable laws providing for a right to trial by jury, Fenner requests a jury trial of all claims and issues.

Dated: February 27, 2023.


Respectfully submitted,

*/s/ Steven L. Murray*
Murray Law, LLC
3900 East Mexico Avenue, Suite 300
Denver, CO  80210
Telephone: (303) 396-9952
E-mail: steven@smurraylaw.com

Plaintiff's Address:
8926 Ridgepoint Way
Castle Pines, CO  80108