**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No.  1:23-cv-00525-CNS-KAS

EARL FENNER, Jr.
An individual,

      Plaintif

      f. v.

UNITED STATES GYPSUM COMPANY
A Delaware corporation.

      Defendant.

---

**PLAINTIFF'S EXPERT WITNESS DISCLOSURE
PURSUANT TO FED. R. CIV. P. 26(a)(2)(B)**

**[DR. DAPHNA MOTRO, PhD: REPORT]**

---

Exhibit #

**Motro 86**

04/03/24 - KS

000348

<u>TABLE OF CONTENTS</u>

I.    OVERVIEW                                                                    1

II.   OPINIONS                                                                    1

III.  FACTS AND DATA CONSIDERED                                                   2

IV.   DISCUSSION                                                                  3

    1.  Overview and Definition of Stereotypes                                3

    2.  How Stereotypes Originate                                            4

    3.  Why We Use Stereotypes                                               5

    4.  How Stereotypes Affect our Perceptions of Others' Behaviors         9

    5.  Stereotypes, Hierarchies, and Decision-Making                      11

    6.  How Hierarchies Affect Stereotype-Based Decisions                  13

    7.  Consequences of Using Stereotypes                                  14

    8.  The Stereotype of the "Angry Black Man"                            15

    9.  USG's & Diane Earll's Behaviors Directed Toward Mr. Fenner
    Exhibit the "Angry Black Man" Stereotype                              17

    10. Mr. Fenner's Objections to Ms. Earll's "Angry" Label              22

    11. Power Structure                                                   25

    12. USG's & Diane Earll's Stereotype Usage Yielded Harmful
    Consequences                                                         26

    13. Categorizing People as "White v. Non-White"                      28

    14. Objections by a Black Man                                         30

000349

15. "White v. Non-White" and Angry Black Man Stereotype     31

16. Future Employment     32

17. Summary     34

V.     EXHIBITS USED OR SUMMARIZED TO SUPPORT OPINIONS     35

VI.     PERSONAL QUALIFICATIONS     36

VII.     PRIOR CASES & TESTIMONY     36

VIII.     STATEMENT OF COMPENSATION     36

IX.     VERIFICATION     36

X.     REFERENCES     36

000350

DocuSign Envelope ID: C2013921-7C1A-4994-B520-482E455E3190

## I.  <u>OVERVIEW</u>

Plaintiff Earl Fenner Jr. has retained me, Daphna Motro, PhD, as an expert witness.

I am the Chair of the Institutional Review Board, Associate Professor of Management & Entrepreneurship, Frank G. Zarb School of Business, Hofstra University. Outlined in this report are (1) my opinions, (2) facts and data considered by me in forming my opinions, (3) exhibits used or summarized to support my opinions, (4) my qualifications, (5) cases in which I have testified in the last four years, and (6) statement of compensation.

This report addresses racial stereotypes, race discrimination in employment and organizations, and racial barriers in post-organization employment.

## II.  <u>OPINIONS</u>

A historic, recognized, racially offensive stereotype of a Black man portrays the Black man as angry and dangerous. [Angry Black Man].

The above stereotype is often referred to as a racial trope. A trope is a common or overused theme or idea.

The Angry Black Man stereotype is well-recognized in employment and organizational behavior.

Actions based on the use and/or consideration of the Angry Black Man stereotype may support a finding that the actor relying on the stereotype is making decisions or statements with a discriminatory bias.

The person labeling a Black man as angry and relying on the stereotypes may act in a discriminatory manner despite not being aware of the stereotype.

1

000351

DocuSign Envelope ID: C2013921-7C1A-4994-B520-482E455E3190

The severity of the discriminatory consequences of the Angry Black Man stereotype may increase in severity when the person relying on the stereotype holds a more significant position of authority and control over the Black man who is labeled angry.

The severity of the discriminatory consequences of the Angry Black Man stereotype may increase in severity when the person labels a Black man as angry, and the Black man (1) objects to the actor who labels him angry, (2) informs the actor that the labeling of him as angry is a racial stereotype, which is racial discrimination, (3) informs the official in the actor's organization that his objection is based on race, and (4) the official informs the actor that the Black man has complained to the official about the actor labeling him as angry and the objection was based on race.

Black men who have achieved a high level of executive success in the culture of a single large corporation in a single industry encounter significant racial barriers in attempting to move into a comparable corporate executive leadership position after being terminated from their initial employment.

## III.  <u>FACTS AND DATA CONSIDERED</u>

The opinions and discussion herein are based on:

1.  My experience, professional study, and research, as indicated in this report's "references" section.

2.  Factual allegations in Mr. Fenner's First Amended Complaint and Request for Jury Trial.

3.  Review of parts of Diane Earll's deposition.

4.  Review of email exchanges between Mr. Fenner and Noreen Cleary.

5.  Review of Mr. Fenner's resume.

000352

6.  Discussions with Steven L. Murray, Mr. Fenner's attorney and Mr. Fenner.

## IV.  **DISCUSSION**

### 1. **Overview and Definition of Stereotypes**

Humans interact with each other constantly. In the workplace, especially, healthy communication among employees is key to meeting organizational goals, creating a safe work climate, and fostering positive work relationships between colleagues (Mikkola & Valo, 2019).

Communication can take on several different forms, including verbal and non-verbal. Verbal communication includes actions such as speaking, emailing, and memoranda, while non-verbal communication includes actions such as facial expressions, tone of voice, or even lack of speaking at all. Together, the use of verbal and non-verbal communication lays the foundation for relationships among employees. Healthy verbal communication, such as using respectful terms in addressing each other, is particularly important in the workplace, as employees often use presentations and meetings to convey whether an organization is meetings its goals (Mikkola & Valo, 2019).

Importantly, when it comes to verbal communication, humans often use deeply embedded assumptions in deciding what to say (Sasso & González-Morales, 2018). When we make assumptions about the person we are speaking with, the words we use are no longer random. For instance, when speaking with junior employees who just joined a company, we may make certain types of assumptions. We recognize that such employees might not be familiar with all aspects of the job, and when it comes to communicating, we use simpler terminology. However, we are significantly more likely to utilize different assumptions when speaking with a seasoned employee who has been in a position for decades. We are more likely to assume they

3

know various aspects of the job and communicate with complex terms more common in the industry.

However, while some assumptions are helpful, such as those that can help us distinguish between junior versus senior employees, other assumptions may be extremely detrimental. One example of a particularly harmful assumption is a *stereotype*.

A stereotype is a broad generalized assumption we make about a group of people, based on surface-level characteristics, such as race and gender (Spencer et al., 2016). Such assumptions are often unfair and discriminatory, tending to be harmful for the person who belongs to one of the stigmatized groups. Fundamentally, stereotypes oversimplify a person, leading an observer to make certain assumptions about an individual even if they may not be true. For instance, assuming that a Black man is dangerous or threatening is an example of a stereotype (Goffin, 2022). Despite an array of research that has continuously shown that stereotypes are harmful, people continue to use them in shaping their perceptions of others and how they arrive at certain decisions (Landy, 2008).

### 2.  <u>How Stereotypes Originate</u>

Stereotypes originate in society through several channels, including the media, cultural factors, and neurological development. As stereotypes develop, they become more durable, becoming sturdier with age (Gilmour, 2015). Thus, once ingrained in our cognitive processing, trying to change, reverse, or suppress stereotypical thinking becomes more and more difficult.

<u>Media</u>. The media, including movies, television, and advertisements, shape our assumptions of others. They convey messages about what are appropriate or inappropriate actions and roles for members of particular social groups (Gorham, 1999). Such messages are considered important because of what they do to the viewer and what they mean to the viewer.

000354

DocuSign Envelope ID: C2013921-7C1A-4994-B520-482E455E3190

The messages generate a learning process in which a viewer starts to understand how certain people behave and initiate the creation of specific stereotypes. This process is particularly applicable in the media; starting from an early age, we are continuously exposed to movies, television, and advertising (Cingel & Krcmar, 2013). We begin to learn how individuals speak and behave.

For instance, in movies and television, it is certainly typical for the role of "thugs" or "criminals" to be played by Black men (Jones, 2013). In many cases, Black men are characterized as violent, menacing, and threatening to other protagonists in the plot (Spence, 2017). Continuous exposure to Black men in these roles is not without consequence.

Psychological research on stereotypes suggests that viewers begin to internalize this information, the characterization of Black men as violent, menacing, and threatening to others, conclude that Black men are "aggressive", not only on screen, but in real life. (Gray, 1996). After all, the question becomes why would a Black man be consistently portrayed this way on screen if he is not like that in real life? Given that a stereotype is a broad generalized assumption we make about a group of people, repeated exposure to certain characterizations of a social group can ultimately form assumptions about that group. We then might draw upon these stereotypes when encountering a Black man in the real world and make the false assumption that he might be, for instance, an inappropriately aggressive person.

Cultural Factors. Cultural factors play a role in stereotype origination. Many individuals grow up in households, cities, or countries in which norms are deeply ingrained into the culture. Culture is defined as a set of shared meanings and practices that are communicated and reinforced among group members that, in turn, influence the values and behaviors of their members (Chiu & Hong, 2007). Culture is often considered a vehicle through which general

5

000355

assumptions about a group (i.e., stereotypes) are transmitted (Williams & Spencer-Rogers, 2010). Living with or interacting among group members who share the same practices is a way to learn what is appropriate and what is not. To maintain membership in a group or be able to identify with a culture, individuals might subscribe to these practices, even if they would be considered stereotypical by a third party. For instance, a Black individual might grow up in a culture where African-American Vernacular English (AAVE) is commonly practiced, and to maintain membership in that group he/she might also speak AAVE. However, this might include using double negative statements or slang words, which contributed to the origin of the stereotype that Blacks are poorly educated (Johnson, 2000).

Neurological Origins. The use of stereotypes has neurological origins. Given that stereotypes contain numerous components, such as assumptions, perceptions of people, and predictions about what a person might do, they are considered more complex than other categories of information (e.g., the color of an object), and thus utilize multiple parts of the brain. Indeed, stereotype usage has been linked to numerous neural correlates, including the amygdala, the prefrontal cortex, posterior cingulate, and anterior temporal cortex (Gilmour, 2015). Using fMRI scans, researchers found that negative racial stereotypes activated brain regions associated with arousal, inhibition, and control (Forbes et al., 2012). For instance, Forbes et al. (2012) found that compared to White faces, exposure to Black faces activated the amygdala, an area of the brain associated with emotion. Subsequent analyses found that most participants were unable to regulate this activation, meaning that an individual's emotions can influence his/her reaction towards a Black person, but not a White person. Overall, neurological evidence indicates that stereotyping might be so ingrained into our cognitive processing that it is even reflected in our brain activity (Mitchell et al., 2009).

000356

DocuSign Envelope ID: C2013921-7C1A-4994-B520-482E455E3190

3.  **Why We Use Stereotypes**

Humans use stereotypes for a variety of reasons, including a natural tendency to categorize information in our environment, a chance to conserve cognitive resources, and an opportunity to reduce uncertainty.

Starting in early childhood, we make significant efforts to make sense of the complex and stimulating world around us. One way to simplify our understanding of the environment is to sort information into different categories (Crick & Dodge, 1994). Early in life, this could mean something as simple as separating moving objects from still objects. We then develop different ways of interacting with moving objects versus still objects. However, as we grow up, simplifying our environment becomes more sophisticated. Research has shown that as adults, we have a powerful tendency to perceive an individual *as* something, rather than simply perceive the individual for who he/she is. For instance, we would tend to place a tall, dark-skinned individual into the "Black man" category rather than perceive that person as just a tall, dark-skinned individual (Goldstone et al., 2003). By doing so, we de-complicate our environment. Now that we have categorized this individual as a Black man, we can draw upon a pre-determined set of criteria to simplify our interaction (e.g., recognizing certain topics or terms we should use or avoid).

Not only do we have a natural tendency to categorize information, we only have a certain amount of resources available to us each day (also known as conservation of resources theory; Halbesleben et al., 2014). For instance, time is considered a valuable and limited resource. Regarding perceptions, interactions, and decision-making, stereotypes can be time-efficient. More specifically, stereotypes can serve as "mental shortcuts" that can help us process and act upon information more quickly.

000357

DocuSign Envelope ID: C2013921-7C1A-4994-B520-482E455E3190

For instance, one stereotype is that Black individuals are particularly interested in sports and athletics (Moskowitz & Carter, 2018). Imagine you are an employee interested in discussing the results of a sports game from the previous night. Instead of considering each employee in your department or organization and whether they would be interested in talking about sports, you might use this stereotype and approach the Black employee first. Many would consider this "shortcut" to be both time- and energy-efficient. Given that we have limited resources available, it can become perhaps more understandable why individuals might utilize stereotypes in different situations.

Uncertainty reduction also motivates using stereotypes (Kunda & Thagard, 1996). Being in a state of uncertainty is deeply distressing for many individuals. This uncertainty could mean not knowing what something means or what will happen in the future, and we often search for mechanisms that will help reduce uncertainty. When we are exposed to an ambiguous event, stereotypes can help guide how we interpret that event until we are certain what it means. For example, an elbow nudge is an ambiguous behavior that can be interpreted as a violent shove or jovial push.

Given the widespread stereotype that Black men tend to be more violent than White men (Gorham, 2006), an elbow nudge by a Black man is more likely to be interpreted as a violent shove, which aligns with this stereotype. On the other hand, an elbow nudge by a White man is more likely to be interpreted as a jovial push. The most likely interpretation of ambiguous information is the interpretation that maximizes the alignment between any relevant stereotypes and the observed behavior (Thagard & Verbeurgt, 1998). This way, the uncertainty with which we interpret the elbow nudge is reduced. Accordingly, any stress associated with the uncertainty is also reduced.

000358

DocuSign Envelope ID: C2013921-7C1A-4994-B520-482E455E3190

Another example would be a Black man using a loud voice when making a point. A loud voice can be interpreted in different ways – it can be seen as an indication of passion and enthusiasm, or, contrarily, as an indicator of anger and frustration. If a Black man is speaking in a loud voice (compared to a White man), it will more likely than not be interpreted as angry given the widespread stereotype of the Angry Black Man (Jackson & Wingfield, 2013); and there is no similar stereotype for White men. Like the elbow nudge, the uncertainty with which we interpret a person's loud voice is reduced when we use the Angry Black Man stereotype.

**4**. __How Stereotypes Affect our Perceptions of Others' Behaviors__

 Stereotypes affect the way we view the world around us. While they can certainly be used to save time or conserve cognitive resources, they can also lead to more maladaptive ways of thinking, including the Fundamental Attribution Error and Intergroup Bias.

*4a. Fundamental Attribution Error*

The fact that stereotypes originate in early childhood and are reinforced throughout adult life through the media, cultural factors, and neurological elements, makes them exceptionally resistant to change. As such, their permeation in human behavior continues to occur, even though society has largely agreed that stereotype usage yields significantly negative consequences (Blum, 2004). Scientific research has identified the *fundamental attribution error* and *intergroup bias* as more specific mechanisms that perpetrate the use of stereotypes in our perceptions of other peoples' behaviors.

The fundamental attribution error (FAE; Tetlock, 1985) is a social error, examined and documented across hundreds of studies, in which observers tend to *overestimate* a person's traits or demographic characteristics (e.g., race, gender) in attributing the cause of an event and *underestimate* the role of situational factors (e.g., the time of day, the behavior of others). There

000359

DocuSign Envelope ID: C2013921-7C1A-4994-B520-482E455E3190

are several papers testifying to the existence of the FAE and how it clouds peoples' judgments –
causing them to attribute a specific behavior or event to internal characteristics rather than
external characteristics.

For instance, FAE research would suggest that if a Black employee shows up late to
work, most people will attribute the reason to an internal cause (e.g., the employee was late
because he is a Black man, and Black men are "lazy"; Reynolds, 2010) rather than to an external
cause (e.g., there was a traffic jam on the way to the office building). This is a fundamental error,
yet could be commonly employed by individuals.

There are at least two key reasons individuals commit the FAE (Berry & Frederickson
2015). First, people tend to be more salient than their situations. Said otherwise, we can see
individuals more clearly than we can see the situation. Consider the prior example. When sitting
in a meeting room, we can physically see the Black man entering late, but we cannot physically
see the traffic jam. Therefore, the visible evidence favors an internal attribution (he is late because
of a trope associated with his race), even though a traffic jam – while not visible – could still
easily explain the tardiness. Second, people tend to feel more comfortable making internal
attributions than external attributions. When an event occurs that deviates from normal
expectations (e.g., being late to a meeting), people become worried that that event might happen
to them (e.g., "What if I am late to work because of a traffic jam?"). To avoid such an uneasy
thought, it is more comforting to attribute the cause of an observed behavior to an internal factor
uniquely associated with the other individual's personality or demographic characteristics (e.g.,
race). In doing so, for many people it minimizes the anxiety-inducing thought that "this negative
event might happen to me". Rather, people would assume that the event would only happen to
that person because that person belonged to a certain race.

000360

DocuSign Envelope ID: C2013921-7C1A-4994-B520-482E455E3190

### *4b. Intergroup Bias*

Along with the FAE, intergroup bias (also known as in-group/out-group bias or ingroup favoritism) is another mechanism that perpetrates the use of stereotypes in our perceptions of other peoples' behaviors. Intergroup bias is among the most widely analyzed phenomenon in social science (Hewstone et al., 2003). It purports that people tend to evaluate members of their own group (in-group) more favorably compared to members of outside groups (out-group). Conversely, there tend to be biases directed towards out-group members, such as prejudice and unfair behavior.

One of the core reasons individuals engage in intergroup bias is to increase their self-esteem (Aberson et al., 2000). By viewing one's in-group more positively, one is then able to view oneself more positively. Many individuals have a fundamental desire for high self-esteem;  so in-group favoritism provides one pathway to achieving that goal. However, in viewing one's in-group more favorably, ample evidence indicates that views of out-group members tend to be more negative (Patterson et al., 2017).

Perceiving out-groups as inferior is another pathway to enhance self-esteem further. Simply put, intergroup bias allows individuals to think that "not only are we a great group, but we are better than other groups". Compelling evidence indicates that in-group members are more likely to trust, help, and hire other in-group members while mistreating out-group members (Crocker & Luhtanen, 1990). Indeed, when conceptualizing out-groups, individuals often use stereotypes to describe them and thus tend to treat them with greater prejudice (Harasty, 1997).

### 5.   **Stereotypes, Hierarchies, and Decision-Making**

Negative stereotypes, reinforced through the FAE and intergroup bias, can have effects

000361

not just on our perceptions of out-group members, but on the decisions we make towards out-group members. Stereotypes influence our decisions, often without us realizing it.

 "Stereotype activation" refers to the increased accessibility of the attributes that are believed to characterize members of a particular social group (Wheeler & Petty, 2001). When someone interacts with a member of a stereotyped group, certain stereotypes might come to mind (i.e., become "activated"), and shape subsequent decisions.

Stereotypes can become activated in different ways (Kunda & Spencer, 2003). The most common way is that the member of the stereotyped group engages in a stereotypical behavior (e.g., a Black employee arrives late to a meeting). This behavior activates the stereotype that Black people are "lazy", even though there is no evidence to support this claim. The same stereotype would not be activated if a White person came to a meeting late because there is no parallel stereotype that White people are lazy. Importantly, stereotype activation is not always conscious. In one study, researchers found that individuals viewed Black female employees as worse leaders and poorer performers than White female employees due to the "activation" of a traditional Black female stereotype (Black women are loud and difficult). However, participants were unaware they used this stereotype when making decisions (Motro et al., 2021).

Stereotypes can also influence our decisions through "confirmation bias." Confirmation bias is people's tendency to search for information that supports their beliefs and ignore or distort information that contradicts them (Peters, 2022). Confirmation bias is often a result of people's deep-set desire to feel consistent about themselves, which can help generate a harmonious state of mind (Lockton, 2012). Thus, if an individual holds a particular stereotype, then he/she is more likely to pay attention to information that confirms that stereotype, disregard other objective evidence, and make biased decisions based on that stereotype (Nelson, 2014). Further, when the

000362

DocuSign Envelope ID: C2013921-7C1A-4994-B520-482E455E3190

actor relying on a confirmation bias and a stereotype is confronted with information contrary to

the bias and stereotype, the actor is likely to dismiss or ignore the new, true information.

### 6.    <u>How Hierarchies Affect Stereotype-Based Decisions</u>

Organizational hierarchy or structure is an important factor in the relationship between

stereotypes and decisions. Individuals who control others' outcomes are relatively powerful,

while people whose outcomes depend on others are relatively powerless. Research has shown

that individuals in positions of power (i.e., those higher up on the hierarchy) are more likely to

use stereotypes when making decisions (Fiske, 1993).

It has even been argued that "power encourages stereotyping" (Fiske, 1993). One of the

reasons is that power entails entitlement (Goodwin et al., 2000). More specifically, employees in

positions of power feel more entitled to judge others and have an increased sense of confidence

in their own beliefs, including their own stereotypes. The thought process is often that if they

made it that far up the organizational ladder, their beliefs and values must hold some merit. As

confidence increases with power, powerful supervisors may feel that their beliefs (including

stereotypes) are especially valid.

In addition, as an employee advances up the corporate hierarchy, there is a greater desire

for him/her to maintain the status quo. Stereotyping subordinate group members is a way through

which dominant groups maintain the status quo (Jost & Banaji, 1994).

More specifically, stereotyping maintains the hierarchies in place, and portrays

subordinate groups as deserving of their lesser positions (Goodwin et al., 2000). As long as there

are no seismic changes in the organization or company performance, the more powerful

employee will likely stay in a position of power. Thus, there is a motivation to use stereotypes to

maintain the status quo and a lack of accountability (Keltner et al., 2003). As an individual

000363

reaches the upper echelons of an organization, there are fewer and fewer supervisors and, as a result, less and less oversight. Therefore, there is somewhat less risk in engaging in questionable behaviors (e.g., stereotyping) because the chance of being "caught" and "punished" by upper management becomes less feasible.

7. **Consequences of Using Stereotypes**

There are several negative consequences to using stereotypes. It is not just subsequent decisions but stereotypical treatment that impacts communication. The most egregious consequence is simply biased and unfair discrimination (Landy, 2008). Said otherwise, decisions that are made based on stereotypes rather than objective behaviors yield significant negative consequences.

In the workplace, the contexts in which biased stereotypical decision-making is made run the gamut from performance evaluations to hiring decisions. For example, in one study on racial discrimination in the labor market (Bertrand & Mullainathan, 2004), resumes that had a typical White American name ("Emily") received 50% more callbacks for interviews than resumes that had a typical Black American name ("Jamal"). One conclusion reached by the authors was the use of "coarse" stereotypes associated with Black employees. Given that Black men are already severely underrepresented in professional positions (Cornileus, 2012), such a finding is especially disheartening.

There are several other damaging consequences of using stereotypes, including more frequent microaggressions and psychological damage. Racial microaggressions are brief behavioral indignities that communicate hostile slights or insults toward people of color (Sue et al., 2007). They are a form of exclusion and marginalization of minorities (Ackerman-Barger et al., 2020). There are several different types of microaggressions (Camargo, 2023), including

000364

DocuSign Envelope ID: C2013921-7C1A-4994-B520-482E455E3190

microinsults (e.g., being rude or dismissive toward a person of color), microinvalidations (e.g., excluding or nullifying the thoughts or feelings of a person of color), and tokenism (e.g., recruiting a minority to "look good"). Microaggressions are often unconscious, meaning individuals can commit them without realizing it (Freeman & Stewart, 2021). It goes without saying that being the recipient of microaggressions – or any other stereotyping for that matter – for people of color can be traumatizing and damaging.

The use of stereotypes can increase microaggressions. If an individual makes a generalized assumption about another person (using a stereotype) it can lead that individual to behave in a racist way towards that person. For instance, if an individual assumes that Black men are more likely to be criminals (a common stereotype; Welch, 2007), then a White person might be more likely to clutch his/her belongings tightly or move further away when crossing the street with a Black man (a microaggression). Being the recipient of a microaggressions, just like being subject to a stereotype, can be devastating for a Black person. It can increase stress and anxiety, social isolation and strained relationships, and reduce job satisfaction (Sue et al., 2008).

### 8. The Stereotype of the "Angry Black Man"

One of the most harmful stereotypes is that of the "Angry Black Man" (Jackson & Wingfield, 2013). According to this stereotype, Black men are prone to anger, aggression, violence, or hostility compared to men of other races (e.g., White men).

The Angry Black Man stereotype has its origins in the institution of slavery and the Jim Crow era in the United States (Burris-Kitchen & Burris, 2011). In attempts to justify the use of brutal force against Black men, slave owners would depict Black men as violent, threatening, aggressive, and angry (especially towards White women), and thus deserving of any dehumanizing conditions to maintain control over them (Crespo, 2018; Neal, 2015). This

000365

DocuSign Envelope ID: C2013921-7C1A-4994-B520-482E455E3190

stereotype has also been reinforced in the media, where Black men often play the role of thugs,

drug dealers, or other criminals, usually in low-income urban neighborhoods (Collins, 2004;

Jackson & Wingfield, 2013).

Many Black men are acutely aware of the Angry Black Man stereotype and must

carefully monitor their behavior to avoid unfair discrimination (Cornileus, 2012; Wingfield,

2007). Navigating cultures where stereotyping is present can be psychologically exhausting. In

one study (Cornileus, 2012), researchers surveyed several professional Black men who noted that

the stereotype of the Angry Black Man is common in corporate America and can spell career

suicide. One Black professional explained that he is constantly battling myths for Black men,

including the stereotype that Black men are not able to handle anger well. To avoid backlash,

many Black men often feel that they must downplay their credentials. This is especially true if

those credentials surpass their White counterparts, as White employees could perceive it as

threatening.

In another study that explored the experience of Black male professionals in the

workplace (Wingfield, 2007), Black men reported having to continuously face the challenge of

the Angry Black Man stereotype. According to this stereotype, the Angry Black Man is an

educated professional who, despite his successes, perceives racism everywhere and is always

enraged. Many Black men indicated that White colleagues expected them to fit this image.

Indeed, one professional Black male said that "*most of them [White colleagues] haven't spent too*

*much time around Black people, so what they think they know is usually from TV [...] I have to*

*do everything I can not to portray that [...] I can't ever get mad. I have to brush it off, always be*

*the nice guy who's not too threatening [...] that would have serious repercussions for my job*"

(Wingfield, 2007, p. 205).

000366

DocuSign Envelope ID: C2013921-7C1A-4994-B520-482E455E3190

Many Black men explicitly noted that they had to tread lightly to avoid being characterized as the Angry Black Man or as an employee who is uncontrollably angry and threatening. Other Black men also reported feelings of exclusion, such as not being invited to get-togethers after work, get-togethers that only consisted of White employees. In addition, researchers have noted that workplace incivility against Black professionals is entrenched in corporate culture (Wade, 2001).

For many Black men, the fear of being stereotyped as an Angry Black Man never truly ends, even as they advance up the organizational ladder (Wingfield, 2010). This fear is especially true in higher professional settings where Black men are far and few between. In such settings, particularly those in predominantly White environments, Black men face heightened visibility, scrutiny, and stereotyping. Indeed, White men perceive more freedom to express anger than their White male counterparts (Jackson & Wingfield, 2007).

Any perception of irritation on the part of the Black man can evoke the trope of the Angry Black Man, who is dangerous and out of control. Overall, this is a widespread image that has far-reaching negative implications. Black men have encountered and continue to encounter racism in the workplace (Barrett et al. 2004; Greenhaus et al. 1990; James 2000; Thomas & Gabarro 1999) and appear to be especially vulnerable to racist encounters.

An employer acts on the Angry Black Man stereotype when it acts and speaks based on the assumption that the Black man is acting and speaking because he is angry, in conformance with the stereotype, rather than believing the Black man is acting and speaking in addressing a legitimate, proper subject.

### 9. <u>USG's & Diane Earll's Behaviors Directed Toward Mr. Fenner Exhibit the "Angry Black Man" Stereotype</u>

000367

DocuSign Envelope ID: C2013921-7C1A-4994-B520-482E455E3190

Diane Earll, a White female, served as Fenner's direct supervisor. Ms. Earll was the decisionmaker for key actions in issue, including placing Fenner on a performance improvement plan (PIP) and terminating his employment.

There is substantial evidence that United States Gypsum Company (USG) and Ms. Earll used the Angry Black Man stereotype in making and taking prejudiced and discriminatory actions towards Mr. Fenner. Mr. Fenner is a highly educated, professional Black male who served as an exemplary employee with USG for over 28 years of service. He began his USG career as a college intern and earned approximately 14 promotions (including positions with advanced responsibilities), plus earned raises, bonuses, and awards. In fact, USG awarded him the CEO Award, the Company's highest honor.

As is common in the professional landscape, Mr. Fenner was USG's only Black General Manager and was the highest-ranking Black employee at USG. In all events discussed, Mr. Fenner was the only Black man and Black employee present during the meetings and presentations.

### *9a. Fundamental Attribution Error*

During Mr. Fenner's employment, he interacted with Ms. Earll, a White female employee at USG.   In 2010/2011, Ms. Earll was Mr. Fenner's direct supervisor. Ms. Earll called Mr. Fenner "angry," even though he was not acting angry. She called him angry after he disagreed with other employees during a meeting about a significant product development and timeline for market release. When Ms. Earll called Mr. Fenner angry, she and Mr. Fenner were the only witnesses to the conversation. She told Mr. Fenner she would not place "anything in his file."

In this instance, Mr. Fenner viewed Ms. Earll's statements as threatening; however, he did not complain afterward because he held a position significantly below the General Manager level

000368

DocuSign Envelope ID: C2013921-7C1A-4994-B520-482E455E3190

then. Ms. Earll was his supervisor with control over his USG future, and he feared losing his job through a future USG layoff. Instead, he returned to his cubicle and continued working.

Mr. Fenner's behavior aligns very clearly with that of many Black professionals in the United States. Being acutely aware of the Angry Black Man stereotype, Mr. Fenner had to suppress his frustration to avoid being potentially stereotyped as a Black man who cannot control his feelings (Wingfield, 2007). If he had expressed anger, Mr. Fenner could have been stereotyped as an Angry Black Man and suffered from the consequences of stereotyping, including prejudice, discrimination, and unfair behavior. After that, Mr. Fenner's future with USG could be severely limited. As significant research shows explicit links between stereotyping and negative consequences (Landy, 2008), it makes sense that Mr. Fenner would not want to express his feelings when he was in a particularly vulnerable situation – one in which USG was conducting periodic layoffs.

A more egregious encounter occurred on January 29, 2021, in a USG Ceilings Leadership Team meeting. The meeting was a formal video leadership team meeting during which Ms. Earll gave an update on the COVID pandemic. While Ms. Earll said that COVID had no adverse impact on operations, Mr. Fenner disagreed with this statement because it had ignored two COVID-caused deaths of employees that were emotionally traumatizing for other employees. Mr. Fenner brought this to Ms. Earll's attention out of compassion during the meeting. More specifically, Mr. Fenner brought to Ms. Earll's attention that there was an employee who was very distraught about a COVID-related death in their department, enough that it merited the help of the USG employee assistance program.

On February 2, 2021, Ms. Earll confronted Mr. Fenner. As before, she informed him that his behavior was angry and disruptive, even though there was a clear basis for his comments.

19

000369

DocuSign Envelope ID: C2013921-7C1A-4994-B520-482E455E3190

Again, the only witnesses to the discussion were Mr. Fenner and Ms. Earll, and she again told

him she "would not place anything in his file."

It could certainly be argued that Ms. Earll was committing the fundamental attribution

error (FAE), making harmful stereotypical assumptions about Mr. Fenner's behavior. As

mentioned, FAE is a social error in which observers overestimate a person's traits (e.g., race) in

attributing the cause of an event and underestimate the role of situational factors. In this case,

Ms. Earll (likely without realizing it) likely attributed the cause of Mr. Fenner's behavior during

the meeting (bringing up the COVID-caused deaths) to the fact that he is just an "Angry Black

Man," rather than to a legitimate situational factor (e.g., a workplace culture in which Ms. Earll

did not want to bring attention to unpleasant issues, such as employee death or the embarrassing

fact that USG missed two people who died because of COVID-related death). Indeed, no

explanation was ever given to Mr. Fenner for why those two COVID-related deaths were omitted

from the company report.

As noted, there are at least two key reasons individuals commit the FAE – that people

tend to be more salient than their situations and that people tend to feel more comfortable making

internal attributions rather than external attributions. Ms. Earll's behavior aligns with these two

reasons. During the meeting, Ms. Earll could clearly see Mr. Fenner and witness his behavior.

According to research on the FAE, she would, therefore, be likely to make an internal attribution

for his actions and attribute his behavior – bringing up the COVID-caused deaths – to a

particular trait. In this case, it would be his race. It would be more difficult for Ms. Earll to "see"

a situational factor, such as a workplace culture, thus making it more difficult to attribute the

omission of discussing COVID-caused deaths to this reason.

People also feel more comfortable making internal attributions rather than external

000370

DocuSign Envelope ID: C2013921-7C1A-4994-B520-482E455E3190

attributions. In this case it is likely much easier to attribute the cause of Mr. Fenner's behavior – bringing attention to employee deaths – to the fact that he is an "Angry Black Man" rather than to another external factor. Making an internal attribution in this way is usually more desirable, as situational, or external factors are often more difficult to control and more difficult to predict.

Making an internal attribution also minimizes uncomfortable thoughts. For instance, a White female would find comfort in the fact that she would never experience certain events (e.g., being labelled as "angry" after speaking about a sensitive issue during a meeting) because she is not a Black male. By labelling Mr. Fenner's behavior as "angry", Ms. Earll likely fell prey to the widely established and thoroughly researched FAE, invoking the stereotype of the Angry Black Man to Mr. Fenner's detriment.

### 9b.    In-Group Bias

The fact that Mr. Fenner's behavior was labelled as "angry" is exacerbated by the fact that Ms. Earll is a White female. In Ms. Earll's deposition, she states she has not labeled a White employee as angry.

Intergroup bias is another way through which stereotypes affect our perceptions and behaviors. People tend to evaluate members of their in-group more favorably and are more likely to use stereotypes when evaluating members of out-groups. Thus, it stands to reason that if Mr. Fenner were a White male, Ms. Earll would not have characterized his behavior as "angry". This is not only because there is no comparable Angry White Man stereotype but because she and the White man would both be part of the same race and share a common ground. In fact, throughout his tenure at USG, Mr. Fenner had seen several White male executives and customers use profanity without being confronted by anyone, including Ms. Earll.

000371

DocuSign Envelope ID: C2013921-7C1A-4994-B520-482E455E3190

The prior example of the elbow nudge is particularly relevant here (Kunda & Thagard, 1996; Motro et al., 2021). The same behavior is often interpreted differently depending upon the race of the individual; it is a jovial push if committed by a White man, but a violent shove if committed by a Black man. In this situation, expressing anger would likely be seen as passionate and enthusiastic by a White man but angry and aggressive by a Black man.

### 10. Mr. Fenner's Objections to Ms. Earll's "Angry" Label

Ms. Earll contacted Mr. Fenner after the meeting, described him as "angry" and told him she would not place anything in his file. The statement reflects the use of the Angry Black Man stereotype and treatment by a person with greater authority and control over Mr. Fenner.

In a subsequent conversation, Mr. Fenner contacted Ms. Earll and objected to her use of the word angry. Mr. Fenner told her that her use of the term was the use of a racial stereotype. He asked her if she was aware of the racial stereotype. She responded she was not aware of the stereotype.

Later, Mr. Fenner complained to Noreen Cleary, USG's Chief of Human Resources. He complained about Ms. Earll's use of the stereotype, explaining it was a racial stereotype. He took several actions: he told Ms. Cleary, he (1) had complained to Ms. Earll, (2) had explained to Ms. Earll that it was a racial stereotype, and (3) he asked Ms. Earll if she knew about the racial stereotype, and she responded that she did not know about the stereotype.

Ms. Cleary informed Ms. Earll of Mr. Fenner's complaint to her and that Mr. Fenner's complaint was based on race and the use of a racial stereotype.

Ms. Earll apologized to Mr. Fenner; however, she never acknowledged that his complaints were about race, or his complaints were about her use of a racial stereotype, or based on race in any way. Ms. Earll never apologized for using a racial stereotype, even if unintended.

000372

DocuSign Envelope ID: C2013921-7C1A-4994-B520-482E455E3190

In Ms. Earll's deposition, she testified to the general point that she did not believe her use of the word angry was racial and explained she "googled" the word angry, and she did not see anything about race.

Ms. Earll did not report her use of the "angry" language to her supervisor, Chris Griffin. USG did not counsel or discipline Ms. Earll for the comment. Despite Mr. Fenner's complaint about the comment and its racially offensive nature, USG did not require Ms. Earll to attend any racial sensitivity training or similar program.

### 10a.  Ms. Earll's Microaggressions

Ms. Earll's response fairly fits the criteria for microaggressions. Not acknowledging the racial undertone of using the term "angry" to describe a Black man's actions is dismissive and insensitive – a classic symptom of a microinsult.

Simply "googling" the word angry is not nearly enough to fully understand the Angry Black Man stereotype. Ms. Earll did not also google the words "racial stereotype," or "race discrimination" or "Angry Black Man." This action reflects an insensitivity to Mr. Fenner's concerns.

Googling the word "angry" is not a serious inquiry into the racial issues in Mr. Fenner's complaint. Googling the word "angry" is far too broad to yield a result on a racial stereotype and fits the criteria for a microinvalidation. A more fruitful approach to fully understand the stereotype and Mr. Fenner's concerns would be to google something such as "Angry Black Man" or "Angry Black Man Stereotype". Adding a few additional words to the search (which takes little effort) is a simple way to express that she takes Mr. Fenner's concerns about racial stereotypes seriously.

At a USG meeting on October 19-20, 2021, Mr. Fenner objected to USG's use of the

000373

DocuSign Envelope ID: C2013921-7C1A-4994-B520-482E455E3190

terms "White" v. "non-White" to label employees. Ms. Earll's statements regarding Mr. Fenner's objections to the use of the word "angry" and the categorization of individuals as "White v. Non-White" fit the criteria for microinsults.

Ms. Earll, in response to Mr. Fenner's statements complaining about her labeling him as "angry" and his complaints about the White v. Non-White labeling, refers to Mr. Fenner as *him* being offended. This reference assumes that only Mr. Fenner would be offended by such terms and no other individuals (including other Black men). Instead, it is something about Mr. Fenner himself that makes him take offense to this terminology and not that it is offensive in and of itself.

USG's response – not requiring Ms. Earll to attend any training or workshop on racial stereotyping – is also a microaggression. It implicitly conveys a culture in which the use of racial stereotypes is not important enough to merit any action that would help de-stigmatize the workplace and educate employees about the hurtful nature of race-based tropes.

### 10b.  *Ms. Earll's Subsequent Behaviors*

The interaction between Mr. Fenner and Ms. Earll could lead to a spiral of events that further perpetuate the stereotype of the Angry Black Man. By Mr. Fenner initially objecting to her use of the term "angry" as stereotypically harmful, it could have "poisoned" Ms. Earll in the sense that it reinforced or "fueled" her perceptions that Mr. Fenner was an angry person. Mr. Fenner complaining to Ms. Earll and pointing out to Ms. Cleary that Ms. Earll did not know of the stereotype could have perpetuated in her mind the stereotype that Black men are indeed angry and that this includes Mr. Fenner. Subsequent actions, such as not informing him concerning complaints about him and giving him a fair chance to respond, USG not interviewing Mr. Fenner and all key witnesses, putting him on a performance improvement plan (PIP),

000374

ceasing discussions about the PIP, and his ultimate termination, could be the result of viewing Mr. Fenner as an angry employee, a personality characteristic that is not typically welcome in the workplace (Sloan, 2004).

### 11. <u>Power Structure</u>

On both occasions, when Ms. Earll characterized Mr. Fenner's behavior as "angry," she was serving as his direct boss. Research shows that individuals in positions of power can be more prone to stereotyping due to a type of "entitlement" and generally a desire to maintain the status quo (and as a result maintain a position of power). Therefore, the fact that Ms. Earll served in a more senior position than Mr. Fenner when she labeled him as angry increases the possibility that she used the Angry Black Man stereotype in her perceptions and interactions with him. Powerful people (i.e., those that control the outcomes of others) can develop the sense that their beliefs and values hold a significant degree of accuracy. Thus, even if it was not conscious, Ms. Earll may have confidently assumed that Mr. Fenner was angry during the meeting even though he was not. Also, making statements such as "I want to give you feedback. I think feedback is a gift." and "Don't worry. I'm not going to put this in your file" implies that she believed that she was correct in her perceptions, and that Mr. Fenner should implicitly be afraid of her characterization and future consequences. This statement is more threatening given that Mr. Fenner did not have any prior concern that something would be "going into his file". This threat is exacerbated by Ms. Earll being the former Chief, Human Resource Officer.

Furthermore, people in a position of power have a motivation to maintain the status quo and generally encounter a lower level of accountability (Keltner et al., 2003). By assuming that Mr. Fenner is simply an Angry Black Man, Ms. Earll can assume that there is nothing wrong with the way things are currently run (e.g., not mentioning the traumatizing deaths of employees

25

during meetings). This point is especially convenient given that she was the president of USG

Ceilings at the time. Those in the organization's upper ranks tend to see less backlash from their

superiors (as there are simply fewer), meaning that by using the stereotype, Ms. Earll likely

would not have faced significant backlash. As discussed, she did not face any backlash: USG did

not reprimand or counsel or send her to any training because of her inappropriate comment to

Mr. Fenner and lack of knowledge about racial issues and sensitivity. For instance, even though

Mr. Fenner contacted USG's Chief of Human Resources and complained about her use of the

term "angry" to describe him, there is no evidence that HR ever warned her, nor did she ever

apologize to Mr. Fenner for specific use of the stereotype.

**12. USG's & Diane Earll's Stereotype Usage Yielded Harmful Consequences**

There are many consequences to using stereotypes, including biased decisions and

microaggressions.

Following Ms. Earll's use of the racial stereotype, Mr. Fenner's objections to her that the

term was an offensive racial stereotype, her admission that she was unaware of the stereotype,

his complaints to Ms. Cleary based on race, and Ms. Cleary informing Ms. Earll that Mr. Fenner

complained and his complaint was based on a racial stereotype, she took a series of harmful

actions against Mr. Fenner, and/or permitted these actions to occur, culminating in the

termination of his employment. These actions included not informing Mr. Fenner about

employee and customer complaints about him, never giving him a fair and reasonable

opportunity to respond to the complaints, relying on his legitimate complaints about the White v.

non-White labeling as a reason to place him on a PIP, prejudging his chance of successfully

completing the PIP, ignoring his suggestions on action items he would complete in the PIP

000376

DocuSign Envelope ID: C2013921-7C1A-4994-B520-482E455E3190

process, cutting off the PIP process when he asked legitimate questions, and terminating his employment.

During his tenure at USG, Mr. Fenner was always a talented and conscientious employee. At the time of his discharge, he was the highest-ranking Black employee and had consistently achieved overall performance ratings of "met or exceeded expectations" in performance appraisals.

After being called "angry" following the meeting on January 29, 2021, USG and Ms. Earll engaged in a series of biased decisions and microaggressions between April and September 2021: (1) Mr. Fenner's team members were not invited to a company meeting and their suggestions were not given any respect or consideration, and (2) Mr. Fenner was not allowed to sit at a presenters' table during the September 2021, high-level USG Board of Directors meeting and not allowed to prepare his slides or run the presentation as a White male colleague was allowed to do. Both behaviors represent a biased decision or a microaggression. Not being invited to a meeting and not being allowed to present equally are classic signs of microinvalidations. As mentioned, a microinvalidation is a behavior (often executed without realizing it) that excludes or nullifies a person based on their race without any reason. Given that there was no objective, performance-based reason for excluding Mr. Fenner from these meetings or presentations, it encompasses all the symptoms of a racist microinvalidation.

Another microaggression occurred in October 2021 when Ms. Earll approached Mr. Fenner, referenced his passion for diversity, and asked if he would be interested in the Senior Director of Talent Management, Diversity & Inclusion position. This proposal represents the symptoms of "tokenism" – a specific type of microaggression (Williams et al., 2021). Tokenism is when a person of color is given or offered a position for the illusion of inclusivity and not for

000377

DocuSign Envelope ID: C2013921-7C1A-4994-B520-482E455E3190

the qualities or talents of the individual. It also expects the person of color to understand or speak

for the whole ethnic group. Asking if Mr. Fenner would be interested in a diversity-related

position is an example of tokenism. The question assumes that because Mr. Fenner is Black, he

would be interested in a diversity-related position even though his background and talents are

unrelated to diversity.

Indeed, Mr. Fenner's background and experience are in mechanical engineering and

business administration, plus USG manufacturing and operating a USG business unit. Expecting

Mr. Fenner to be able to understand or speak for all diverse employees is not appropriate. There

is little empirical basis for the idea that he would be a good fit for this position other than that he

is Black. What could perhaps serve as an even stronger motivator is the fact that moving him to

this position would create a greater distance for Ms. Earll from her contact with her contact with

Mr. Fenner.

### 13.    <u>**Categorizing People as "White v. Non-White"**</u>

On or about October 19, 2021, two White Sales Directors made a presentation in which

Mr. Fenner was present. Their presentation described team members as "White" and "Non-

White". Mr. Fenner asked whether USG is now describing people as White as Non-White,

which is not a rude or offensive question. When asked more specific questions about the race-

based data, neither the presenters nor USG could explain the source of the data.

Classifying groups into "White" and "Non-White" when all other members in the room

are White, including the presenters, is an example of intergroup bias. It splits the room into two

groups. In this case, it was White v. Black. This division can significantly increase tension

among employees.

DocuSign Envelope ID: C2013921-7C1A-4994-B520-482E455E3190

Classifying groups as White v. Non-White assumes that people who are "Non-White" (e.g., mixed race, Black, Asian, Hispanic) do not deserve their own categorization nor deserve to be recognized as unique groups in a presentation. It perpetuates the idea that "White" is the "default race" (Petsko & Rosette, 2023) and that other people can be characterized as simply not belonging to the default group (or being less than), rather than belonging to another distinct group.

This categorization may subconsciously encourage employees to think about people as either White or not White. In the future, this can easily heighten intergroup bias (potentially triggering all the negative consequences associated with in-group/out-group categorization), rather than foster inclusivity and view everyone as employees of USG – not as White or Non-White employees of USG.

As mentioned, intergroup bias can lead to greater trust and help of in-group members, while treating out-groups more negatively. Using such terminology in a professional setting can legitimize intergroup bias. Put simply, it makes it "ok" to think about people as "White" or "Non-White." As extensive research on intergroup bias suggests, employees identifying as White would be more likely to help others in their group (other White employees) compared to others (e.g., Black employees).

As people attach positive utility to the welfare of their own group (Tajfel, 1974), they are more likely to help in-group members than out-group members (Levine et al., 2005). There is also work showing that individuals are more likely to be uncivil towards out-group members compared to in-group members (Patterson et al., 2017). In one study, researchers found that out-group members were at an increased risk of supervisor incivility in the workplace (Thompson et

000379

DocuSign Envelope ID: C2013921-7C1A-4994-B520-482E455E3190

al., 2018). Thus, using terminology such as "White" and "Non-White" at USG sets the stage for intergroup bias and all the associated consequences.

**14. <u>Objections by a Black Man</u>**

Mr. Fenner objected to the categorization of White v. Non-White, especially given that his daughters are mixed-race. In a subsequent microaggression, a White employee asked Mr. Fenner about the categorization because they did not know. This inquiry is another example of tokenism – it assumes that because Mr. Fenner is Black, he should know the answer to the complicated and sensitive question of how to conceptualize race in the United States. Once again, it is essential to note that Mr. Fenner's background is not in "talent and diversity management," so there is little empirical reason to expect Mr. Fenner to know the answer to this question.

The next day on October 20, 2021, Mr. Fenner explained in more detail why the categorization of White v. Non-White upset him. However, no employee at USG asked Mr. Fenner why he felt that way or explained how such a categorization could occur.

USG never raised or complained about Fenner's conduct until November 29, 2021, over one month later. Ignoring Mr. Fenner's feelings is another example of a microinvalidation. It dismisses the experiences or psychological thoughts of a member of a minority group and downplays any existence of racism in the workplace (Alabi, 2015; Sue et al., 2008). Ms. Earll's behavior may convey a hidden meaning that his points regarding racist terminology are not valid. Otherwise, it would have been more appropriate to at least acknowledge his concerns and address them in a more thorough, at least somewhat empathetic manner.

Another microaggression occurred on October 22, 2021, when Ms. Earll and Mr. Fenner had a telephone conversation. During the conversation, Ms. Earll insisted that Mr. Fenner's

000380

DocuSign Envelope ID: C2013921-7C1A-4994-B520-482E455E3190

comments about the Executive Innovation Meeting, in which the presentation failed to acknowledge him or his team's contributions, were inappropriate and that Mr. Fenner should apologize.

Ms. Earll's behavior represents several characteristics of a microinsult (another type of microaggression) in which a person's statement conveys rudeness, insensitivity, and demeans another person's racial identity (Sue et al., 2008). While subtle, microinsults convey a hidden insulting message. Ms. Earll's statements appear rude and dismissive of Mr. Fenner's concerns.

When Mr. Fenner made comments with which Ms. Earll disagreed, she would label him angry or criticize the nature or the "way he made the comments."

### 15. "White v. Non-White" and Angry Black Man Stereotype

In addition to the characterization of Mr. Fenner as "angry", the use of the terminology "White v. Non-White" in a professional setting contributes to a hostile work environment based on race. Failing to address Mr. Fenner's concerns about being called "angry" and the Angry Black Man stereotype and making decisions based on the stereotype and his race-based complaints about the stereotype, implicitly conveys that the environment at USG is not sympathetic to race-based disputes and vulnerable to stereotypical thinking. More evidence of this hostile work environment can be observed in the use of "White v. Non-White" in another professional setting. Once more, USG did not appropriately address Mr. Fenner's concerns, again conveying its disregard for racial issues. Mr. Fenner's objection to both events and the organization's lack of robust response to both connotes a racially insensitive culture. As a result, Mr. Fenner likely experienced mental and physical afflictions, including emotional pain, stress, and anxiety.

000381

DocuSign Envelope ID: C2013921-7C1A-4994-B520-482E455E3190

## 16. **Future Employment**

Research has continuously shown that it is difficult for many Black men in the United States to secure callbacks, interviews, employment, raises, and promotions, and they are significantly more likely than White men to be fired or laid off (Austin, 2021; Mong & Roscigno, 2010). Indeed, one study found that between February 2020 and May 2020, the racial gap in employment between White men and Black men increased by nearly 44% (Dias, 2021). Black men have high unemployment rates and are twice as likely as White men to experience long bouts of joblessness (Cohn & Fossett, 1995).

Bias and discrimination certainly factor into the disparities in employment. When considering job candidates and employees, employers often engage in racial stereotyping. For instance, employers often describe Black men as defensive, overly sensitive, violent, and difficult to control (Moss & Tilly, 2001). There is also an inherent bias that Black men are simply not as good performers as White men (King et al., 2023).

Not only is it difficult for Black individuals to secure employment, but the chance of securing a comfortable position becomes more difficult as age increases, especially after age 50 (Roscigno et al., 2007). Given that Mr. Fenner is currently 53, two obstacles are facing him in securing new, comparable employment: his race and age.

Despite his excellent qualifications and expertise, Mr. Fenner's chances of securing a senior executive/leadership position in corporate America will be difficult. At the time of his termination, Mr. Fenner held a high-level position at USG. He was employed there for more than 25 years with USG, where he developed a highly refined set of skills for his positions and industry. Finding a comparable position at another company will be challenging, as such skill

000382

DocuSign Envelope ID: C2013921-7C1A-4994-B520-482E455E3190

sets do not always transfer smoothly, especially if the companies have different corporate cultures (Clarke, 2008).

USG, by terminating Mr. Fenner's employment on January 11, 2022, destroyed Mr. Fenner's professional equity with the company. The termination caused Mr. Fenner to suffer economic damages, which, given the difficulty facing Black men, will be extremely challenging to redress in today's professional environment.

Being the target of biased decisions and microaggressions can wreak havoc on a person's psyche and physiology. In one study, nearly 70% of Black Americans in the United States reported having experienced racial discrimination (Lee et al., 2019), and research has shown that Black Americans are much more likely to perceive being discriminated against in employment than White Americans (Yang, 2021).

Racism and microaggressions predict adverse mental health issues, including anxiety and depression (King et al., 2023). They also contribute to chronic stress that can result in physical problems, such as increased blood pressure and poor immune responses. Black employees are especially vulnerable to the mental and physical consequences of microaggressions because they are significantly more likely to experience them in the workplace compared to other racial minority populations (Forrest-Bank & Jenson, 2015).

Another symptom of psychological damage is decreased self-esteem. Self-esteem is the degree to which an individual believes himself or herself to be capable, significant, and worthy as an organizational member (Matzler et al., 2015),  and is highly correlated with job satisfaction and performance (Judge & Bono, 2001). Low self-esteem is among the many consequences related to racial discrimination, and consistent research has demonstrated a link between racist behaviors toward Black Americans and low self-esteem (Cénat et al., 2022). Being treated

000383

unfairly, being the target of microaggressions, and being subject to biased decisions could easily make an individual feel disliked, insignificant, and unworthy, even if such characterizations are false.

**17. <u>Summary</u>**

Evidence shows that USG engaged in discriminatory and biased decisions when interacting with Mr. Fenner. In his interactions with Ms. Earll, she called him "angry," even though he was not acting angry, without recognizing its devastating meaning. No one, including Ms. Earll, ever acknowledged the historical context and stereotype of the Angry Black Man. In addition, Mr. Fenner's behavior could have fueled Ms. Earll's perceptions of Black men as angry and also generated several negative consequences. Evidence shows that USG committed the fundamental attribution error and succumbed to intergroup bias. Also, using these stereotypes resulted in several subsequent microaggressions, ultimately leading to Mr. Fenner's employment termination. Such behaviors have significant consequences given the difficulty of Black men to secure employment, especially in senior management positions.

Ms. Earll's confirmation bias is reflected by her ignoring information that was contrary to her view of Mr. Fenner, information beneficial to him. As Ms. Earll testified in her deposition, before deciding to terminate Mr. Fenner, she did not review his performance evaluations, history of promotions, awards, pay raises, and bonus payments.

Perhaps the most demoralizing implication, however, is the damage to Mr. Fenner's mental health, which has resulted from the culmination of these experiences. Moving forward, it is always best for organizations to acknowledge the existence of stereotypes, what they mean for minority groups, and, most importantly, consider all the employee's concerns. Doing so maximizes honest, open, and fruitful communication in the workplace.

000384

DocuSign Envelope ID: C2013921-7C1A-4994-B520-482E455E3190

## V.  EXHIBITS USED OR SUMMARIZED TO SUPPORT OPINIONS

I reviewed the sources in the references section of my report. Also, I have reviewed these documents/materials: (1) Mr. Fenner's First Amended Complaint, (2) Mr. Fenner's resume, (3) parts of Diane Earll's deposition, and (4) an exchange of emails between Mr. Fenner and Ms. Noreen Cleary. I will treat the above items (3)-(4) as confidential and use these items only for this case, and I will not share these materials with anyone.

## VI. PERSONAL QUALIFICATIONS

I earned a Bachelor of Arts with Highest Distinction in Cognitive Science from the University of Virginia. I then earned a PhD in Management & Organizations from the University of Arizona. I was hired as a Professor of Management & Entrepreneurship at Hofstra University in Hempstead, NY. I was promoted from Assistant Professor to Associate Professor with Tenure in July 2023. To date, I have published 20 academic articles and presented 24 conference papers. I also serve as a peer reviewer for multiple journals and teach several courses at the undergraduate and MBA level.

My research focuses on issues in the workplace. Of the 20 academic articles I have published and 24 papers I have presented at conferences, several focus on employee anger, gender, race, employment, and performance. I examine how employees react differently to each other depending on how they are feeling or based on certain demographic characteristics. In several experiments and quantitative studies, I have analyzed how the gender or race of an individual can influence others' behaviors. A recurring theme in my research is that observers often react more negatively to females and Black individuals in a variety of contexts, including team performance and perceptions of leadership. My research is rooted in human psychology and

000385

DocuSign Envelope ID: C2013921-7C1A-4994-B520-482E455E3190

how our interactions with others can be biased or emotionally charged. I have explored the

concept of stereotypes in detail and the damage they can yield, even without us realizing it.

   My curriculum vitae is attached.

## VII. <u>PRIOR CASES & TESTIMONY</u>

   I have not testified in any cases in the past four years.

## VIII. <u>STATEMENT OF COMPENSATION</u>

   I received $3,000 for completing this report.

## IX.  <u>VERIFICATION</u>

   I have read this report, and my statements are true to the best of my knowledge and belief

and the sources on which the statements are based.

DocuSigned by:

*Dr. Daphna Motro PhD*          1/16/2024

35072465FEB9460...

_____

Daphna Motro, PhD                    Date

## X.  <u>REFERENCES</u>

Aberson, C. L., Healy, M., & Romero, V. (2000). Ingroup bias and self-esteem: A meta

analysis. *Personality and social psychology review*, *4*(2), 157-173.

Ackerman-Barger, K., Boatright, D., Gonzalez-Colaso, R., Orozco, R., & Latimore, D. (2020).

Seeking inclusion excellence: understanding racial microaggressions as experienced by

underrepresented medical and nursing students. *Academic Medicine*, *95*(5), 758-763.

Alabi, J. (2015). "This actually happened": An analysis of librarians' responses to a survey about

racial microaggressions. *Journal of Library Administration*, *55*(3), 179-191.

36

000386

DocuSign Envelope ID: C2013921-7C1A-4994-B520-482E455E3190

Austin, A. (2021). *The jobs crisis for Black men is a lot worse than you think*. Center for Economic and Policy Research.

Barrett, I. C., Cervero, R. M., & Johnson-Bailey, J. (2004). The career development of Black human resource developers in the United State*s. Human Resource Development International, 7*(1), 85–100.

Berry, Z., & Frederickson, J. (2015). Explanations and implications of the fundamental attribution error: A review and proposal. *Journal of Integrated Social Sciences*, *5*(1), 44-57.

Bertrand, M., & Mullainathan, S. (2004). Are Emily and Greg more employable than Lakisha and Jamal? A field experiment on labor market discrimination. *American economic review*, *94*(4), 991-1013.

Blum, L. (2004). Stereotypes and stereotyping: A moral analysis. *Philosophical papers*, *33*(3), 251-289.

Burris-Kitchen, D., & Burris, P. (2011). From slavery to prisons: A historical delineation of the criminalization of African-Americans. *Journal of Global Intelligence & Policy*, *4*(5).

Camargo, A. (2023). Developing strategies to improve the sense of belonging and mitigate tokenism. *Clinical Imaging*, *103*, 109987.

Cénat, J. M., Darius, W. P., Dalexis, R. D., Kogan, C. S., Guerrier, M., & Ndengeyingoma, A. (2022). Perceived racial discrimination, internalized racism, social support, and self-esteem among Black individuals in Canada: A moderated mediation model. *Cultural Diversity and Ethnic Minority Psychology.* Advance online publication.

Chiu, C. Y., & Hong, Y. Y. (2007). Cultural processes: Basic principles. In A.W. Kruglanski & E.T. Higgins (Eds.), Social psychology: Handbook of basic principles (2nd ed., pp. 785 – 804). New York, NY: Guilford.

000387

DocuSign Envelope ID: C2013921-7C1A-4994-B520-482E455E3190

Cingel, D. P., & Krcmar, M. (2013). Predicting media use in very young children: The role of demographics and parent attitudes. *Communication Studies*, *64*(4), 374-394.

Clarke, M. (2008). Understanding and managing employability in changing career contexts. *Journal of European Industrial Training*, *32*(4), 258-284.

Cohn, S., & Fossett, M. (1995). Why racial employment inequality is greater in northern labor markets: Regional differences in white-black employment differentials. *Social Forces*, *74*(2), 511-542.

Collins, P.H. (2004). *Black sexual politics*. New York, NY: Routledge.

Cornileus, T. H. (2012). "I'm a Black man and I'm doing this job very well": How African American professional men negotiate the impact of racism on their career development. *Journal of African American Studies*, *17*, 444-460.

Crespo, C. L. (2018). Race and the Psychoanalytic Experience: How Race Impacts the African-American Psyche. *Issues in Psychoanalytic Psychology*, *40*.

Crick, N. R., & Dodge, K. A. (1994). A review and reformulation of social information-processing mechanisms in children's social adjustment. *Psychological bulletin*, *115*(1), 74.

Crocker, J., & Luhtanen, R. (1990). Collective self-esteem and ingroup bias. *Journal of personality and social psychology*, *58*(1), 60.

Dias, F. A. (2021). The Racial gap in employment and layoffs during COVID-19 in the United States: A visualization." *Socius: Sociological Research for a Dynamic World 7*(1).

Fiske, S. T. (1993). Controlling other people: The impact of power on stereotyping. *American Psychologist*, *48*(6), 621.

000388

DocuSign Envelope ID: C2013921-7C1A-4994-B520-482E455E3190

Forbes, C. E., Cox, C. L., Schmader, T., & Ryan, L. (2012). Negative stereotype activation alters interaction between neural correlates of arousal, inhibition, and cognitive control. *Social cognitive and affective neuroscience*, *7*(7), 771-781.

Forrest-Bank, S., & Jenson, J. M. (2015). Differences in experiences of racial and ethnic microaggression among Asian, Latino/Hispanic, Black, and White young adults. *Journal of Sociology and Social Welfare, 42*(1), Article 8.

Freeman, L., & Stewart, H. (2021). Toward a harm-based account of microaggressions. *Perspectives on Psychological Science*, *16*(5), 1008-1023.

Gilmour, J. (2015). Formation of stereotypes. *Behavioural Sciences Undergraduate Journal, 2*(1), 67-73.

Goffin, K. (2022). Biased Emotions: Implicit Bias, emotion & attributability. *Review of Philosophy and Psychology*, 1-19.

Goldstone, R. L., Kersten, A., & Carvalho, P. F. (2003). Concepts and categorization. *Comprehensive handbook of psychology*, *4*, 599-621.

Goodwin, S. A., Gubin, A., Fiske, S. T., & Yzerbyt, V. Y. (2000). Power can bias impression processes: Stereotyping subordinates by default and by design. *Group processes & intergroup relations*, *3*(3), 227-256.

Gorham, B. W. (1999). Stereotypes in the media: So what?. *Howard Journal of Communication*, *10*(4), 229-247.

Gorham, B. W. (2006). News media's relationship with stereotyping: The linguistic intergroup bias in response to crime news. *Journal of communication*, *56*(2), 289-308.

000389

DocuSign Envelope ID: C2013921-7C1A-4994-B520-482E455E3190

Gray, S. F. (1996). Recognizing stereotypical images of African Americans in television and movies. *Yale-New Haven Teachers Institute*, 1-12.

Greenhaus, J. H., Parasuraman, S., & Wormley, W. M. (1990). Effects of race on organizational experiences, job performance evaluations, and career outcomes. *Academy of Management Journal, 33*(1), 64–86.

Halbesleben, J. R., Neveu, J. P., Paustian-Underdahl, S. C., & Westman, M. (2014). Getting to the "COR" understanding the role of resources in conservation of resources theory. *Journal of management*, *40*(5), 1334-1364.

Harasty, A. S. (1997). The interpersonal nature of social stereotypes: Differential discussion patterns about in-groups and out-groups. *Personality and Social Psychology Bulletin*, *23*(3), 270-284.

Hewstone, M., Rubin, M., & Willis, H. (2003). Intergroup bias. *Annual review of Psychology, 53*(1), 575-604.

Jackson, B. A., & Wingfield, H. A. (2013). Getting angry to get ahead: Black college men, emotional performance, and encouraging respectable masculinity. *Symbolic Interaction*, *36*(3), 275-292.

James, E. H. (2000). Race-related differences in promotions and support: underlying effects of human and social capital. *Organization Science, 11*(5), 493–508.

Johnson, F. L. (2000). *Speaking culturally: Language diversity in the United States*. Sage.

Jones, D. M. (2013). He's a Black Male-Something Is Wrong with Him: The Role of Race in the Stand Your Ground Debate. *U. Miami L. Rev.*, *68*, 1025.

000390

DocuSign Envelope ID: C2013921-7C1A-4994-B520-482E455E3190

Jost, J. T., & Banaji, M. R. (1994). The role of stereotyping in system-justification and the
production of false consciousness. *British journal of social psychology*, *33*(1), 1-27.

Judge, T. A., & Bono, J. E. (2001). Relationship of core self-evaluations traits—self-esteem,
generalized self-efficacy, locus of control, and emotional stability—with job satisfaction and job
performance: A meta-analysis. *Journal of applied Psychology*, *86*(1), 80.

Keltner, D., Gruenfeld, D. H., & Anderson, C. (2003). Power, approach, and inhibition.
*Psychological review*, *110*(2), 265.

King, D. D., Fattoracci, E. S., Hollingsworth, D. W., Stahr, E., & Nelson, M. (2023). When
thriving requires effortful surviving: Delineating manifestations and resource expenditure
outcomes of microaggressions for Black employees. *Journal of Applied Psychology*, *108*(2), 183.

Kunda, Z., & Spencer, S. J. (2003). When do stereotypes come to mind and when do they color
judgment? A goal-based theoretical framework for stereotype activation and
application. *Psychological bulletin*, *129*(4), 522.

Kunda, Z., & Thagard, P. (1996). Forming impressions from stereotypes, traits, and behaviors: A
parallel-constraint-satisfaction theory. *Psychological review*, *103*(2), 284.

Landy, F. J. (2008). Stereotypes, bias, and personnel decisions: Strange and stranger. *Industrial
and Organizational Psychology*, *1*(4), 379-392.

Lee, R. T., Perez, A. D., Boykin, C. M., & Mendoza-Denton, R. (2019). On the prevalence of
racial discrimination in the United States. *PloS one*, *14*(1), e0210698.

Levine, M., Prosser, A., Evans, D., & Reicher, S. (2005). Identity and emergency intervention:
How social group membership and inclusiveness of group boundaries shape helping
behavior. *Personality and Social Psychology Bulletin*, *31*(4), 443-453.

000391

DocuSign Envelope ID: C2013921-7C1A-4994-B520-482E455E3190

Lockton, D. (2012). Cognitive biases, heuristics, and decision-making in design for behavior change. *Heuristics and Decision-Making in Design for Behavior Change.*

Matzler, K., Bauer, F. A., & Mooradian, T. A. (2015). Self-esteem and transformational leadership. *Journal of Managerial Psychology*, *30*(7), 815-831.

Mikkola, L., & Valo, M. (2019). *Workplace communication*. New York, NY: Routledge.

Mitchell, J. P., Ames, D. L., Jenkins, A. C., & Banaji, M. R. (2009). Neural correlates of stereotype application. *Journal of cognitive neuroscience*, *21*(3), 594-604.

Mong, S. N., & Roscigno, V. J. (2010). African American men and the experience of employment discrimination. *Qualitative Sociology*, *33*(1), 1-21.

Moskowitz, G. B., & Carter, D. (2018). Confirmation bias and the stereotype of the black athlete. *Psychology of Sport and Exercise*, *36*, 139-146.

Moss, P., & Tilly, C. (2001). *Stories employers tell: Race, skill, and hiring in America*. New York, NY: Russell Sage Foundation.

Motro, D., Evans, J. B., Ellis, A. P., & Benson III, L. (2022). Race and reactions to women's expressions of anger at work: Examining the effects of the "angry Black woman" stereotype. *Journal of Applied Psychology*, *107*(1), 142.

Neal, M. A. (2015). *New Black man*. New York, NY: Routledge.

Nelson, J. A. (2014). The power of stereotyping and confirmation bias to overwhelm accurate assessment: The case of economics, gender, and risk aversion. *Journal of Economic Methodology*, *21*(3), 211-231.

000392

DocuSign Envelope ID: C2013921-7C1A-4994-B520-482E455E3190

Patterson, A. M.. Chris, A. C. and Gonzalez-Morales, M. G. (2017). Workplace incivility. In C. L. Cooper and M. Leiter (Eds.), *The Routledge companion to wellbeing at work* (pp. 150-168). Routledge.

Peters, U. (2022). What is the function of confirmation bias?. *Erkenntnis*, *87*(3), 1351-1376.

Petsko, C. D., & Rosette, A. S. (2023). Are leaders still presumed white by default? Racial bias in leader categorization revisited. *Journal of Applied Psychology*, *108*(2), 330.

Reynolds, R. (2010). They think you're lazy" and other messages Black parents send their Black sons: An exploration of critical race theory in the examination of educational outcomes for Black males. *Journal of African American Males in Education*, *1*(2), 144-163.

Roscigno, V. J., Mong, S., Byron, R., & Tester, G. (2007). Age discrimination, social closure and employment. *Social Forces*, *86*(1), 313-334.

Sasso, T., & González-Morales, M. G. (2018). Centering the target of mistreatment in our measures. *Industrial and Organizational Psychology*, *11*(1), 107-112.

Sloan, M. M. (2004). The effects of occupational characteristics on the experience and expression of anger in the workplace. *Work and Occupations*, *31*(1), 38-72.

Spence, L. K. (2017). Images of black people in general, and black men in particular, have long. *Contours of African American Politics: Volume 2, Black Politics and the Dynamics of Social Change*, 281-293

Spencer, S. J., Logel, C., & Davies, P. G. (2016). Stereotype threat. *Annual review of psychology*, *67*, 415-437.

000393

DocuSign Envelope ID: C2013921-7C1A-4994-B520-482E455E3190

Sue, D. W., Capodilupo, C. M., Torino, G. C., Bucceri, J. M., Holder, A., Nadal, K. L., & Esquilin, M. (2007). Racial microaggressions in everyday life: implications for clinical practice. *American psychologist*, *62*(4), 271-286.

Sue, D. W., Capodilupo, C. M., & Holder, A. (2008). Racial microaggressions in the life experience of Black Americans. *Professional psychology: Research and practice*, *39*(3), 329.

Tajfel, H. (1974). Social identity and intergroup behaviour. *Social Science Information*, *13*(2), 65-93.

Tetlock, P. E. (1985). Accountability: A social check on the fundamental attribution error. *Social psychology quarterly*, 227-236.

Thagard, P., & Verbeurgt, K. (1998). Coherence as constraint satisfaction. *Cognitive science*, *22*(1), 1-24.

Thomas, D. A., & Gabarro, J. J. (1999). Breaking through: the making of minority executives in corporate America. Boston: *Harvard Business School Press.*

Thompson, G., Buch, R., & Glasø, L. (2018). Low-quality LMX relationships, leader incivility, and follower responses. *Journal of General Management*, *44*(1), 17-26.

Wade, C. L. (2001). Corporate governance as corporate social responsibility: Empathy and race discrimination. *Tulane Law Review*, *76*, 1461-1482.

Welch, K. (2007). Black criminal stereotypes and racial profiling. *Journal of contemporary criminal justice*, *23*(3), 276-288.

Wheeler, S. C., & Petty, R. E. (2001). The effects of stereotype activation on behavior: a review of possible mechanisms. *Psychological bulletin*, *127*(6), 797.

000394

DocuSign Envelope ID: C2013921-7C1A-4994-B520-482E455E3190

Williams, M. T., Skinta, M. D., & Martin-Willett, R. (2021). After Pierce and Sue: A revised racial microaggressions taxonomy. *Perspectives on Psychological Science*, *16*(5), 991-1007.

Williams, M. J., & Spencer-Rodgers, J. (2010). Culture and stereotyping processes: Integration and new directions. *Social and Personality Psychology Compass*, *4*(8), 591-604.

Wingfield, A. H. (2007). The modern mammy and the angry Black man: African American professionals' experiences with gendered racism in the workplace. *Race, Gender & Class*, 196-212.

Wingfield, A. H. (2010). Are some emotions marked" whites only"? Racialized feeling rules in professional workplaces. *Social Problems*, *57*(2), 251-268.

Yang, P. Q. (2021). Race, gender, and perceived employment discrimination. *Journal of Black Studies*, *52*(5), 509-527.

000395

# EXHIBIT  A

## CURRICULUM VITAE
## DR. DAPHNA MOTRO

# DR. DAPHNA MOTRO

Department of Management and Entrepreneurship
Frank G. Zarb School of Business
Hofstra University
Hempstead, NY 11546
516-463-5692
daphna.motro@hofstra.edu

## ACADEMIC APPOINTMENTS

Associate Professor of Management and Entrepreneurship, Frank G. Zarb School of Business, Hofstra University, Hempstead, NY, September 2023-Present

Assistant Professor of Management and Entrepreneurship, Frank G. Zarb School of Business, Hofstra University, Hempstead, NY, September 2017-September 2023

## EDUCATION

Ph.D., Management and Organizations
     University of Arizona, Tucson, AZ, May 2017.

Bachelor of Arts, Psychology and Cognitive Science
     University of Virginia, Charlottesville, VA, 2012.
     *Highest Distinction*

## RESEARCH INTERESTS

race; intersectionality; gender dynamics; emotion, ethics, organizational decision-making

## REFERRED PUBLICATIONS

Pittarello, A. & **Motro, D.** (forthcoming). Women who cry to manipulate others face more backlash than men. *Journal of Behavioral Decision-Making.*

Comer, D. R., Lenaghan, J. A., & **Motro, D**. (2023). Seeing past different signals in the job interview: Information improves ratings of candidates on the autism spectrum. *Equality, Diversity and Inclusion, 42*(7), 872-888.

**Motro, D.,** Pittarello, A., Nolan, K., Lenaghan, J., & Shahani-Denning, C. (2023). The dark side of leave: How voluntary leave shapes preferences for male and female supervisors. *Journal of Managerial Psychology*, *38*(1), 21-33.

Hamby, A. **Motro, D.**, Shawver, Z., & Gerrig, R. (2023). Examining readers' emotional responses to stories: An appraisal theory perspective. *Journal of Media Psychology, 35*(3), 131-144.

**Motro, D.,** & Sullivan, D. (2022). Resurrecting the evil genius: Examining the relationship between unethical behavior and perceived competence. *Journal of Managerial Psychology, 37*(6), 591-603.

Pittarello, A. & **Motro, D.** (2022). Dishonesty. In V. P. Glǎveanu (Ed.), *The palgrave encyclopedia of the possible*, Palgrave McMillan, New York, NY.

**Motro, D.,** Evans, J. B., Ellis, A. P. J., & Benson III, L. (2022)*. The angry black woman stereotype at work, *Harvard Business Review*. https://hbr.org/2022/01/the-angry-black-woman-stereotype-at-work
   *Media coverage: CNN

**Motro, D.,** Evans, J. B., Ellis, A. P. J., & Benson III, L. (2021)*. Race and reactions to women's expressions of anger at work: Examining the effects of the "Angry Black Woman" stereotype, *Journal of Applied Psychology, 107*(1)*, 142-152.
   *Media coverage: Inside Tucson Business

**Motro, D.,** Spoelma, T. M., & Ellis, A. P. J. (2020). Incivility and creativity in teams: Examining the role of perpetrator gender, *Journal of Applied Psychology, 106*(4)*, 560-581.

**Motro, D**., Comer, D. R., & Lenaghan, J. A. (2020). Examining the effects of negative performance feedback: The roles of sadness, feedback self-efficacy, and grit, *Journal of Business & Psychology 36*(3), 367-382.

**Motro, D.,** Ye, B., Kugler, T., & Noussair, C. (2019). Measuring emotions in the digital age. *MIT Sloan Management Review, 61*(1), 1-4.

Kugler, T., Ye, B., **Motro, D.,** & Noussair, C. (2019). On trust and disgust: Evidence from face reading and virtual reality. *Social Psychological and Personality Science, 11*(3), 317-325.

**Motro, D.,** Gabriel, A. S., & Ellis, A. P. J. (2019). Understanding women's health at work: The effects of menstruation. *Journal of Occupational and Organizational Psychology, 92*(3), 695-706.

**Motro, D.,** & Ellis, A. P. J. (2017). Boys, don't cry: Gender and reactions to negative performance feedback. *Journal of Applied Psychology, 102*(2), 227-235.

**Motro, D.,** Ordóñez, L. D., Pittarello, A., & Welsh, D. T. (2016)*. The effect of anger and guilt on unethical behavior: A dual-process approach. *Journal of Business Ethics, 152*(1), 133-

148.
*Media coverage: HR Gazette

**Motro, D.,** & Sullivan, D. (2016). Could two negative emotions be a positive? The effects of anger and anxiety in enemyship. *Journal of Experimental Social Psychology*, *69*, 130-143.

**Motro, D.**, Kugler, T., & Connolly, T. (2016). Back to the basics: How feelings of anger affect cooperation. *International Journal of Conflict Management*, *27*(4), 1-24.

Pittarello, A., **Motro, D.**, Rubaltelli, E., & Pluchino, P. (2016)*. The relationship between attention allocation and cheating. *Psychonomic Bulletin & Review, 23*(2)*, 609-616*.
*Media coverage: The Psychonomic Society

Pittarello, A., Rubaltelli, E., & **Motro, D.** (2015). Legitimate lies: The relationship between omission, commission, and cheating. *European Journal of Social Psychology*, *46*(4), 481-491

**Motro, D**., Ordóñez, L. D., Pittarello, A., & Welsh, D. T. (2014). The effect of anger and guilt on unethical behavior: A self-regulation approach. *Proceedings of the Seventy-third Annual Meeting of the Academy of Management.*

## CONFERENCE PRESENTATIONS

**Motro, D**., Perkins, B. G., & Ellis, A. P. J. (August, 2023). *Responses to observing others caught cheating: The role of schadenfreude.* Presented at the Annual Academy of Management Conference, Boston, MA.

Elfenbein, H. A., Hahn, R., & **Motro, D**. (August, 2023). *Menstruation matters: The current challenges and future goals of menstruation research.* Presented at the Annual Academy of Management Conference, Boston, MA.

Comer, D. R., Lenaghan, J. A., Pittarello, A., & **Motro, D** (August, 2023). *Please don't let me be misunderstood: Social barriers to inclusive neurodiverse workplaces.* Presented at the Annual Academy of Management Conference, Boston, MA.

Hsu, D., Yang, S., **Motro, D**., & Chan, R. S. (June, 2023). *"Your story reminds me of my past": How nostalgia affects equity vs. philanthropic investments.* Presented at the Annual Babson College Entrepreneurship Research Conference (BCERC), Knoxville, TN.

**Motro, D.,** & Pittarello, A. (August, 2022). *How crying fabricated tears negatively impacts women more than men: The role of anger and empathy*. Presented at the Annual Academy of Management Conference, Seattle, WA.

Comer, D., Lenaghan, J, & **Motro, D**. (August, 2022). *Seeing past different signals: Information improves ratings of job candidates on the Autism Spectrum.* Presented at the Annual Academy of Management Conference, Seattle, WA.

**Motro, D**., Pittarello, A., Nolan, K., Lenaghan, J., & Shahani-Denning, C. (April, 2022). *The dark side of leave: how voluntary leave shapes preferences for male and female supervisors.* Presented at the Annual Society for Industrial and Organizational Psychology Conference, Seattle, WA.

**Motro, D.,** & Sullivan, D. (August, 2021). *The "Evil Genius": Examining the relationship between perceived competence and  unethical behavior.* Presented at the Annual Meeting of the Academy of Management, Virtual.

Wang, X., **Motro, D**., Kammer, E., & Cassell, D. (April, 2021). *How affirmative inquiry matters: An exploratory study on mechanisms and boundaries.* Presented at the Annual Society for Industrial and Organizational Psychology Conference, Virtual.

**Motro, D.,** Evans, J. B., Ellis, A. P. J., & Benson III, L. (August, 2019). *Examining the effects of the "angry black women" stereotype.* Presented at the Annual Meeting of the Academy of Management, Boston, MA.

**Motro, D**., Comer, D. R., & Lenaghan, J. A. (August, 2019). *Using face-based emotion recognition software to examine the effects of negative feedback.* Presented at the Annual Meeting of the Academy of Management, Boston, MA.

**Motro, D.,** Evans, J. B., Ellis, A. P. J., & Benson III, L. (November, 2018). *Race and reactions to negative feedback among women at work: Examining the effects of the "angry black woman" stereotype.* Presented at the Annual Meeting of the Society for Judgment and Decision Making, New Orleans, LA.

**Motro, D.,** & Ellis, A. P. J. (August, 2018). *Examining the effects of menstruation on women at work: A self-regulatory approach.* Presented at the Annual Meeting of the Academy of Management, Chicago, IL.

Connolly, T., Kugler, T., **Motro, D.,** Noussair, C., & Ye, B. (November, 2017). *On trust and disgust: Using face reading technology to investigate the emotional underpinnings of trusting decisions.* Presented at the Annual Meeting of the Society for Judgment and Decision Making, Vancouver, BC, Canada.

**Motro, D.,** & Sullivan, D. (November, 2016). *Could two negative emotions be a positive? The effects of anger and anxiety in enemyship.* Presented at the Annual Meeting of the Society for Judgment and Decision Making, Boston, MA.

**Motro, D.,** Spoelma, T. M., & Ellis, A. P. J. (August, 2016). *Examining a multilevel model of anger contagion in teams: An information processing approach.* Presented at the Annual

Meeting of the Academy of Management, Anaheim, CA.

**Motro, D.,** Evans, J. B., Hart, E., & Kugler, T. (November, 2015). *You don't want to lie to me when I'm angry: The effect of emotion on detecting social deception.* Presented at the Annual Meeting of the Society for Judgment and Decision Making, Chicago, IL.

**Motro, D.,** Kugler, T., & Connolly, T. (August, 2015). *Anger and cooperation: Lay theories and social bonds.* Presented at the Annual Meeting of the Academy of Management, Vancouver, BC, Canada.

**Motro, D.,** Pittarello, A., Rubaltelli, E., & Pluchino, P. (August, 2015). *Willful blindness: The relationship between attention allocation and unethical behavior.* Presented at the Annual Meeting of the Academy of Management, Vancouver, BC, Canada.

**Motro, D.,** Ordóñez, L. D., Pittarello, A., & Welsh, D. T. (November, 2014). *Investigating the effects of anger and guilt on unethical behavior: A dual-process approach.* Presented at the Annual Meeting of the Society for Judgment and Decision Making, Long Beach, CA.

Pittarello, A., **Motro, D.,** Rubaltelli, E., Pluchino, P. (November, 2014). *Turning a blind eye: Using eye-tracking technology to investigate cheating behavior.* Presented at the Annual Meeting of the Society for Judgment and Decision Making, Long Beach, CA.

**Motro, D.,** Ordóñez, L. D., Pittarello, A., & Welsh, D. T. (August, 2014). *The effect of anger and guilt on unethical behavior: A self-regulation approach*\*. Presented at the Annual Meeting of the Academy of Management, Philadelphia, PA.

> **\*judged one of the best accepted papers and published in the *Academy of Management Proceedings***

**Motro, D.,** Kugler T., & Connolly, T. (November, 2013). *Why are you mad? The effect of different anger sources on cooperation*\*. Presented at the Annual Meeting of the Society for Judgment and Decision Making, Toronto, Canada.

> **\*won 3rd place in Student Poster Competition**

**Motro, D.,** Kugler, T., & Connolly, T. (July, 2013). *The effect of different anger sources on cooperation in social dilemmas.* Presented at the International Conference on Social Dilemmas, Zurich, Switzerland.

## AWARDS AND GRANTS

**Lawrence A. Stessin Prize for Outstanding Scholarly Publication**
    $2,000, Hofstra University, 2022

**Dean's Research Award**
> $2,000, Frank G. Zarb School of Business, Hofstra University, 2022

**Stephen J. Robbins Doctoral Fellowship Award**
> $5,000, Department of Management and Organizations, University of Arizona, 2016

**Eller Center for Leadership Ethics Research Grant**
> $3,500, Center for Leadership Ethics, University of Arizona, 2015

**Stephen J. Robbins Doctoral Fellowship Award**
> $5,000, Department of Management and Organizations, University of Arizona, 2014

## TEACHING EXPERIENCE

Compliance, Ethics, and Sustainability (MBA 214), Department of Management & Entrepreneurship, Hofstra University, Fall 2021-present

Organizational Behavior and Leadership Skills for Strategic Advantage (MGT 207), Department of Management & Entrepreneurship, Hofstra University, Fall 2017-present

Human Relations in Organizations (MGT 130), Department of Management & Entrepreneurship, Hofstra University, Fall 2020-present

Business Ethics and Society (MGT 200), Department of Management & Entrepreneurship, Hofstra University, Fall 2017-Fall 2020

Research Seminar in Human Resource Management (MGT 309), Department of Management & Entrepreneurship, Hofstra University, Fall 2019-present

Graduate Internships, Department of Management & Entrepreneurship, Hofstra University, Fall 2019-present

Leadership and Teams, Teaching Assistant, Department of Management and Organizations, University of Arizona, 2015

Integrating Business Fundamentals with Ethics and Law
Department of Management and Organizations, University of Arizona, 2015

Organizational Behavior: The Human Side of the Organization
Department of Management and Organizations, University of Arizona, 2014

Statistical Inference in Management
Department of Management and Organizations, University of Arizona, 2014

Statistical Inference in Management

Department of Management and Organizations, University of Arizona, 2013

## PROFESSIONAL MEMBERSHIPS

Academy of Management
Society for Industrial and Organizational Psychology
Society for Judgment and Decision Making

**Service Record**

**University Level**

**Institutional Review Board**
**Position: Board Chair**
**August 2021-present**
**Responsibilities:** Schedule and oversee full committee board meetings. Review research proposals and amendments that involve humans as participants and offer recommendations to full board. Also contact researchers across other schools in the University if their proposals require either minor edits or major revisions. Create and administer new procedures when necessary. Help onboard new members. Serve as the first point of contact for inquiries about the IRB process. Interact with administration and outside parties regarding research with Hofstra University faculty and students.

**Institutional Review Board**
**Position: Board Member**
**August 2020-present**
**Responsibilities:** Review research proposals and amendments that use humans as participants. Offer recommendations to full board that consists of members from other schools in the University. Ensure that all faculty-submitted research proposals meet the appropriate federal guidelines and contain the required materials (e.g., informed consent documents, surveys). Advise change where necessary so that the research participants are adequately protected. Analyze the risks and benefits of the research and determine if and where additional protections are required. Communicate with researchers if and when needed regarding their proposals.

**HUHC Advisory Group**
**Position: Committee Member**
**February 2020-present**
**Responsibilities**: Help serve as a sounding board for ideas that enrich the experience of high-achieving students in all fields at Hofstra University. Create a call for preliminary proposals where students are encouraged to engage in cross-disciplinary research and experimentation in student teams. The proposals will be reviewed by the HUHC deans and project-based seminars will be led by up to 3 faculty. Created an honors option for MGT 130 where students learn about human relations in organizations at a deeper, more sophisticated level.

**School Level**

**Assurance of Learning Oversight Committee**
**Position: Committee Member**
**September 2022-present**
**Responsibilities:** Work together with the chair of the Undergraduate Assurance of Learning

committee and the chair of the curriculum committee to make adjustments to courses as necessary. Ensure that changes are data-driven and made with the intention of enriching student learning experiences. Work towards continuous improvement and brainstorm ways to make the assurance of learning process as effective as possible.

**Graduate Assurance of Learning Committee**
**Position: Committee Chair**
**September 2022-present**
**Responsibilities:** Work with the Assurance of Learning director in meeting AACSB standards. Help collect data when necessary. Discuss different ways to add and revise program goals and objectives for graduate education, including MBA and MS programs. Emphasize the importance of including DEI and sustainability goals and objectives when applicable. Identify objective outcomes, such as internships, employment, and certifications that can be used as measures of learning.

**Deans Business Research Scholars Program**
**Position: Faculty Advisor**
**May 2023-present**
**Responsibilities:** Advise undergraduate students in developing their research skills to build better Zarb scholars. Work with each student in developing a research project in an area that they are interested in, such as human resource management or diversity, equity, and inclusion research. Take them through the entire research process, including how to conduct literature reviews, conduct studies, write manuscript, and create presentations. Meet with students and provide detailed feedback on deliverables.

**Zarb Women in Business**
**Position: Faculty Advisor**
**January 2022-present**
**Responsibilities:** Oversee activities of Zarb Women in Business (ZWIB) club. ZWIB is a professional graduate club that advocates for the presence of women in all businesses and industries. Helped activate social media sites, such as Facebook and Instagram for the club. Interact with executive board in creating activities and scheduling meetings. Thus far, this has included a Zarb Alumni Event and Invited Speaker Series. Oversee budget decisions and keep track of financial records.

**Undergraduate Assurance of Learning Committee**
**Position: Committee Member**
**September 2020-May 2022**
**Responsibilities:** Discuss topics raised by the Oversight Committee, such as changes to the BBA Learning Goals and Objectives that were in place from 2013-2018. These changes included both minor alterations and substantial changes to the language in a number of the goals. Discuss and create new objectives for different learning goals.

**Behavioral Lab Student Subject Pool Committee**
**Position: Committee Member**

**September 2018-present**
**Responsibilities**: Work with faculty to help build policies regarding the creation of a subject pool for the new behavioral lab. Work with research assistants who want to use the lab for any projects. Recruit faculty members in offering students extra credit for participating in departmental studies. Also give tours to faculty, students, and staff of the facility, demonstrate the technology, and answer any questions they might have.

**Department Level**

**Department Personnel Committee**
**Position: Committee Member**
**September 2022-present**
**Responsibilities:** Attend job candidate interviews for new department positions. For candidates that are brought to campus, attend their job talks and meet with them afterwards. Rank the candidates on a standardized candidate interview evaluation form that includes evidence of the candidate's research productivity and relevant teaching experience. Consult with other members of the committee about whether the candidate is a good fit for the position.

**Blue Ribbon Committee**
**Position: Committee Member**
**February 2022-present**
**Responsibilities:** Offer recommendations to the inclusion of technology in the curriculum that is in the Zarb strategic plan and will be part of the AACSB report for reaccreditation. Present these recommendations to the department faculty for discussion and adoption. One adopted recommendation was incorporating the resources of the behavioral lab into learning environments, such as encouraging students to participate in research studies that utilize eye-tracking and facial recognition technology.