*Earl Fenner v. United States Gypsum Company*, 23-cv-00525

# EXHIBIT B

Transcript of Dr. Daphna Motro
Conducted on April 3, 2024

1 (1 to 4)

---

**Page 1**

```
         IN THE UNITED STATES DISTRICT COURT
             FOR THE DISTRICT OF COLORADO

EARL FENNER, JR.,            )
                             )
           Plaintiff,        )
                             )
     vs.                     ) No. 1:23-cv-525-CNS
                             )
UNITED STATES GYPSUM         )
COMPANY, et al.,             )
                             )
           Defendants.       )
```

The deposition of DR. DAPHNA MOTRO, called for examination, taken pursuant to notice and pursuant to the Federal Rules of Civil Procedure for the United States District Courts pertaining to the taking of depositions, taken before Jennie Entress, Certified Shorthand Reporter, commencing at 9:30 a.m. on the 3rd day of April, 2024.

---

**Page 2**

A P P E A R A N C E S

ON BEHALF OF THE PLAINTIFF:

   STEVEN L. MURRAY, ESQUIRE
   MURRAY LAW, LLC
   3900 East Mexico Avenue, Suite 300
   Denver, Colorado 80210

ON BEHALF OF THE DEFENDANTS:

   PAUL BATEMAN, ESQUIRE
   SHANTHI V. GAUR
   LITTLER MENDELSON, PC
   321 North Clark Street, Suite 1100
   Chicago Illinois 60654
   312.372.5520

ALSO PRESENT:
   REMOTE TECH KY SHANKLIN, PLANET DEP
   EARL FENNER, JR.

         *   *   *   *   *

---

**Page 3**

```
                    I N D E X
WITNESS:                              PAGE:
Dr. Daphna Motro
   Examination by Mr. Bateman
   Examination by Mr. Murray
```

---

**Page 4**

1  REMOTE TECHNICIAN: Thank you to everyone for attending this proceeding remotely, which we anticipate will run smoothly. Please remember to speak slowly and do your best not to talk over one another. Please be aware we're recording this proceeding for backup purposes.

Any off the record discussions should be had away from the computer and please remember to mute your mics for those conversations. Please have your video enabled to help the reporter identify who is speaking. If you're unable to connect with video and are connecting via phone, please identify yourself each time before speaking.

We will provide a complimentary unedited recording of this deposition with the purchase of a transcript. I apologize in advance for any technical difficulties. Thank you.

(Witness sworn.)

WHEREUPON:

DR. DAPHNA MOTRO, called as a witness herein, having been first duly sworn, was examined and testified as follows:

13

1  A.  I don't remember what was in the actual
2  e-mail.  I can go -- I would have to go back and
3  read the text of the e-mail.
4      Q.  You didn't read it prior to this today
5  for your deposition?
6      A.  No.
7      Q.  Thank you.  All right.  So you received
8  an e-mail from Mr. Murray.  It sounds like it
9  was some time in October, November of 2023,
10 correct?
11     A.  Correct.
12     Q.  And then what happened after that?  Did
13 you respond to him via e-mail or -- or what?
14     A.  I either responded to him via e-mail or
15 I contacted him on the phone, but I did respond
16 to him.
17     Q.  Okay.  And how soon after you received
18 an e-mail from Mr. Murray, that Mr. Murray has
19 indicated that he will produce, when did you
20 have a conversation with Mr. Murray?
21     A.  I would have to check my records, but
22 soon after that.
23     Q.  And when you say you would have to
24 check your records, what do you mean by that?
25 What are the records that you would have to

14

1  check?
2      A.  I would have to check my e-mail sent
3  out box and my outgoing phone calls.
4      Q.  And you still have your outgoing
5  e-mails, is that -- those haven't been deleted
6  with respect to this case?
7      A.  I believe I still have them, yes.
8      Q.  Okay.  After receiving the e-mail, did
9  you have a phone conversation with Mr. Murray?
10 Because it sounds like you did.
11     A.  Yes.
12     Q.  And was it just you and Mr. Murray on
13 the line?
14     A.  Yes.
15     Q.  Okay.  And what was the purpose of the
16 phone call?
17     A.  It was to discuss whether I would be
18 interested in acting as an expert witness in a
19 lawsuit.
20     Q.  Okay.  Going back to the e-mail that we
21 don't have, do you recall what the substance of
22 what Mr. Murray's communication to you was in
23 that e-mail?
24     A.  I don't recall.  I'd have to read the
25 e-mail.

15

1      Q.  Okay.  That -- that's fair enough.  But
2  did he ask you in that e-mail to be an expert
3  witness?
4      A.  I can't remember.  I'd have to check
5  the e-mail.
6      Q.  Okay.  Did he make any reference to,
7  perhaps, an article he might have read that you
8  had been a -- a -- an author of?
9      A.  I would have to read the e-mail.
10     Q.  Okay.  Did you take any notes of your
11 phone conversation with Mr. Murray?
12     A.  *we.
13     Q.  Did you -- so after you -- you received
14 the e-mail, I -- if I understand it correctly,
15 because I can't read the e-mail because I don't
16 have it, but your phone conversation with him,
17 he asked you to be an expert witness?
18     A.  I believe so.
19     Q.  Did he -- did he indicate to you what
20 he wanted you to opine on as an expert witness?
21     A.  I believe it was regarding a case
22 involving discrimination.
23     Q.  Okay.  To the best of your
24 recollection, can you tell me what Mr. Murray
25 said to you and what you said to him in that

16

1  initial conversation?
2      A.  Based on my recollection, it was that
3  he was representing a client who is claiming
4  race-based discrimination.  And based on my
5  research and background, I would be -- that as
6  an expert witness, you opine on this case.
7      Q.  Okay.  And -- and did he -- what were
8  you to opine on in terms of being an expert
9  witness that might have been discussed during
10 that initial phone conversation?
11     A.  The extent to which the case involved a
12 racial discrimination.
13     Q.  Okay.  Are you an expert on racial
14 discrimination?
15     A.  I believe I have sufficient knowledge
16 to opine on that, to opine on this case.
17     Q.  What is your expertise with regard to
18 racial discrimination?  I just want to make sure
19 I understand that.
20     A.  My expertise is rooted in my research
21 that I've conducted and the typed* papers I've
22 published and the conferences I've presented at.
23     Q.  Oh, okay.  And -- and -- and is there
24 like a particular area of racial discrimination
25 that you consider yourself to be an expert on?

Transcript of Dr. Daphna Motro
Conducted on April 3, 2024

5 (17 to 20)

17
1  A. Particularly with race, black and white
2 discrimination, racial discrimination.
3  Q. Black and white discrimination?
4  A. So when you examine it, you usually
5 have to compare different forms of race to
6 examine whether discrimination is present. So
7 in my research, I generally compare -- compare
8 black employees or individuals compared to white
9 employees or individuals.
10  Q. And do you also compare black employees
11 to other employees who might not necessarily be
12 white?
13  A. In my current research? No.
14  Q. Okay. So you just compare black versus
15 white, is that correct in that regard?
16  A. That is correct.
17  Q. Okay. What about with regard to
18 gender? Do you do anything in that realm?
19  A. Yes.
20  Q. Okay. Now, and what is your expertise
21 in that respect?
22  A. I have researched different forms of
23 discrimination based on gender discrimination
24 towards males in certain contexts and
25 discrimination towards females in different

18
1 contexts in the workplace.
2  Q. And -- and you have actually published
3 articles on this?
4  A. Yes.
5  Q. And the articles that you have
6 published, have you ever had to retract or
7 change any of your conclusions?
8  A. No.
9  Q. So, for example, the articles that have
10 been written by you that are identified in your
11 CV, just to be how can I put it, a little
12 colloquial, you stand by your publications; is
13 that correct?
14  A. Yes, that is correct.
15  Q. All right. So I -- I want to go back
16 to this initial phone conversation you had with
17 Mr. Murray after you received the e-mail.
18      Can you tell us what else you discussed
19 during that phone call?
20  A. I cannot recall what else was discussed
21 besides what I mentioned about the case.
22  Q. Did you take notes of the conversation?
23  A. No.
24  Q. Did you discuss the fee during your
25 initial conversation?

19
1  A. Not a specific fee, no.
2  Q. Okay. If at any time you remember
3 anything else about that initial conversation,
4 would you be kind enough to say hey, Mr.
5 Bateman, I remember something else?
6  A. Yes.
7  Q. Okay. Thanks much. Did you have a
8 subsequent conversation with Mr. Murray or a
9 subsequent communication in writing to
10 Mr. Murray where he indicated to you what your
11 assignment would be in this case?
12  A. Yes.
13  Q. Okay. And how soon after this first
14 conversation did this second conversation take
15 place?
16  A. I would have to consult my -- again, my
17 outbox and my phone records, but a few days to a
18 week.
19  Q. That -- that -- that's quite
20 understandable, which is why it would have been
21 nice to have seen those before today, which
22 would have made -- to make this go a lot more
23 quickly. But we are where we are, Dr. Motro.
24 Okay. All right.
25      So this second conversation -- did you

20
1 have a second conversation with Mr. Murray to
2 discuss your assignment in this case?
3  A. Yes.
4  Q. Okay. Was anyone else a part of this
5 conversation?
6  A. No.
7  Q. Okay. Can you tell me, to the best of
8 your recollection, what you discussed with
9 Mr. Murray during this second conversation?
10  A. I believe it went into more specifics
11 about the case, what happened and the overall
12 different components of the trial, as I have
13 never been an expert witness. So a lot of it
14 focused on what actually happens in a case. The
15 different components of -- of the trial.
16  Q. Okay. What components of the case were
17 discussed with you? I'm just curious.
18  A. That there was -- there is an initial
19 report and then there's a deposition, if
20 requested and then there's a court appearance,
21 if requested. There's three -- the different
22 stages.
23  Q. Okay. So you had a discussion about
24 the different stages of litigation or the
25 different stages of how this case could proceed,

correct?
**A. Correct.**
Q. All right. What else was discussed?
**A. More specifics regarding the case, what happened based on Mr. Fenner's allegations and what -- mentioned what occurred at the organization and the allegation of racial discrimination.**
Q. And this was conveyed to you by Mr. Murray?
**A. Correct.**
Q. Were any documents shared with you during this second conversation?
**A. No.**
Q. Anything else you can recall with regard to the second conversation with Mr. Murray regarding your retention in this case?
**A. Not that I can recall.**
Q. Okay. During the second conversation, were you retained as an expert witness in this case?
**A. Well, that went through a contract when I was officially retained. It went through a written contract. It was not an oral agreement**

**that...**
Q. Okay. Have you told me everything that you can recall with regard to this second conversation with Mr. Murray?
**A. As much as I can recall, yes.**
Q. Okay. You said a written contract. Was that discussed in the second conversation?
**A. I can't remember.**
Q. That's okay. Was there a third conversation with Mr. Murray?
**A. There were -- after the second, there were a series of conversations, e-mails, phone calls, but I can't remember the content of each one.**
Q. Okay. How many conversations have you had with Mr. Murray with regard to this case?
**A. Without checking my outbox and my phone records, I would estimate 10 to 15.**
Q. I want to make sure I heard that last part. Did you say 15 or 50?
**A. 10 to 15.**
Q. Okay. And it sounds like these started in October of 2023?
**A. Correct.**
Q. And -- and those continued to 2024?

**A. Correct.**
Q. Okay. Your written contract, when was that entered into?
**A. As best as I can recall, November of 2023.**
Q. Do you know who drafted the written contract?
**A. Mr. Murray.**
Q. Okay. And does this written contract set forth the terms of your compensation?
**A. Yes.**
Q. Does it set forth the scope of your assignment?
**A. Yes.**
Q. So in -- in this written contract, it says what Mr. Murray is paying you to do in this particular piece of litigation?
**A. Yes.**
Q. Okay. The first conversation that you had with Mr. Murray, was Mr. Fenner part of that conversation?
**A. No.**
Q. What about the second conversation?
**A. No.**
Q. Have you ever talked to Mr. Fenner?

**A. Yes.**
Q. How many times have you spoken to Mr. Fenner?
**A. I would estimate from two and three -- two to three.**
Q. Do you recall when these conversations took place?
**A. And I would have to double-check my records, but late December, early January, late December of 2023, early January of 2024, around that time.**
Q. The conversations where Mr. Fenner was involved, was that just you and Mr. Fenner or was anyone else involved in those conversations?
**A. Mr. Murray.**
Q. Mr. Murray. Have you ever had a conversation with just Mr. Fenner?
**A. Not that I can recall.**
Q. Thank you. Did you look at any of these documents that you have before we started this deposition today to prepare for our -- your deposition?
**A. You mean the -- the Complaint and the -- and my report?**
Q. Yes, anything of that?

**Page 25**

1  A. I looked at those documents and the
2  deposition of *Ms. Earl.
3  Q. Do you have a file for this case from
4  your report?
5  A. Yes.
6  Q. What all is in that file?
7  A. The deposition of *Ms. Earl, the First
8  Amended Complaint, my report and then I -- those
9  things, for certain. And then I'd have to go
10 check the file -- or to check the folder for
11 other -- for what else is there.
12  Q. I -- I -- I'm still kind of a paper
13 person here. But if -- if -- if -- if we were
14 to put it into inches of paper, how -- how --
15 how thick is your -- how thick would your file
16 be?
17  A. One fourth of an inch.
18  Q. Okay. With regard to Ms. Earl's
19 deposition, did you read the entire deposition?
20  A. I did.
21  Q. Okay. Did you read Mr. Fenner's
22 deposition before you -- before your deposition
23 here today?
24  A. No.
25  Q. So to prepare your report, you did look

**Page 26**

1  at Ms. Earl's deposition?
2  A. I did.
3  Q. Okay. Did you look at Mr. Fenner's
4  deposition to prepare your report?
5  A. No.
6  Q. Did you look at any other depositions
7  to prepare your report?
8  A. No.
9  Q. Did you look at any other documents to
10 prepare your report?
11  A. Research articles.
12  Q. Did you speak to any current employees
13 of USG to prepare your report?
14  A. No.
15  Q. Did you have a discussion with any
16 former employee of USG to prepare your report?
17  A. No.
18  Q. I've looked at your CV Dr. Motro, and
19 just help me out here, because I just want to
20 make sure that I'm not misunderstanding
21 something. Okay?
22  A. Okay.
23  Q. Am I correct that you do not consider
24 yourself an economist?
25  A. Correct.

**Page 27**

1  Q. Okay. Do you consider yourself to be a
2  treating psychologist?
3  A. I do not.
4  Q. And is it fair to say that in terms of
5  your retention by Mr. Murray, which is probably
6  the scope of which is in that contract you
7  signed with him, that you were not asked to
8  provide any kind of psychological services to
9  Mr. Murray?
10  A. I was not.
11  Q. All right. And is it also fair to say
12 that you're not -- or you don't consider
13 yourself, in any event, because you do have a --
14 a very lengthy background here in certain
15 things.
16     But with regard to job search activity,
17 you're not an expert on that, are you?
18  A. I don't understand.
19  Q. Yeah. Let me -- let me rephrase it.
20 You're not an expert in terms of knowing what
21 available job positions there are for
22 individuals or within the -- the Denver
23 metropolitan area; is that correct?
24  A. Within the Denver? No.
25  Q. Okay. Did you ever request any

**Page 28**

1  information from Mr. Murray so that you could
2  prepare your report?
3  A. Not that I can recall, no.
4  Q. Did you ever request any information
5  from Mr. Fenner so that you could prepare your
6  report?
7  A. No.
8  Q. And if we could just look at your
9  report, Bates labeled 382. So it's -- let's go
10 here, 385. It's Roman numeral V, exhibits used
11 or summarized to support opinions. If you can
12 just take a look at that paragraph under no --
13 Roman numeral number V.
14     And when you have done so, just let me
15 know.
16  A. Okay.
17  Q. All right. I -- is -- is this accurate
18 in terms of what information that you looked at
19 to prepare this report?
20  A. Yes, in addition to research articles
21 that are in the References section.
22  Q. And when you're referring to the
23 References section, are you referring to Roman
24 numeral X that begins on 386 and that
25 continues -- and it continues on to -- it looks

### Page 29

1  like it continues on to 394; is that right?
2  A.  395.
3  Q.  395?  You're right, Page 4 and 5 of
4  your report.  Okay.  Sorry.  I didn't mean to
5  cut off at that point.
6       And you -- and you refer to each and
7  every one of these articles in order to prepare
8  this report?
9  A.  Correct.
10  Q.  Okay.  How long did it take you to
11  prepare your report?
12  A.  Between 20 and 30 hours.
13  Q.  And during what time period was this
14  report prepared?  And when I say time period,
15  I'm talking about the dates, just generally
16  speaking.
17  A.  November 2023.
18  Q.  Okay.  So this report was prepared in
19  November of 2023.
20  A.  Correct.
21  Q.  I'm looking at Page 386.  And you have
22  to go -- you have to go down a little and it --
23  it might be coming up a little different.  But
24  if you can go to your signature page that's
25  right above -- right above References.

### Page 30

1  A.  Correct.
2  Q.  Okay.  You signed this report on
3  January 16, 2024?
4  A.  Correct.
5  Q.  But it was completed in November of
6  2023?
7  A.  It was prepared in November of 2023.
8  That's when I started the report.
9  Q.  Okay.  When did you finish the report?
10  A.  Probably early January of 2024, but I
11  would have to check my records on the exact
12  date.
13  Q.  Okay.  Now I'm -- I'm just trying to
14  follow the chronology here.  Tell me if I've got
15  this wrong, but it -- it -- I think I heard you
16  say that you spent 20 to 30 hours preparing this
17  report in November of 2023.  Do I have that
18  right?
19  A.  Yes.
20  Q.  Okay.  And did you have -- first have a
21  draft of this report after you prepared it?
22  A.  That was the draft.  The first
23  preparation, yes.  In November of 2020.
24  Q.  Okay.  After you completed your draft,
25  did you discuss it with anyone?

### Page 31

1  A.  Yes.
2  Q.  With whom did you have a discussion
3  with regard to the drafting of the report that
4  you completed in November of 2023?
5  A.  Mr. Murray.
6  Q.  And how many discussions with
7  Mr. Murray did you have regarding the draft?
8  A.  I would really have to go back and
9  check my outbox on the number of...
10  Q.  Did Mr. Murray ask you that -- to -- to
11  review the draft with him?
12  A.  With him?  I don't understand, with
13  him.
14  Q.  Okay.  You reviewed the draft with
15  Mr. Murray, correct?
16  A.  I sent the draft via e-mail to
17  Mr. Murray.
18  Q.  Okay.  So that's another one of the
19  e-mails that you have, correct, regarding this
20  case?
21  A.  Yes.
22  Q.  Okay.  So you sent the draft to
23  Mr. Murray.  And did you send that draft to him
24  via e-mail in November of 2023?
25  A.  I believe so, yes.

### Page 32

1  Q.  And Mr. Murray asked you to send him
2  the draft of your report?
3  A.  Yes.
4  Q.  When did he ask to see the draft of
5  your report?
6  A.  Okay.  I would have to check my outbox
7  for exact dates.  I can only estimate around
8  November 2023.
9  Q.  And you sent the draft report to
10  Mr. Murray via e-mail.
11  A.  Correct.
12  Q.  And after you sent the draft to
13  Mr. Murray via e-mail, did you have a discussion
14  with Mr. Murray regarding the draft?
15  A.  Yes.
16  Q.  When did that conversation take place?
17  A.  I would have to check my outbox and
18  phone records to be thorough, but it was either
19  November of 2023 going into December of 2023.
20  Q.  At the time that you prepared the draft
21  that you sent to Mr. Murray, had you seen
22  Mr. Fenner's deposition transcript?
23  A.  I never saw his deposition transcript.
24  Q.  You've never seen Mr. Fenner's
25  deposition transcript?

33

1   MR. MURRAY: Objection, asked and
2 answered.
3 BY MR. BATEMAN:
4   Q. Oh, I meant to tell you at the very
5 beginning about this, how this works.
6 Mr. Murray can raise an objection. It's denoted
7 for the record. And now you can go ahead and
8 answer the question.
9   **A. I have not seen his deposition.**
10   Q. Okay. Have you seen Ms. Earl's
11 deposition transcript?
12   **A. Yes.**
13   Q. When did you see Ms. Earl's deposition
14 transcript?
15   **A. I would have to check my inbox on the**
16 **dates that I received it.**
17   Q. Did you see it before or after you sent
18 the draft of Mr. Murray of your report in
19 November of 2023 via e-mail?
20   **A. I would have to check my inbox to see**
21 **when I received the deposition.**
22   Q. Okay. Did you ever ask to see
23 Mr. Fenner's deposition transcript?
24   **A. No.**
25   Q. Were you not interested in Mr. Fenner's

34

1 deposition transcript?
2   **A. I just prepared and completed my report**
3 **based on -- on the documents that I received. I**
4 **did not request additional documents. I**
5 **completed my report based on what I received.**
6   Q. I understand. That's not the question
7 I'm asking you. Were you not interested in
8 seeing what Mr. Fenner testified to in his
9 deposition under oath? Yes or no?
10   **A. No. I didn't know that it existed.**
11   Q. Okay. Okay. When you had a discussion
12 with Mr. Murray regarding the draft of your
13 report that you sent him via e-mail in November
14 of 2023, did Mr. Murray make any suggestions to
15 you with regard to revisions to your report?
16   **A. Regarding the revisions?**
17   Q. Yes.
18   **A. Yes.**
19   Q. What suggestions did Mr. Murray make to
20 you regarding revisions to your -- the draft
21 report that you sent him in November of 2023?
22   **A. Again, I would have to go back to see**
23 **what he said in my inbox and what he sent. I**
24 **can't remember exactly what he said.**
25   Q. Okay. I understand you don't remember

35

1 exactly. Do you remember anything about what he
2 might have said to you with regard to revisions
3 to your draft report that you sent him in
4 November 2023 via e-mail?
5   **A. I would have to go back and check what**
6 **he said.**
7   Q. So you have no independent
8 recollection? That's how we say it in lawyer --
9 legalese.
10   You don't remember anything unless you
11 can look at an e-mail; is that correct?
12   **A. Correct.**
13   Q. And you *haven't produced those
14 e-mails; is that correct?
15   **A. Correct.**
16   MR. BATEMAN: Let's take a five-minute
17 break. We've been at this for about an hour.
18 Okay. That's how we do things. So you can take
19 a -- a little bit of break and we'll let the
20 court reporter relax her fingers, and we'll be
21 back on the record in ten minutes.
22   (A short break was had.)
23 BY MR. BATEMAN:
24   Q. All right. I -- I -- I do want to come
25 back to your conversation with Mr. Murray, but

36

1 I'm going to ask you a question.
2   Given that you've never been an expert
3 witness before, did you rely upon any form or
4 any -- an example from anyone else in terms of
5 prepare -- actually putting your report
6 together?
7   **A. No, I did not.**
8   Q. Did you consult with someone who has
9 been an expert witness before to assist you in
10 preparing your report?
11   **A. No.**
12   Q. Did -- did you look at any cases out
13 there to help you to prepare your report?
14   **A. No.**
15   Q. Okay. So you did this all start to
16 finish, apart from your conversations with
17 Mr. Murray perhaps, to -- to prepare the report
18 in this case?
19   **A. Yes.**
20   Q. I think I asked you a question with
21 your report on Page No. 368. You use a term
22 there "substantial evidence."
23   What does that mean, substantial
24 evidence?
25   **A. That would indicate that it's not**

Transcript of Dr. Daphna Motro
Conducted on April 3, 2024

10 (37 to 40)

**Page 37**

1  the -- the events that took place were not
2  simply due to chance.
3      Q.  Not simply due to chance.  Okay.
4  That's what substantial evidence means here?
5      A.  Yes.
6      Q.  I -- I just wanted to -- to make sure
7  that I was on the -- I understood because
8  that -- that actually has a different legal
9  connotation in -- in certain settings.  But
10 anyway, that's -- that's what you meant, not due
11 to chance.  Okay.
12     Going back, let's go back to the
13 November of 2023.  You remember that's where we
14 were before we took the break.  And you said
15 that you had not reviewed Mr. Fenner's
16 deposition.  You did not know it existed.
17     Did Mr. Murray ever give you any
18 suggestions with regard to revisions to the
19 draft of your report?
20     **A.  Revisions were offered, but I -- I**
21 **would have to go back to my outbox and see what**
22 **they were specifically.**
23     Q.  Do you recall any revisions that might
24 have been offered, without looking at your
25 outbox?

**Page 38**

1      **A.  Not off the top of my head.**
2      Q.  And let me just ask another question
3  because I think I know the answer to this, just
4  from the manner in which you testified today.
5      You haven't had any discussion with
6  anyone regarding your deposition during the
7  break that we just took; is that correct?
8      **A.  Other than Mr. Murray?**
9      Q.  Okay.  Did you have any discussion with
10 Mr. Murray during the break?
11     MR. MURRAY:  Yes, she did.
12 BY MR. BATEMAN:
13     Q.  What discussion did you have with
14 Mr. Murray during the break?
15     **A.  A discussion about this deposition.**
16     Q.  Who contacted who?
17     **A.  I received a text.  I answered with a**
18 **phone call.**
19     Q.  So, Mr. Murray sent you a text during
20 this deposition?
21     MR. MURRAY:  I contacted her at the
22 break and I thought she --
23     MR. BATEMAN:  I'm not asking you,
24 Mr. Murray.  I'm asking her.  I'm asking her.
25 If you could just hold on a second.

**Page 39**

1      THE WITNESS:  I received a text message
2  during the break.
3  BY MR. BATEMAN:
4      Q.  Okay.  From Mr. Murray?
5      **A.  Correct.**
6      Q.  And what did the text message say?
7      **A.  Please call me.**
8      Q.  Anything else?  Anything else?  You do
9  still have that text message right in front of
10 you.  What does it say?  Tell us.
11     **A.  Please call me.**
12     Q.  Okay.  And did you call Mr. Murray?
13     **A.  I did.**
14     Q.  Okay.  And how long did you guys talk?
15     **A.  Two minutes.**
16     Q.  What did you discuss?
17     **A.  That I was doing okay.**
18     Q.  Mr. Murray didn't need to call you to
19 say that.  I can tell you that you're doing just
20 fine.  Okay.  Because you're -- I believe you're
21 answering the questions truthfully.  All right?
22     **A.  I am.**
23     Q.  All right.  So anything else that
24 Mr. Murray told you, other that he thought that
25 you're doing okay?

**Page 40**

1      **A.  That was the -- that was it, that this**
2  **is my first deposition.  That was really it.**
3      Q.  Okay.  You didn't *talk?
4      **A.  Yes.**
5      Q.  Okay.  Was Mr. Fenner on the phone?
6      **A.  *no.**
7      Q.  All right.  So after you sent the draft
8  to Mr. Murray in November of 2023 and he gave
9  you some suggestions or had some comments, which
10 we can only learn from your -- the e-mail that
11 has not been produced, did you make any
12 revisions to your report?
13     **A.  The report was re -- yes.  It was**
14 **revised.  I made revisions.**
15     Q.  Okay.  When this report revised?
16     **A.  In the period between November 2023 and**
17 **January of 2024?  I'd have to go back to my**
18 **outbox to check the specific dates.**
19     Q.  I thought you -- I thought you were
20 going to say that.  Let me just ask one
21 question, though and I'm not trying to be
22 religious here.  Was it before or after
23 Christmas?
24     **A.  Before, I believe.**
25     Q.  Okay.

Transcript of Dr. Daphna Motro
Conducted on April 3, 2024

11 (41 to 44)

**Page 41**

1  A. I believe.
2  Q. And -- and do you recall what revisions you made to your report after talking with Mr. Murray?
5  A. I would just have to check the drafts. I don't recall off the top of my head what revisions I made.
8  Q. How many drafts of the report did you complete?
10 A. Again, I'd have to check. An estimate, four or five.
12 Q. Four or five times. Okay.
13 A. An estimate.
14 Q. And I understand that's an estimate. In terms of the post revisions that you made to your report after having the conversation with Mr. Murray, do you recall what the substance of the revisions were?
19 A. I have to go back and check the -- the -- the comments. I'd have to go back and -- and look at the -- what the substance was. I can't tell you off the -- off the top of my head.
24 Q. Understood. After you made the first set of revisions, did you send a revised report,

**Page 42**

1 a revised draft to Mr. Murray?
2  A. Yes.
3  Q. And after sending the revised draft to Mr. Murray, did you have a conversation with him about the revisions?
6  A. Yes.
7  Q. Okay. And -- and then tell me if I'm -- if I'm getting this wrong, but my guess is unless you look at an e-mail, you can't tell me when you sent Mr. Murray the revised draft, am I right there?
12 A. You are correct.
13 Q. And you can't tell me, without looking at the draft or -- or without looking at the e-mail, what the substance of those revisions were?
17 A. That's correct.
18 Q. And after you sent the revised draft to Mr. Murray on whatever date that might have occurred, whatever -- whatever revisions might have been in there at Mr. Murray's suggestion, was the report acceptable to Mr. Murray, then?
23 A. After the drafts? Yes, the report was acceptable.
25 Q. No. I'm taking about after the first

**Page 43**

1 revision, was it acceptable or did you have to make another revision at the suggestion of Mr. Murray?
4  A. I estimate there were approximately, estimate, four to five revision.
6  Q. And those revisions were done at the direction of Mr. Murray?
8  A. Correct.
9  Q. And the revisions that were made can only be discerned by you looking at the drafts you have not produced or the e-mails that have not been produced; is that correct?
13 A. That's correct.
14 Q. Okay. If I -- if I understand correctly, you're at Hofstra University?
16 A. Correct.
17 Q. And if understood your answer earlier, you did not receive any assistance, other than from Mr. Murray, in terms of preparing your report?
21 A. Correct.
22 Q. Did you ever go and talk to, like, one of your colleagues at Hofstra about how do you prepare an expert report?
25 A. No.

**Page 44**

1  Q. Hofstra has a law school, does it not?
2  A. It does.
3  Q. Did you ever talk to anybody at the law school about, hey, I'm doing this expert report in the Federal Court, how do you do these?
6  A. No.
7  Q. Okay. Tell me, Dr. Motro, if I'm incorrect here, but any question that I might ask you today regarding the revisions to your report from the time that you initially submitted a draft to Mr. Murray in November of 2023 to the time that you signed this report on January 16th, 2024, that you cannot give me any information based off of your independent recollection about how those drafts were changed; is that right?
17 A. That's correct.
18 Q. So unless I look at your e-mails or I look at your drafts, you can't tell me anything more about how you prepared this report?
21 A. That's correct.
22 Q. You can't even tell me the dates on which you made the revisions?
24 A. No. I'd have to check my outbox.
25 Q. You can't tell me the substance of the

Transcript of Dr. Daphna Motro
Conducted on April 3, 2024

13 (49 to 52)

**49**

1  A. A few days ago.
2  Q. Three days ago?
3  A. A few days ago.
4  Q. But he contacted you a week -- you said
5  a week ago, he contacted you. So he contacted
6  you before or after you received the check?
7  A. It was before, to see if I had received
8  it. And I received it one or two days later,
9  something like that.
10  Q. Okay. To prepare your report, you've
11  identified certain documents that you have
12  relied upon, correct?
13  A. Correct.
14  Q. And you've listed every document that
15  you relied upon, correct?
16  A. Correct.
17  Q. Have you asked for documents to prepare
18  the report that you did not receive?
19  A. No.
20  Q. And after prepare -- preparing the
21  report, there are no documents that you think
22  that you would have needed to prepare it; is
23  that correct?
24  A. That's correct.
25  Q. Okay. And how much will you receive if

**50**

1  you are a witness at trial in this case?
2  A. That has not been determined yet.
3  Q. That has not been decided yet?
4  A. No.
5  Q. Are you familiar with an individual by
6  the name of Noreen Cleary (phonetic)?
7  A. I read her -- I'm familiar with that
8  name.
9  Q. Okay. And you started to say you read
10  something. So tell me what you think you read
11  with regard to Noreen Cleary?
12  A. I believe it was an e-mail exchange
13  between Ms. Cleary and Mr. Fenner. I would have
14  to go back, but I believe it was the e-mail
15  exchange between the two.
16  Q. Have you ever read any deposition with
17  regard to Noreen *Cleary?
18  A. I did not read her deposition.
19  Q. Okay. Do I understand correctly the
20  only deposition that you have read in this case
21  is that of Ms. Earl; is that right?
22  A. That's right.
23  Q. But do you know there are other
24  depositions that have taken place in this case?
25  A. I did not know. When I was writing the

**51**

1  report, I did not.
2  Q. Okay. As you sit here today, do you
3  know that there are other depositions that have
4  taken place in this case?
5  A. You've mentioned that Mr. Fenner has
6  given his deposition, yeah.
7  Q. Mr. Fenner never told you that he had
8  been deposed in this case?
9  A. Mr. Murray mentioned that Mr. Fenner
10  had been deposed, yes.
11  Q. Okay. When did Mr. Murray mention that
12  to you, before or after you -- you signed off on
13  your report in January of 2024?
14  A. I don't remember. I don't remember
15  when he told me.
16  Q. Okay. Was it before or after you
17  signed the report in January of 2024?
18  A. I really don't remember.
19  Q. Did you ever ask Mr. Murray like, hey,
20  if they took -- if -- if -- if you took a
21  deposition of Ms. Earl, there must be a
22  deposition of Mr. Fenner?
23  A. No.
24  Q. You didn't?
25  A. No.

**52**

1  Q. Okay. Since you signed the report in
2  January of 2024, have you looked at any other
3  additional information, besides that which is
4  listed in your report, that might have some
5  bearing on your conclusions?
6  A. No.
7    MR. BATEMAN: Let's take a five-minute
8  break.
9    (A short break was had.)
10  Q. I guess I should ask, any phone calls
11  during this break?
12  A. No.
13  Q. Okay. Strike that off the list. I
14  just wanted to ask you with regard to the
15  references that are identified in your report,
16  beginning on Page 36 of your report, going
17  through Page 45, am I correct that some of these
18  references you probably had read before you
19  prepared this report?
20  A. Yes.
21  Q. Okay. Because I see one of the
22  references, you wrote, correct?
23  A. Yes.
24  Q. With regard to your expert testimony, I
25  had asked you some questions or a question with

Transcript of Dr. Daphna Motro
Conducted on April 3, 2024

14 (53 to 56)

**Page 53**

1  regard to your expertise in the availability of
2  jobs for Mr. Fenner. Do you remember that?
3  That was an hour or two ago.
4     A. Yes.
5     Q. But anyway, I think you -- when you
6  answered the question, you said you weren't
7  familiar with regard to a job availability in
8  Denver.
9        Are you an expert with regard to job
10 availability anywhere in the United States?
11    A. What kind of job?
12    Q. Well, with respect to jobs that
13 Mr. Fenner might be qualified for, are you an
14 expert in that area? And if so, is that what
15 you were hired to opine on by Mr. Murray?
16    A. No.
17    Q. Okay. Other than -- my last question
18 to you: Other than what you have expressed in
19 your report that is before today, does your
20 report reflect your complete opinion that you
21 would testify to at trial in this matter?
22    A. Yes.
23       MR. BATEMAN: And Dr. Motro, thank you
24 so much.
25       THE WITNESS: Thank you.

**Page 54**

1        MR. BATEMAN: I pass the witness. And
2  if not, then --
3        MR. MURRAY: Can you hear me now?
4  Hello?
5        MR. BATEMAN: Yes.
6              EXAMINATION
7  BY MR. MURRAY:
8     Q. Okay. Very good. Doctor, I just have
9  a few questions. In the course of your work as
10 an academic, have you had the opportunity to
11 prepare works and then have to defend those
12 documents or theses or similar documents?
13    A. I don't understand, like --
14    Q. For example, have you prepared papers,
15 such as a thesis that you -- or a dissertation,
16 that you would have to defend by a panel or an
17 individual who was an expert in -- in the field
18 at issue?
19    A. Yes.
20    Q. And can you describe that process?
21    A. The one that comes to mind is the
22 dissertation defense, where you prepare your
23 dissertation. That's completed across several
24 years. And you prepare it to the dissertation
25 committee.

**Page 55**

1        They ask questions about your research,
2  and you're required to defend the criticism that
3  they -- what they -- what they provide. You
4  have to -- you have to respond to them. And
5  whether you receive your dissertation depends on
6  whether you successfully did that.
7     Q. And in that process, is it -- do you
8  just defend the dissertation at the end, or are
9  there steps in the process where you defend it
10 at different stages?
11    A. You defend the final dissertation, and
12 then you have and defend the initial
13 dissertation, as well.
14    Q. How long does the -- does the defense
15 take, the final defense?
16    A. Mine took a few hours.
17    Q. Okay. And have you had any other
18 papers that you prepared or presented and then
19 there was a form of you having to explain it or
20 defend it?
21    A. Just my dissertation.
22    Q. Okay. In the course of you preparing
23 the report in this case, did you feel you had
24 all the information you needed to prepare the
25 report that you, in fact, prepared?

**Page 56**

1     A. Yes.
2        MR. MURRAY: I have nothing further.
3        MR. BATEMAN: Okay. Dr. Motro,
4  sometimes opposing counsel asks questions as a
5  follow-up. I have questions, but I can tell you
6  in this instance, I have none. It was a
7  pleasure meeting you and I wish you all the best
8  in your academic career.
9        THE WITNESS: Thank you. It was a
10 pleasure meeting you, as well. Thank you.
11       MR. MURRAY: Thank you.
12       MS. COURT REPORTER: Would you like to
13 order the transcript, Mr. Bateman?
14       MR. BATEMAN: Absolutely.
15       MS. COURT REPORTER: Okay. Mr. Murray,
16 would you like a copy?
17       MR. MURRAY: Yes, ma'am. Okay.
18       MR. BATEMAN: Thank you.
19       MR. MURRAY: All right. We're all set.
20 Thank you, guys.