*Earl Fenner v. United States Gypsum Company*, 23-cv-00525

# EXHIBIT C

Page 1

```
DISTRICT COURT, FREMONT COUNTY, COLORADO
Civil Action No. 1:23-cv-00525-CNS-KASS
---------------------------------------------------
DEPOSITION OF DIANE EARLL          December 18, 2023
---------------------------------------------------
Plaintiff:
EARL FENNER, Jr., an Individual,
v.
Defendant:
UNITED STATES GYPSUM COMPANY, a Delaware corporation.
---------------------------------------------------
APPEARANCES:
    MURRAY LAW, LLC
        By Steven L. Murray, Esq.
        3900 East Mexico Avenue
        Suite 300
        Denver, Colorado  80210
        303.369.9952
        steven@smurraylaw.com
            Appearing on behalf of Plaintiff;
    LITTLER MENDELSON, P.C.
        By Shanthi V. Gaur, Esq.
        321 North Clark Street
        Suite 1100
        Chicago, Illinois  60654
        312.372.5520
        sgaur@littler.com
            Appearing on behalf of Defendant.
Also Present:
Earl Fenner, Jr.
Brett Nerad, Esq., In-House Counsel USG
Kelly Woods, Videographer
```

Page 2

```
 1       Pursuant to Notice and the Federal Rules
 2  of Civil Procedure, the deposition of DIANE EARLL,
 3  called by Plaintiff, was taken on Monday, December 18,
 4  2023, commencing at 8:57 a.m., at 200 North LaSalle
 5  Street, Suite 700, Chicago, Illinois, before Judith T.
 6  Lepore, Certified Shorthand Reporter for the State of
 7  Illinois.
 8            I N D E X
 9  DEPOSITION OF DIANE EARLL
10  EXAMINATION BY:                              PAGE
11      Mr. Murray                                  5
12      Ms. Gaur                                  345
13  EXHIBITS                            INITIAL REFERENCE
    Earll
14  Exhibit No. 11 - Declaration                   91
    Exhibit No. 12 - Emails                       105
15  Exhibit No. 13 - Photograph                   157
    Exhibit No. 14 - Text Messages                170
16  Exhibit No. 15 - MySafeWorkplace              178
    Exhibit No. 16 - Emails                       210
17  Exhibit No. 17 - Test Messages                212
    Exhibit No. 18 - Emails                       245
18  Exhibit No. 19 - Bates USG0001275             216
    Exhibit No. 20 - Emails                       221
19  Exhibit No. 21 - Emails                       222
    Exhibit No. 22 - EEOC Response                228
20  Exhibit No. 23 - Bates USG0001414-1418        235
    Exhibit No. 24 - Feedback                     236
21  Exhibit No. 25 - Email                        241
    Exhibit No. 26 - Workplace Profile            245
22  Exhibit No. 27 - PIP Documents                252
    Fenner Exhibit No. 7                          259
23  Exhibit No. 28 - Email                        273
    Exhibit No. 29 - Email                        286
24  Exhibit No. 30 - Murlin's Exit Notes          287
    Exhibit No. 31 - Email                        289
25  Exhibit No. 32 - Annual Incentive Award       297
```

Page 3

```
 1  EXHIBITS                            INITIAL REFERENCE
 2  Exhibit No. 33 - Miller Presentation          303
    Exhibit No. 34 - Examples of Profanity        307
 3  Exhibit No. 35 - USG's Objections &           311
    Responses to Plaintiff's Interrogatories
 4  Exhibit No. 36 - Text Messages                327
```

Page 4

```
 1         THE VIDEOGRAPHER:  My name is Kelly Woods,
 2  Certified Legal Video Specialist with AB Litigation
 3  Services in Denver, Colorado.  I am the videographer
 4  on December 18th, 2023, for the recording of the
 5  deposition of Diane Earll being taken at McCorkle
 6  Litigation Services, Chicago, Illinois, at the time of
 7  8:57 a.m. in the matter of Earl Fenner, Junior,
 8  Plaintiff, versus United States Gypsum Company,
 9  Defendant, filed in the United States District Court
10  for the District of Colorado, Case No.
11  1:23-cv-00525-CNS-KAS.
12         Will counsel please identify themselves for
13  the record, beginning with plaintiff's counsel.
14         MR. MURRAY:  Good morning.  My name is
15  Steven Murray, and I'm the attorney for the plaintiff
16  Earl Fenner.  And Mr. Fenner is seated to my immediate
17  left.
18         MS. GAUR:  Good morning.  Shanthi Gaur,
19  attorney for USG.
20         THE VIDEOGRAPHER:  Could the court reporter
21  please identify herself and swear in the witness.
22         THE COURT REPORTER:  Judy Lepore.
23             (The witness was duly sworn.)
24
25
```

**Page 81**

1  initiated telephone discussion two?
2      A.   Yes.
3      Q.   Okay.  And did he describe what the black
4  stereotype for a black man was?
5      A.   He said that the comment, the behavior --
6  because it was a behavior I was describing -- the
7  behavior you're angry refers to an angry black man.
8      Q.   And did he use the word "trope"?
9      A.   Not that I recall.
10     Q.   Did he describe the stereotype as an angry
11 black man as someone who is dangerous?
12     A.   Yes.
13     Q.   Okay.  Do you -- are you aware of any other
14 black -- other stereotypes of black men?
15     A.   No.
16     Q.   Are you aware of any stereotypes of women in
17 the workplace?
18     A.   I don't know what you're asking me.
19     Q.   Okay.  I'm asking you this.  You either know
20 or you don't know.  Are you aware -- can you tell me
21 today of a stereotype of a woman in the workplace?
22          MS. GAUR:  Object to the form.
23 BY MR. MURRAY:
24     Q.   A negative stereotype of a woman in the
25 workplace.

**Page 82**

1          MS. GAUR:  Object to the form.
2          THE WITNESS:  I would say raising their voice
3  when they have an objection.
4  BY MR. MURRAY:
5      Q.   That's a behavior.  A stereotype -- would you
6  agree that a stereotype in the employment sense is
7  assigning traits to a person that is negative and as
8  applying to all people in that class; would you agree
9  with that?
10     A.   Mm-hmm.
11     Q.   Okay.  You need to say yes, ma'am.
12     A.   Yes.
13     Q.   And you're not aware of any -- are you aware
14 of any sexual stereotypes that have denied women
15 employment opportunities?
16          MS. GAUR:  Object to the form.
17          THE WITNESS:  I actually don't understand
18 that question.
19 BY MR. MURRAY:
20     Q.   Okay.  Have you referred to any white
21 employee in your chain of command as angry?
22     A.   The behavior angry, no.
23     Q.   Okay.  So would it be correct this is the
24 first time anyone you've ever supervised you used that
25 word angry?

**Page 83**

1      A.   Yeah.  It's the first time anyone's treated
2  me that way, yes, the behavior.
3      Q.   And what did you find -- was Mr. Fenner's
4  behavior -- are you talking about his behavior at the
5  meeting?
6      A.   Yes.
7      Q.   Okay.  And what did he do at the meeting that
8  caused you to make that comment?
9      A.   When I was asking him questions about the
10 business, asking if he's brought in our continuous
11 improvement team to look at productivity improvements
12 in his organization, asking about have they mapped out
13 the process, he was very short.  He would raise his
14 voice.  He didn't -- it was -- it appeared to me that
15 he was upset or angry that I was asking these
16 questions.  And I -- that was -- it was the -- it was
17 not the people that passed away.  It was the way that
18 he approached that we didn't have it on the list,
19 because we were talking about operations with COVID,
20 but then it just escalated throughout the entire
21 meeting when I was asking him questions about his
22 business.
23     Q.   Now, would you agree that that's a common
24 thread in this case, that you -- on more than one
25 occasion in this case, you've taken the position that

**Page 84**

1  it's not what Mr. Fenner said, it's how he said it?
2      A.   It's both.
3          MS. GAUR:  Object to the form.
4  BY MR. MURRAY:
5      Q.   Okay.
6      A.   It's both.
7      Q.   Is -- when he talked about the black
8  stereotype, did you think that was inappropriate?
9      A.   No.
10     Q.   Now, did anyone -- okay.  Did you believe his
11 statement to you about the stereotype was proper?
12     A.   Yes.
13     Q.   Okay.
14     A.   Proper in the fact of bringing it to my
15 attention, yes.
16     Q.   But he believed, even though you didn't --
17 you likely disagreed, but he believed that your
18 statement about anger was offensive to him as a black
19 man.
20          MS. GAUR:  Object to the form, lack --
21 BY MR. MURRAY:
22     Q.   Would you agree with that?
23     A.   Yes.
24          MS. GAUR:  Object to the form, lack of
25 foundation.

Page 93

1  Q. Okay. And that's Brett?
2  A. Georgia and Brett.
3  Q. Georgia, okay.
4     And I'm very sorry, Brett. Could you give me
5  Brett's last name again?
6     MR. NERAD: It's Nerad, N-e-r-a-d.
7  BY MR. MURRAY:
8  Q. Okay, thank you.
9     So I want to -- if you could at paragraph --
10 I just want to understand a little bit about what
11 you're saying.
12    On paragraph four on the first page, it
13 starts with "Mr. Fenner became very upset and
14 disrupted the meeting by yelling." Let's do this
15 first. By yelling, what did he yell about?
16 A. He was yelling about the COVID operations
17 update we were giving him.
18 Q. Anything else he was yelling about?
19 A. He raised his voice when we were talking
20 about the business, the Specialty business, and I was
21 asking him questions.
22 Q. What topics was he talking about in the
23 Specialty business?
24 A. We were talking about operational
25 efficiencies, talking about should we bring in Lean

Page 94

1  Six Sigma to be able to put processes together. Just
2  questioning the business and the results.
3  Q. What is Lean Six Sigma?
4  A. Lean Six Sigma is like a continuous
5  improvement action. It's you typically have master
6  Black Belts that help through a continuous improvement
7  part of the business. So they come in, and they look
8  for areas of process improvement to be able to better
9  the business.
10 Q. So these are outside professionals that come
11 in and improve efficiencies of companies?
12 A. It is -- they're inside. We have a Lean Six
13 Sigma and continuous improvement organization, a
14 shared service.
15 Q. Within USG?
16 A. Within USG.
17 Q. And you mentioned he used profanity.
18 A. Yes.
19 Q. Do you recall what he said?
20 A. Yes. He -- I think he might have used the
21 word -- the F word.
22 Q. Okay.
23 A. And then bullshit.
24 Q. Okay. Anything else?
25 A. No, not that I'm aware of.

Page 95

1  Q. So if you go down to the middle of that
2  paragraph, it says, "the next day during my monthly
3  one-on-one meeting with Fenner."
4  A. Yes.
5  Q. Okay. And you state: "I felt he seemed
6  angry at me when I asked a question." Do you see
7  that?
8  A. Yes.
9  Q. Is that what you said to him?
10 A. Yes.
11 Q. Why did you believe the anger was directed at
12 you?
13 A. Because I was asking the questions.
14 Q. Okay. But part of his discussion was about
15 COVID, correct?
16 A. Yes.
17 Q. And he was upset about COVID?
18 A. Well, he was upset about the way --
19 Q. Well, just -- are you -- he was upset about
20 the COVID issue and the way you and Ms. Franzen
21 presented or talked about?
22 A. Yes.
23 Q. Okay. Go ahead. Now, what else were you --
24 A. No, that's it.
25 Q. Okay. So Mr. -- when you just said "I felt

Page 96

1  he seemed angry at me," is when he was talking about
2  the fact that you and Ms. Franzen did not mention the
3  COVID deaths in your initial discussions?
4  A. No, it was --
5     MS. GAUR: Object to the form.
6  BY MR. MURRAY:
7  Q. Go ahead.
8  A. It was throughout the entire meeting. It was
9  different parts of the way that he talked to me during
10 the meeting, which I believe were inappropriate.
11 Q. And then the last sentence says, "I said his
12 behavior could be disruptive." Do you --
13 A. Yes.
14 Q. -- see this?
15 A. Yes.
16 Q. Are you -- are you saying it was disruptive
17 or it can be disruptive?
18 A. Both.
19 Q. Okay. And what do you mean " not acceptable
20 for his role"?
21 A. He is a general manager of the company. His
22 behavior was unacceptable in that meeting.
23 Q. Because of what?
24 A. Because of the language he used, the way that
25 he answered questions almost yelling. He cuts -- he

Page 149

1  A.  Not on that date.
2  Q.  Okay. And Mr. Fenner asked is USG now
3  describing people as white and nonwhite?
4  A.  Yes, he might have mentioned it that way.
5  Yes.
6  Q.  And Mr. Fenner pounded the table on both
7  days?
8  A.  Yes. It might not have been -- on the first
9  day, it might not have been during the -- during the
10 white, nonwhite.
11 Q.  Yes.
12 A.  It could have been. And that went on for --
13 it definitely went on for -- the conversation went on
14 for a while, as we all were listening to Earl and
15 commenting.
16 Q.  So -- and did he pound the table a second
17 day?
18 A.  Yes.
19 Q.  And how did he do it the second day?
20 A.  Oh, he was (indicating).
21 Q.  Okay. And how long did the pounding go on
22 the second day?
23 A.  You know, probably only -- it happened
24 multiple times in -- but probably less than maybe
25 10 seconds, because it's one -- like -- but it was

Page 150

1  multiple times throughout the conversation.
2  Q.  Now, did -- do you believe he discussed his
3  family the second day?
4  A.  Yes, I believe so in the overnight -- after
5  the overnight thoughts.
6  Q.  And what did he discuss the second day?
7  A.  I believe -- well, he -- we were doing
8  overnight thoughts, which is something that we do at
9  USG, to see if there's anything that we missed the day
10 before, and he wrote on the board "nonwhite." I think
11 he very forcefully got up, wrote it, threw the marker
12 down, put the marker down. I think it fell off the
13 easel thing. And then he sat down very purposely, and
14 then was recounting some of the events the night
15 before.
16 Q.  Did he mention his wife?
17 A.  He did.
18 Q.  What did he say?
19 A.  Oh, yes, he did. He said something like, how
20 do you think I feel. I am -- my children are
21 biracial. I think that's a term he used. He said,
22 "My wife is white. I am black. My children are
23 biracial." He said that he was planning a trip to
24 Hawaii, and he had to fill out some forms. I don't
25 know if it was for the hotel, for -- I don't know what

Page 151

1  it was for. And he said and there was -- what does
2  his children, what box do they check, or like he
3  didn't know how to -- like they didn't have a box to
4  describe his children.
5  Q.  So in the -- on the first day, what time of
6  day did Mr. Fenner raise his concern about white,
7  nonwhite?
8  A.  I think it was in the afternoon.
9  Q.  In the afternoon?
10 A.  I believe so. I could be wrong in the time.
11 Q.  When Mr. Fenner raised his complaint, did you
12 at any time during the day attempt to comfort him?
13 A.  Oh, we all were -- we were all very --
14 Q.  No. I'm asking --
15 A.  Absolutely, yes.
16 Q.  And did you walk up to him and try to comfort
17 him?
18 A.  We -- it was a verbal.
19 Q.  What -- okay. What did you say?
20 A.  We said, "We are sorry" --
21 Q.  I don't know want to know we.
22 A.  I said, "We hear you. We understand you.
23 This will not happen again." I believe I said, "The
24 reason I believe it says nonwhite is because we
25 typically would say people of color." And Mr. Fenner

Page 152

1  has had an issue with the term "people of color." So
2  I said, "This will not happen again. This is a
3  learning experience for all of us here. We apologize.
4  This should have never happened. That that data
5  didn't have" -- it could have been left off the
6  presentation because it had really not a lot to do for
7  the sales presentation other than we are trying to
8  make sure that we have a very balanced, diverse
9  workforce in our sales team.
10 Q.  So -- okay. Did you ever confront Mr. Fenner
11 on that first day and criticize his conduct, criticize
12 his tone, criticize his language?
13 A.  No.
14 Q.  Did you ever confront him on the first day
15 and criticize the fact that he pounded on the table?
16 A.  No.
17 Q.  Did you ever call -- did you call
18 Chris Griffin and tell him about the events?
19 A.  No.
20 Q.  Did you tell anyone else at headquarters
21 about this?
22 A.  No.
23 Q.  Was Nora Cleary there?
24 A.  No.
25     MS. GAUR: Object to the form.

Page 209
1  belittling and --
2     Q.  When did you tell him that?
3     A.  Right after the email.  He sent the email
4  that day, and I talked to him and said, "This is
5  inappropriate behavior to send to a customer in an
6  email."
7     Q.  Is this the November 9 email?
8     A.  Could be November 9th.
9     Q.  Okay.
10         MS. GAUR:  When you're at a good place, can
11 we take a quick break?
12         MR. MURRAY:  Sure.
13         MS. GAUR:  Is now good?
14         MR. MURRAY:  Yes.
15         THE VIDEOGRAPHER:  Okay.  We are going off
16 the record at 2:08.
17                  (Whereupon, a short break
18                   was taken, after which the
19                   following proceedings were
20                   had:)
21         THE VIDEOGRAPHER:  We are going back on the
22 record at 2:21.
23 BY MR. MURRAY:
24    Q.  Ms. Earll, we'll get back to this a little
25 bit more later.  But at the executive innovation

Page 210
1  meeting, do you believe it was appropriate for
2  Mr. Fenner to be omitted from the presentation?
3     A.  Yes.
4     Q.  And why is that?
5     A.  The project that CIC was working on, which
6  was metal ceiling consolidation, was not at a point
7  that we would share it at the CIC.
8     Q.  And do you believe it was inappropriate for
9  Mr. Fenner to object to his slides -- his area being
10 not covered?
11    A.  Yes.
12              (Whereupon, Earll Exhibit No. 16
13               was marked for identification.)
14 BY MR. MURRAY:
15    Q.  Look at Exhibit 16, please.  This is the --
16 is this what you were referring to when you had
17 apologized to the customer?
18    A.  This was the email, yes, and then there was a
19 phone conversation.  But this is the email.
20    Q.  Who was the phone call with?
21    A.  I believe the same people.  It was Nathan
22 Ramsey, Tim Mahaffey.  I don't know if Mark Sweeney
23 was on the call, but definitely Nathan Ramsey and
24 Tim Mahaffey and myself and Mr. Fenner.
25    Q.  Did -- in the November -- did you show

Page 211
1  this -- your document to Mr. Fenner at the time you
2  sent it on November 9?
3         MS. GAUR:  Object to the form.
4         THE WITNESS:  He was -- he sent it.
5  BY MR. MURRAY:
6     Q.  No.  Your message to Paul Haney, did you --
7  when you apologized, did you show this to Mr. Fenner?
8     A.  No.
9     Q.  Okay.  And Mr. Fenner did not -- was not
10 aware of your email until November 29, correct?
11    A.  Not aware of this email or the email --
12    Q.  Your email.
13    A.  -- that he sent?
14    Q.  Your email.  Your email.
15    A.  I talked to him about the situation I thought
16 was inappropriate.
17    Q.  Did you talk to him before November 29?
18    A.  Oh, yes.
19    Q.  And was it -- what did he say?
20    A.  He didn't say much.  He was just, this has
21 been going on long enough.  I said his comments in the
22 email were unacceptable as a leader in the
23 organization.
24    Q.  Did you hold this meeting up at -- this
25 letter up in the November 29 meeting?

Page 212
1     A.  Yes.
2     Q.  In the November 29 meeting, did Mr. Fenner
3  ask you the specifics about what Mr. Piche said about
4  him at the dinner?
5     A.  I actually don't recall.
6     Q.  And on December 1 through December 3, did
7  Mr. Fenner ask you again about the specifics of what
8  Mr. Fenner -- what Mr. Piche said about him?
9     A.  No.  I don't believe that -- I can't recall,
10 but I don't believe that he asked for that.
11    Q.  Okay.  Let's look at Exhibit 16, please.
12    A.  Yes.
13    Q.  I mean Exhibit 17.
14              (Whereupon, Earll Exhibit No. 17
15               was marked for identification.)
16 BY MR. MURRAY:
17    Q.  Exhibit 17 is the text messages with
18 Dan Piche?
19    A.  Yes.
20    Q.  Okay.  So you called Mr. Piche, and then he
21 sent you this text message?
22    A.  Yes.
23    Q.  And he states here that Earl is terrible.  Do
24 you see this?
25    A.  I see that.

Page 217

1 pages in the presentation.
2    Q.  Okay.  And who -- what's Kuma's full name?
3    A.  Kumar Natesaiyer.
4    Q.  And he didn't record the meeting, correct?
5    A.  Yeah, I guess it was not recorded.
6    Q.  So you sent this to Ms. Nelson.  This is your
7 version of what occurred at the meting?
8    A.  Yes.
9    Q.  Okay.  I want to point out to you, do you
10 recall stating that Mr. Fenner made his comments after
11 Miller, Mr. Miller presented?
12   A.  Yes.
13   Q.  Okay.  All right.  And you believe it was
14 appropriate for Mr. Fenner to make his objection?
15   A.  No.
16   Q.  You do not believe it was appropriate?
17   A.  Not in that forum.
18   Q.  Okay.  What did Mr. Fenner do that you found
19 inappropriate?
20   A.  He -- we can read the words that he used.  It
21 is inappropriate to challenge a leader of your
22 business at an executive corporate innovation
23 ceremony.
24   Q.  And do you believe that the nature of the
25 presentation of Mr. Miller by excluding Mr. Fenner and

Page 218

1 Mr. Fenner's team embarrassed Mr. Fenner?
2    A.  No.
3    Q.  Do you believe it reflected poorly on
4 Mr. Fenner?
5    A.  We -- they only highlight certain projects,
6 so I would say the largest portion of the Ceilings
7 business was represented.
8    Q.  On the second -- on the paragraph below there
9 where it says, "Chris Griffin's comments," and it says
10 here that Griffin said, "He lacks emotional
11 intelligence, and these types of behaviors are
12 continued examples of his leadership limitations."  Do
13 you see this?
14   A.  I see that.
15   Q.  Why in the world didn't Mr. Griffin put a
16 stop to this at some point between when Fenner got
17 appointed as general manager in April or May of 2019
18 until now?  He had plenty of opportunity to get
19 involved and stop this behavior.
20       MS. GAUR:  Objection, lack of foundation.
21       THE WITNESS:  Yeah, I don't know what -- how
22 Chris Griffin had approached situations.
23 BY MR. MURRAY:
24   Q.  So Mr. Fenner was appointed general manager
25 around, let's say, March to May of 2019.  So he

Page 219

1 received a performance evaluation that was signed by
2 Mr. Macey in January of 2020, and that was positive.
3 There was no mention of all these problems that you're
4 alleging.  Then in 2021 for the year '20, Macey signed
5 a satisfactory performance evaluation that he signed
6 in 2021.  There was no indication -- have you read
7 both of those evaluations?
8    A.  Yes.
9    Q.  And -- or would you agree that there's no
10 indication in there that whatever Mr. Fenner's
11 shortcomings are that it rises to the level of a PIP,
12 or rises to the level of termination, at least in
13 those two documents?
14       MS. GAUR:  Object to the form.
15       THE WITNESS:  Yeah, I would say the does not
16 meet expectations is not something we would normally
17 give a general manager, and he got a does not meet
18 expectations on partnership and collaboration.
19 BY MR. MURRAY:
20   Q.  And I don't have the evaluation in front of
21 me, but his overall rating was satisfactory?
22   A.  It was meets.
23   Q.  It was meets?
24   A.  Yes.
25   Q.  Mr. Macey found -- do you believe that you

Page 220

1 saw something in Mr. Fenner that Mr. Macey did not
2 see?
3        MS. GAUR:  Objection, lack of foundation.
4        THE WITNESS:  Yeah, I -- his -- I don't know
5 his behavior under Chris Macey.  His behavior under
6 Diane Earll, under my leadership was unacceptable, and
7 I would believe, based on Nancy Mercolino's comments,
8 that Earl's behavior was definitely unacceptable the
9 year prior.
10 BY MR. MURRAY:
11   Q.  Mr. Macey was fully aware of Nancy
12 Mercolino's situation.  Would you agree?
13       MS. GAUR:  Objection, lack of foundation.
14       THE WITNESS:  He was copied on the email.
15 BY MR. MURRAY:
16   Q.  Okay.  No, was he -- he was -- Mr. Macey was
17 instrumental in removing Nancy Mercolino.  Would you
18 agree with that?
19       MS. GAUR:  Objection, lack of foundation.
20       THE WITNESS:  I would believe so.
21 BY MR. MURRAY.
22   Q.  Okay.  And Mr. Macey was familiar with
23 Richard Murlin going above Mr. Fenner in the chain of
24 command.  Would you agree with that?
25       MS. GAUR:  Objection, lack of foundation.

Page 229

1  MS. GAUR: Object to the form.
2  BY MR. MURRAY:
3  Q. Okay. When did this meeting occur?
4  A. July 1st of 2021.
5  Q. And did Mr. Fenner pound the table at this
6  meeting?
7  A. Oh, God, yeah.
8  Q. Okay. And can you tell me how he pounded it
9  at this meeting?
10 A. Oh, he was (indicating) "Fuck. This is
11 fucking ridiculous. I have fucking worked so hard. I
12 fucking come here every week. I fucking" -- he must
13 have said the F word 20 times during the meeting with
14 all of these people in there.
15 Q. Okay. Did you -- did anybody just stop it
16 and nip it in the bud?
17 A. Oh, yes.
18 Q. And tell me how -- who did that?
19 A. I said -- I stopped the meeting and said,
20 "This is getting nowhere, so we are going to stop this
21 meeting." And then I called it. Then Earl went into
22 his office. I came into his office and said, "This is
23 unacceptable. You use profanity. You said" -- I
24 said, "You use the F word like people use the umm
25 word." He used F every other word. "Unacceptable it

Page 230

1  was," I said.
2  Q. So who prepared this document? Did you
3  prepare it?
4  A. This one, no. It was Cassandra.
5  Q. Prepared it?
6  A. Yes.
7  Q. And she makes no mention of Mr. Fenner
8  pounding the table?
9  A. She was not there, but I --
10 Q. No, but she conducted -- did you direct
11 Ms. Nelson to prepare this document?
12 A. I asked her to call Mariana, who's the HR
13 person that's there, to say is this the behavior that
14 Earl is showing when -- I'm only there every six
15 months. If this is the behavior that he has at
16 this -- this is unacceptable.
17 Q. Okay.
18 A. Absolutely unacceptable. So she did do that.
19 Q. She -- Ms. Nelson followed your direction,
20 and she conducted an overview or an investigation of
21 the meeting and wrote this document?
22 A. She talked to people.
23 Q. Right.
24 A. Yes.
25 Q. And nowhere in here does she mention that he

Page 231

1  pounded the table?
2  A. She wasn't there.
3  Q. No, but she -- no one told her that? It's
4  not in here.
5  MS. GAUR: Object to the form. The document
6  doesn't cover that meeting.
7  THE WITNESS: Yes. She was -- she was not
8  there.
9  BY MR. MURRAY:
10 Q. Are you saying that the 7/1/2001 [sic]
11 meeting --
12 A. Yes.
13 Q. -- is the meeting where he pounded the table?
14 A. Yes.
15 Q. And he used the F word?
16 A. Oh, yes.
17 Q. And Ms. Nelson, whatever she did, she talked
18 to people because you wanted to know what happened?
19 A. I wanted to know is this the behavior that,
20 first of all, Nancy Mercolino originally said was
21 happening. If this is the behavior that is occurring
22 with Earl Fenner going out to this location, it is
23 unacceptable behavior is what I said. And the
24 comments here would say that -- you can read those.
25 Q. The comments that are made under 7/2/2021, do

Page 232

1  you see this?
2  A. Yes.
3  Q. These are not specific as to any specific
4  date, correct?
5  A. No.
6  Q. Okay. And aside from not mentioning
7  pounding, first -- and you never shared this with
8  Mr. Fenner and talked to him about this, correct?
9  A. No.
10 Q. Is that correct?
11 A. That is correct.
12 Q. Okay.
13 A. I talked to him about -- I want to correct
14 that. The 7/1 meeting, I talked to him about it
15 saying it was inappropriate for the meeting. And then
16 we had that town hall meeting where he said the F word
17 twice and said Jesus Christ in front of all of our
18 population of people, which, again, it think is
19 inappropriate.
20 Q. When was that meeting?
21 A. It was -- I believe it was the day before or
22 this morning. It was in the same exact visit. And I
23 said, unacceptable behavior, the profanity.
24 Q. And his statement that four years ago they
25 were losing money and now they had millions in the

Page 293

1  A. I would say, based on the interviews from the
2 investigation, the long-term employees have said this
3 behavior has been happening for a long time. So,
4 again, I don't base my decision on activities that
5 happened before I was there, but the series of events
6 that took place in such a short period of time, that
7 has gone on long enough.
8  Q. So are you saying that you based his
9 termination only on what occurred after you arrived in
10 2021?
11  A. Yes.
12  Q. Okay. So those behaviors would have been the
13 complaint from L&W, correct?
14  A. Yes.
15  Q. His conduct at the leadership meeting in Lake
16 Geneva?
17  A. Yes.
18  Q. The conduct at the executive innovation
19 meeting?
20  A. Yes.
21  Q. And his November -- is it 9th email?
22  A. Yes. And then the CI -- or that Ceilings
23 Plus conversation.
24  Q. And that occur -- is that the -- is that
25 the --

Page 294

1  A. That was in July.
2  Q. July. And did he -- and he pounded the table
3 on that meeting?
4  A. Oh, yeah.
5  Q. Okay. What time of day -- was that a two-day
6 meeting?
7  A. We were there for three days, because we also
8 did a customer visit.
9  Q. And what time -- and Mr. Griffin came out for
10 that meeting, correct?
11  A. No, that was a different meeting.
12  Q. And did he pound the -- when did Mr. Fenner
13 pound the table?
14  A. It was on July 1st, July 1st when we had the
15 meeting.
16  Q. And then on the second and third?
17  A. I think we were there the day early. The day
18 prior, we had dinner. I think we had an event. And I
19 think the next day is when we went to go visit PCI.
20  Q. So it's three days, and he pounded the table
21 on the second day?
22  A. I believe it was the second day, on the 1st.
23  Q. Okay. And did -- if he pounded the table and
24 made the outrageous gesture that you mentioned, did
25 you tell him that he could not participate anymore?

Page 295

1  A. No. I had a meeting with him, and he said
2 that he would refrain from those actions, and he would
3 try not to use profanity.
4  MR. MURRAY: Okay. I'm going to have to take
5 a break, please.
6  THE VIDEOGRAPHER: Okay. We are going off
7 the record at 6:21. This is the end of Media No. 4.
8     (Whereupon, a short break
9      was taken, after which the
10      following proceedings were
11      had:)
12  THE VIDEOGRAPHER: We are going back on the
13 record at 4:40. This is the beginning of Media No. 5.
14  MR. MURRAY: Are we on?
15  THE VIDEOGRAPHER: Yes.
16 BY MR. MURRAY:
17  Q. Ms. Earll, we talked about this email where
18 whether Mr. Fenner was included in the meeting or not
19 included. Do you recall that around December 2nd?
20  A. He was in -- no, he was included for them to
21 meet with him, but not included -- I don't even know
22 if there a TBD afterwards, but yes.
23  Q. Okay.
24  A. I remember what you're --
25  Q. Now, I believe that you testified that there

Page 296

1 were incentive people in sales that did not report to
2 Mr. Fenner. Was that what you said?
3  A. The two salespeople that report up to
4 Earl Fenner are on MIP, so management incentive
5 programs.
6  Q. Okay. And are you saying that's a reason why
7 he wasn't included in the meeting?
8  A. The sales incentive programs are recommended
9 and approved -- recommended by the directors of sales
10 and approved by myself, along with our finance team.
11 We consult with the leaders. So we consult with
12 Mark Miklosz, Mark Kemerling, as well as Earl. It
13 shows that to meet with Earl just to make sure that
14 the categories, so it's just categories that we're
15 incenting people on.
16  Q. So are -- but your reason for -- if you said
17 you left him out, and you said you didn't know if you
18 left him out at all, but if you left him out on
19 purpose, that would have been for what reason?
20  A. I didn't leave him out on purpose, because
21 it -- here it shows "Please check with Mark Kemerling,
22 Earl Fenner on the recommendations on the incentives
23 and weight. We can talk as a team, you, me, Megan,
24 Mark." Mark Kemerling has salespeople that report up
25 to him, so that's why Mark Kemerling was invited.

```
                                                    Page 313                                                    Page 314
 1  possible, correct?                                       1       A.   After the January 9th meeting or -- yeah, the
 2       A.   Yes, he could have.                            2  January 9th meeting.
 3       Q.   And I don't want you to convey what Mr. Haney  3       Q.   Okay.  Could it be January 6?  That's the
 4  said to you, but what I'm trying to understand is,       4  first meeting.
 5  what was his role in the termination of Mr. Fenner?  I   5       A.   If that was the first meeting, yes.  It was
 6  don't want to know what he said, what he -- I want to    6  after our PIP meeting, so maybe it was the 6th.
 7  say what was his role?  Was he a decision-maker or was   7       Q.   And -- so was it made on the 7th or 8th?
 8  he a lawyer?  What was Mr. Haney's role in your          8       A.   Around there.
 9  decision to fire Mr. Fenner?                             9       Q.   So Mr. Fenner asked some questions, and then
10       MS. GAUR:  And I'm just going to instruct          10  you decided we're going to fire him?
11  you, because he is a lawyer, not to convey any          11       A.   We determined that he was -- the premise of
12  communications you had with Mr. Haney in answering the  12  the PIP was not adhered to because he did not come
13  question.                                               13  back with any action items, and he disputed almost
14       THE WITNESS:  Okay.  What she said.                14  every one.
15  BY MR. MURRAY:                                          15       Q.   Now, so if you could look at page 4, and this
16       Q.   So what was his role?                         16  is at the bottom of the answer to paragraph -- to
17       A.   He was my HR person, because you have to have 17  Interrogatory No. 4.  It says, "The fact that
18  an HR person present.                                   18  plaintiff had an outburst during which he interrupted
19       Q.   How -- when -- and Mr. Macey, you didn't      19  a presenter."  Do you see that language?
20  consult with him in any way whatsoever?                 20       A.   Yes.
21       A.   Consult, no.                                  21       Q.   Do you recall earlier we talked about this
22       Q.   Is there a rift between you and Mr. Macey?    22  situation, and your document said that Mr. Fenner
23       A.   No.                                           23  spoke about this after Mr. Miller had finished his
24       Q.   Okay.  When was the decision made to          24  presentation?
25  terminate Mr. Fenner?                                   25       A.   Yes.

                                                    Page 315                                                    Page 316
 1       Q.   And which one is the correct version?          1  21st?  The executive innovation was 21?
 2       A.   I -- Tim Miller was talking, and then he --    2       A.   It was the 21st.
 3  there was an interruption in between there when he       3       Q.   And despite his conduct at that meeting, you
 4  started answering -- he asked a question, and            4  offered transferring him to another position; is that
 5  Tim Miller was answering, and then he disrupted him.     5  correct?
 6       Q.   So did the following occur:  Miller gave his   6       A.   That was before --
 7  presentation, then Ann Franzen and Mark Miklosz and      7       MS. GAUR:  Object to the form, misstates the
 8  Chris Griffin, not in that order, they all had           8  testimony.
 9  interchanges with Mr. Miller, and then at that time is   9       THE WITNESS:  That was before the meeting
10  that when Mr. Fenner spoke?                            10  that took place, and I did have a conversation with
11       A.   I can't recall the order in which he was     11  him the next day on the 22nd to discuss his behavior.
12  answering, commenting, or asking questions.            12  BY MR. MURRAY:
13       Q.   And when you talk about several USG leaders  13       Q.   When Mr. Fenner complained to you about the
14  provided you with negative feedback --                 14  use of the angry comment and when he complained to
15       A.   Yes.                                         15  Nora Cleary about the use of the angry and then when
16       Q.   -- and who would these leaders be?           16  he complained about white versus nonwhite meeting and
17       A.   It would be Chris Griffin, Joe Holmes, Scott 17  then he complained about other meetings that we've
18  Schaffer, Curt Malone, Mark Miklosz, Mark Kemerling,   18  talked about, were you -- and when he complained in
19  Ann Franzen, Jack White, Steve Bjorklund, and there's  19  his PIP about retaliation, discrimination, did you
20  somebody else on the leadership team.  I don't know if 20  take -- were you insulted by that?
21  Chris Macey said something.  But there were definitely 21       MS. GAUR:  Object to the form.
22  over 10 people that specifically came up to me and     22  BY MR. MURRAY:
23  said something.                                        23       Q.   What was your reaction to his complaints?
24       Q.   And this was never discussed with Mr. Fenner 24       A.   Which complaints?
25  from October 22nd -- was that meeting the 22nd or      25       Q.   All of them.
```