IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 1:23-cv-00525-CNS-KAS

EARL FENNER, JR.

    Plaintiff.

    v.

UNITED STATES GYPSUM COMPANY

    Defendant.

---

**PLAINTIFF'S RESPONSE TO DEFENDANT'S MOTION TO EXCLUDE [ECF # 149] EXPERT OPINION AND TESTIMONY OF DR. DAPHNA MOTRO**

---

## INTRODUCTION

Plaintiff Earl Fenner, Jr., [Fenner or Plaintiff], through his attorney, Steven L. Murray, Murray Law LLC, submits his response to Defendant's Motion to Exclude the Expert Opinion and Testimony of Dr. Daphna Motro. [USG or Defendant] [ECF # 149]. For the reasons herein, Fenner respectfully requests the Court to deny USG's entire motion.

## DISCUSSION

Dr. Motro's report and testimony meet the Federal Rule of Evidence 702 requirements. As interpreted by the Supreme Court, Rule 702 requires that an expert's testimony be <u>reliable</u>, in that the witness is qualified to testify regarding the subject, and <u>relevant,</u> in that it will assist the trier in determining a fact in issue. *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 589–92 (1993). *James v. Fenske,* 2012 WL

1

2923274, at *1 (D. Colo. July 18, 2012). The District Court is the "gatekeeper" in admitting or excluding expert testimony. *Bitler v. A.O. Smith Corp.,* 400 F.3d 1227, 1232 (10th Cir. 2004).

Rule 702 governs the admission of expert testimony, providing, if scientific, technical, or other specialized knowledge assists the trier of fact in understanding the evidence or in determining a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify in the form of an opinion or otherwise, if (1) the testimony is <u>based upon sufficient facts or data</u>, (2) the testimony is the <u>product of reliable principles and methods</u>, and (3) the witness has <u>applied the principles and methods reliably to the facts of the case</u>. Fed.R.Evid. 702.

Courts construe Rule 702 liberally in favor of admissibility. *See Daubert v. Merrell Dow Pharms., Inc.*, 509 US 579, 588 (1993). In considering the admissibility of an expert, the Court must independently decide whether this "expert had sufficient specialized knowledge to assist the jurors in deciding the particular issues in the case." *Kumho Tire Co. v. Carmichael,* 526 US 137, 156 (1999).

1. **Discrimination Cases & Social Framework Experts**

The Court in *Chinn v. Whidbey Pub. Hosp. Dist.,* 2021 WL 5200171, at *3 (WD Wash. November 9, 2021), discusses the commonplace use of the social framework analysis in employment discrimination cases. See *Apilado v. N. Am. Gay Amateur Athletic All.*, No. C10-0682, 2011 WL 13100729, *2 (WD Wash. July 1, 2011). *Chinn* cites cases where courts have approved using social framework experts in employment discrimination cases. In *Tuli v. Brigham and Women's Hospital,* 592 F. Supp. 2d 208, 211-

2

21, 215 (D. Mass. 2009), a court permitted social framework testimony and allowed the expert to "describe how stereotyping and discrimination operate—what contexts, in what fashion—based on empirical research." Later, In *Merrill v. MITCH Charter School Tigard*, 2011 WL 1457461, * 4-5 (D. Ore. April 4, 2011), the Court concluded that the social framework expert's testimony fell "within the range of reasonable expert opinion" and that the defendants' criticism of the expert's methodology as "unreliable" went to the weight, not the admissibility, of the evidence.

*Chinn* determined that the plaintiff met her burden under Rule 702 to establish the reliability and potential assistance to the trier of fact of the expert's testimony about stereotyping and backlash effects generally. 2021 WL 5200171, at *3. *Chinn* explained Title VII's legislative purpose: Congress intended to strike at the entire spectrum of disparate treatment of men and women resulting from sex stereotypes. (quotations omitted). *Chinn* notes as for the legal relevance of sex stereotyping, we are beyond the day when an employer could evaluate employees by assuming or insisting they matched the stereotype associated with their group [internal quotations and citations omitted]. *Id.*

Fenner asserts that the same reasoning applies to Title VII's goal of contesting all forms of racial discrimination in employment, including discriminatory actions based on racial stereotypes.

In addition to the cases cited in *Chinn*, see *EEOC v. Morgan Stanley & Co.*, 324 F.Supp.2d 451, 461 (S.D.N.Y.2004) (admitting social psychologist's testimony about how gender stereotypes may have affected decisions at the defendant's company); *EEOC v. A & E Tire, Inc.*, 325 F. Supp. 3d 1129, 1133 (D. Colo. 2018) [The Supreme Court has

made it clear that Title VII prohibits discrimination not just based on sex but also based on traits that are a function of sex.].

### 2. Racial Stereotypes: Recognized Issues in Discrimination Law

Courts have recognized the use of the term "angry black man" as a degrading stereotype. See *Parris v. Becerra*, 2022 WL 306193, at *1 (DDC February 2, 2022). Also, discrimination cases recognize that dog-whistle racism exists, such as "the use of code words and themes which activate conscious or subconscious racist concepts and frames." *Thelwell v. City of New York*, 2015 WL 4545881, at *11 (SDNY July 28, 2015) (internal quotations and citations omitted). "[F]acially non-discriminatory terms" may "invoke racist concepts that are already planted in the public consciousness such as "thug," etc. *Id*. "**Allegations that a plaintiff was stereotyped as an 'angry black [man]' could support a claim for racial and/or gender discrimination**." *Flanagan v. Girl Scouts of Suffolk Cnty., Inc.,* 2023 WL 6594885, at *11 (EDNY August 25, 2023).

### **ARGUMENT**

Dr. Morto's report meets the three critical requirements of Rule 702: (1) the report is based on sufficient facts and dates, (2) her testimony is the product of reliable principles and methods, and (3) she applied the principles and methods reliably to the facts of the case. Fed.R.Evid. 702. Dr. Motro's testimony logically advances a material aspect of Fenner's case and meets the relevance threshold. Disputed expert testimony remains reliable as long as "it falls within 'the range where experts might reasonably differ, and where the jury must decide among the conflicting views.'" *See SM v. JK,* 262 F.3d 914, 921–22 (9th Cir.2001) (citations omitted).

4

Dr. Motro's report is concise and within the proper bounds of an expert. Dr. Motro explains her report sets forth (1) her opinions, (2) facts and data considered by her in forming her opinions, (3) exhibits used or summarized to support her opinions, (4) her qualifications, (5) cases in which she had testified in the last four years, and (6) a statement of compensation. Moreover, Dr. Motro explains that her report addresses racial stereotypes, racial discrimination in employment and organizations, and racial barriers in post-organization employment. (ECF # 149-1, p. 4).

USG's categorization of Dr. Morto's report is not accurate. Dr. Motro's opinions are not one-sided findings that USG engaged in discrimination, and the jury must find for him. Dr. Motro's opinions do not invade the fact-finding province of the jury. In contrast, she relies on recognized principles in her opinions, and in her analysis and reasoning, she relies on them to reach her opinions. Dr. Motro's specific eight opinions include:

(1) A historic, recognized, racially offensive stereotype of a Black man portrays the Black man as angry and dangerous. [Angry Black Man].

(2) The above stereotype is often referred to as a racial trope. A trope is a common or overused theme or idea.

(3) The Angry Black Man stereotype is well-recognized in employment and organizational behavior.

(4) Actions based on the use and/or consideration of the Angry Black Man stereotype may support a finding that the actor relying on the stereotype is making decisions or statements with a discriminatory bias.

(5) The person labeling a Black man as angry and relying on the stereotypes

5

may act in a discriminatory manner despite not being aware of the stereotype.

(6) The severity of the discriminatory consequences of the Angry Black Man stereotype may increase in severity when the person relying on the stereotype holds a more significant position of authority and control over the Black man who is labeled angry.

(7) The severity of discriminatory consequences of the Angry Black Man stereotype may increase in severity when the person labels a Black man as angry, and the Black man (i) objects to the actor who labels him angry, (ii) informs the actor that the labeling of him as angry is a racial stereotype, which is racial discrimination, (iii) informs the official in the actor's organization that his objection is based on race, and (iv) the official informs the actor that the Black man has complained to the official about the actor labeling him as angry and the objection was based on race.

(8) Black men who have achieved a high level of executive success in the culture of a single large corporation in a single industry encounter significant racial barriers in attempting to move into a comparable corporate executive leadership position after being terminated from their initial employment. (ECF # 149-1, p. 59-60).

Dr. Motro's opinions are developed through her detailed analysis of seventeen elements/parts in the discussion section of her report. All elements support the admissibility of Dr. Morto's report because these points reflect her in-depth, sound

6

methodology. The following points warrant review in the context of the above discussion concerning racial stereotypes and related issues: (1) How Stereotypes Affect our Perceptions of Others' Behaviors, (i) including 4a. Fundamental Attribution Error, (ECF # 149-1, p. 359); and (ii) 4b. Intergroup Bias (ECF # 149-1, p. 361); (2) Stereotypes Hierarchies and Decision-Making (ECF # 149-1, p. 361-362), and reference to tokenism. *Id*., at p. 377.

USG's contention that a layperson/juror has "normal experiences and qualifications" is without merit.

### **FENNER'S RESPONSES TO USG'S SPECIFIC ARGUMENTS**

First, Fenner agrees that Dr. Morto is an expert only in race discrimination; however, Fenner disagrees with USG in limiting the scope of Dr. Morto's expertise because her expertise may be applied in areas where race discrimination involves other topics. i.e., obstacles to an accomplished black man finding comparable work.

Second, Fenner disputes USG's position that Dr. Motro's report and testimony are inadmissible under Federal Rule of Evidence 702. Dr. Motro's report specifies that she relies on her focused experience and study. Dr. Motro is an exceptionally talented academician focusing on social science issues, including discrimination.

Dr. Motro's social framework analysis meets the liberal test of *Daubert,* and her social framework analysis is consistent with the cases cited above. Specifically, Dr. Motro's methodology is credible because she combines at least three data groups. Dr. Motro relies on legal principles that are established and applied by the Courts, racially discriminatory stereotypes, including the angry black stereotype, and the race factor in

7

terms such as the White/Non-white labeling of USG employees. In addition, Dr. Morto applies the principles from her academic and related studies. Further, Dr. Motro relies on the precise data provided by USG. Specifically, one of her most objective data points is her reliance on Diane Earll's deposition. Earll is arguably USG's most favorable witness.

USG argues that Dr. Morto did not contact current and former USG employees. This point defies reason. Any such conduct would potentially create several discovery and improper contact issues. Moreover, USG attempts to characterize Dr. Motro's report as one in which she followed Fenner's attorney's suggestions and edits. Dr. Motro is a highly educated, credentialed professional. In this case, Haney wrote the USG EEOC position statement. He did not sign it. Nelson signed it without changing a word. USG submitted the report to the EEOC without indicating that Haney had written it. Dr. Morto would not and did not engage in such conduct. She has a well-earned, brilliant future. Engaging in any scintilla of such could cause her severe professional harm. Dr. Morto worked extremely hard on her report. She stands by the report, as does Fenner.

Fourth, USG argues Dr. Motro's report and testimony are not relevant under Rule 702 and *Daubert* because ***racial stereotypes and racial discrimination are issues that are familiar to a jury of laypersons and the Court. Dr. Motro's opinions will not aid the factfinder in determining the ultimate issues in this case.***

USG's argument conflicts with Diane Earll's knowledge and testimony. Earll served in USG's highest HR position. She served as Chief, HR. [(ECF # 165-2 (Earll Dep. 3A), p. 21/24-p. 22/17].  Earll testified to these points: (1) she was not aware calling

8

a black man angry had anything to do with race, (2) she did not believe that she should have been aware because she "Googled" the term angry and it did not mention race; however, (3) she did not Google the term, stereotype of a black man. [(ECF # 165-2 (Earll Dep. 3A), p. 120/8-22]. Further, Earll testified (1) Fenner described the racial stereotype of a black man, (2) he asked her if she was the racial stereotype, and (3) she responded she was not aware. [(ECF # 165-2 (Earll Dep. 3A), p. 80/5-15].

Diane Earll supports Fenner's position, not USG's contention, that racial stereotypes and race discrimination are issues that are familiar to a jury of laypersons. Diane Earll decided to place on a PIP and terminate his employment. She was his direct supervisor during these two actions. Earll served at the top of USG's organization, one of about ten Executive Leadership Team members, and directly reported to Chris Griffin, CEO. Previously, she served in the highest HR position within USG, Chief of HR.

Fifth, Fenner disputes USG's argument that the risk of unfair prejudice substantially outweighs the probative value of Dr. Motro's report and testimony. USG will not suffer any prejudice. USG did not retain any expert to rebut Motro's testimony. USG's deposition of Motro lasted less than three hours. Critically, the District Court has the power, through litigating instructions and jury instructions, to take any necessary measures to address the risk of any unfair prejudice to any party.

## **CONCLUSION**

Fenner respectfully requests the Court to deny USG's motion to exclude Dr. Motro's report and testimony.

Dated: June 10, 2024.

Respectfully submitted,

<u>/s/ Steven L. Murray</u>
Steven L. Murray
Murray Law, LLC
3900 East Mexico Avenue, Suite 300
Denver, CO 80210
303-396-9952
Email: steven@smurraylaw.com

10

## CERTIFICATE OF SERVICE

The undersigned certifies a true copy of the above PLAINTIFF'S RESPONSE TO DEFENDANT'S MOTION TO EXCLUDE [ECF # 149] EXPERT OPINION AND TESTIMONY OF DR. DAPHNA MOTRO was served to all counsel for Defendants listed below via the Court's ECF filing service this June 10, 2024, and to Plaintiff Earl Fenner, Jr. via his email address.

Paul Bateman
Shanthi V. Gaur
Colette L. Kopon
LITTLER MENDELSON, P.C.
321 North Clark Street, Suite 1100
Chicago, IL 60654

Email Addresses:

pbateman@littler.com
sgaur@littler.com
ckopon@littler.com


/s/*Steven L. Murray*
Steven L. Murray

11