IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge Charlotte N. Sweeney

Civil Action No. 1:23-cv-00525-CNS-KAS

EARL FENNER, JR.,

    Plaintiff,

v.

UNITED STATES GYPSUM COMPANY, a Delaware corporation,

    Defendant.

---

ORDER

---

Before the Court is the motion for summary judgment filed by Defendant United States Gypsum Company (USG). ECF No. 150. The parties also filed two motions related to the motion for summary judgment: Defendant's Motion to Strike Plaintiff's Amended Declaration, ECF No. 188; and Plaintiff's Motion for Leave to File Motion to Admit Three Documents, ECF No. 205. For the following reasons, the motion for summary judgment is GRANTED in part and DENIED in part. The motion to strike Plaintiff's amended declaration, ECF No. 188, is DENIED, and the motion for leave to admit the three documents, ECF No. 205, is GRANTED, and the three documents are admitted.

I.    **UNDISPUTED MATERIAL FACTS**[1]

Plaintiff Earl Fenner filed claims of race discrimination, hostile work environment, and retaliation against his former employer, USG, following his placement on a Performance Improvement Plan (PIP) and his subsequent termination. Plaintiff worked

---

[1] These facts are taken from the undisputed material facts in Defendant's motion for summary judgment and Plaintiff's corrected/amended response. ECF Nos. 150, 176.

1

for USG in various roles from 1994 until January 11, 2022. ECF No. 150, ¶ 2. At the time of his termination, Plaintiff was the General Manager of the Specialty Business Unit (Specialty) within USG's Ceilings Division; he had been in this role since May 2019. *Id.*, ¶ 3, 5. At that time, Plaintiff was the only Black General Manager and was USG's highest-ranking Black employee. ECF No. 176, Additional Disputed Facts ¶ 3. Chris Macey, who had promoted Plaintiff to that role, stated in his deposition that he had believed that Plaintiff was struggling with his new leadership role, and that he had provided Plaintiff with feedback about how to collaborate, communicate with others, and listen to others to reach a compromise. ECF No. 150, ¶ 6.

In October 2019, Nancy Mercolino, whom Plaintiff supervised, resigned from USG and sent a letter to Diane Earll that detailed Plaintiff's conduct and stated, "I wanted you to know my resignation is unequivocally due to a negative and often unbearable working relationship with [Plaintiff]." *Id.*, ¶ 7. Plaintiff denies engaging in the underlying unprofessional conduct, but does not deny the existence of the letter or that Diane Earll received the complaints within it. ECF No. 176, Response to USG's Undisputed Material Facts ¶¶ 7–8. Mercolino's letter included a list of specific incidents, including complaints that Plaintiff swore during meetings and acted aggressively towards her and others. ECF No. 150-4; ECF No. 150, ¶ 8. Because of these complaints, Macey requested that Plaintiff undergo coaching with human resources on his leadership style. *Id.*, ¶¶ 9–10.

Michele Green, the human resources officer who worked with Plaintiff, noted that they were working on "known pitfalls" and "history repeating itself." *Id.*, ¶ 11. Green based these comments on prior assessments of Plaintiff from 2003 and 2013 that included concerns that Plaintiff is "impatient," "pushy," "can come across as overly self-serving," needs to "do a better job of managing [his] ego," and "has a lack of awareness" that "can

2

constrain his ability to understand others."[2] *Id.*, ¶ 13. In one session in October 2019, Green provided Plaintiff with similar feedback from other employees, and generally discussed his leadership style, his working relationships, and how specific conduct might be perceived as retaliation. *Id.*, ¶¶ 14, 15.[3] Green emailed Earll and Macey a copy of her coaching worksheet and noted that she believed that Plaintiff had accepted her feedback and was committed to making change. *Id.*, ¶ 16. However, Plaintiff's 2020 performance review gave Plaintiff a rating of "Development Need" for the category of "Partnerships and Collaboration," which assesses an individual's communication and interpersonal skills. *Id.*, ¶ 17.

In January 2021, Earll became Plaintiff's direct supervisor. *Id.*, ¶ 19. Soon after, Earll, Plaintiff, and other members of the Ceilings leadership team participated in a video conference. *Id.*, ¶ 20. Earll asked Plaintiff questions and discussed the impact of COVID-19 on business operations. *Id.*, ¶¶ 21–22. Earll could sense Plaintiff's frustration and felt that when she asked him questions, he appeared upset. *Id.*, ¶¶ 22–23. In his response, Plaintiff clarified that "he was upset because the presentations did not recognize the Covid related deaths of two USG employees." ECF No. 176, Response to USG's Undisputed Material Facts ¶ 22. In her deposition, Earll stated that during the meeting, Plaintiff's responses were very short and that he had used profanity and raised his voice, such that it appeared to her that he was upset or angry that she was questioning him. ECF No. 150-1 at 83:7–22, 93:12–21, 94:17–25; ECF No. 150, ¶¶ 22–23. Plaintiff denies using

---

[2] Plaintiff denied this statement of fact in part, objecting to the 2003 report because it "should have been destroyed," and to the 2013 report because Plaintiff had had successes after 2013. Neither of these objections call into question the authenticity of the documents or denies that the concerns are listed in these documents. Thus, the Court considers the listed concerns as undisputed facts.

[3] Plaintiff denied paragraph 14 in part "because of inaccurate description of feedback" and because Green did not share the coaching sheet with him. The Court interprets this denial as an objection to the specific comments about Plaintiff, and so omits those specifics.

3

excessive profanity, yelling, raising his voice, and providing short answers, but he does not deny Earll's statements about his conduct. ECF No. 176, Response to USG's Undisputed Material Facts, ¶ 22. Later, Earll provided Plaintiff with feedback, explaining that he seemed angry. *Id.*, ¶ 24. The next day, Plaintiff told Earll that her use of the word "angry" referenced a discriminatory racial stereotype of the "Angry Black Man." ECF No. 150, ¶ 26; ECF No. 176, Additional Disputed Facts, ¶ 11. Earll responded that she did not know that the word "angry" was a stereotype or that it would offend Plaintiff. *Id.*, ¶ 27.

After speaking with Earll, Plaintiff discussed the conversation with Noreen Cleary, who at the time was USG's Chief Human Resources Officer. *Id.*, ¶ 28. Plaintiff told her that he was offended by Earll's use of the term "angry," and they discussed his concerns. *Id.* Cleary then spoke to Earll about the stereotype of "the angry black man." *Id.* In response, Earll told Cleary that she did not understand that the word "angry" could be interpreted that way and that it was not her intention to offend Plaintiff. *Id.*, ¶ 30. Earll and Plaintiff then spoke about the issue, and Earll apologized and thanked him for raising his concerns. *Id.* She told him that she did not intend to offend him and that she would not describe him as angry in the future. *Id.* Earll never again used the word "angry" with Plaintiff. *Id.* Cleary asked Plaintiff whether he believed further action was necessary, and he said he did not need more follow-up and that they were moving forward from the incident. *Id.*, ¶ 32.

Later, during the week of June 28, 2021, Plaintiff visited California for meetings. *Id.*, ¶ 33. At a public forum in front of hourly workers and at a later meeting, Plaintiff repeatedly used profanity. *Id.*, ¶ 34. In her deposition, Earll testified about the second meeting and stated that Plaintiff pounded the table and that "he must have said the F word 20 times during the meeting," to the point that she had to end the meeting early.

4

ECF No. 150-1 at 229:8–14; ECF No. 150, ¶ 36. Plaintiff denies pounding the table, using the "F word" 20 times, and being the reason Earll ended the meeting. ECF No. 176, Response to USG's Undisputed Material Facts, ¶ 36. After the meeting, Earll discussed Plaintiff's conduct with him. *Id.*, ¶ 37. In her deposition, Earll testified that she has "never had anyone that used profanity the way that Earl Fenner uses profanity." ECF No. 150-1 at 308:19–20; ECF No. 150, ¶ 37.

From October 19–20 2021, Plaintiff attended a Ceilings Leadership Team meeting in Lake Geneva, Wisconsin. *Id.*, ¶ 40. Chris Mandock, the Sales Director, testified in his deposition that Plaintiff interrupted others and inappropriately turned the conversation to his Specialty group. ECF No. 166-4 at 104:2–9 (Mandock Dep., Pl.'s Ex. 10A).[4] During another presentation, Mandock presented a slide with demographic data about the salesforce that included "White" and "Non-White" in reference to ethnicity. ECF No. 150, ¶ 43. The three individuals who were referred to as "Non-White" later self-identified as Hispanic/Latino and Asian. *Id.*, ¶ 44. Plaintiff objected to the use of the term "Non-White," and Earll and Mandock assured Plaintiff that they would not use the terms in the future. *Id.*, ¶ 46. Defendant stated that Plaintiff's reaction was "surprising" because, about two months before the meeting, an HR partner had emailed Plaintiff a spreadsheet containing the same demographic information and terminology, and Plaintiff voiced no objection. *Id.*, ¶¶ 51–52. USG has not used the terms "White" and "Non-White" in presentations since Plaintiff voiced his objection. *Id.*

Earll and others testified that, for the remainder of the multiday meeting, Plaintiff continued to raise his voice, interrupt and speak over colleagues, and swear; some

---

[4] Again, Plaintiff denies this statement of fact as an inaccurate description of his conduct and language, but he does not dispute that Mandock testified in this way.

testified that he banged on the table and threw a marker. *Id.*, ¶ 48. Plaintiff denied that he pounded on the table, and objected to the description of his tone, conduct, language, and throwing of the market, but he did not refute the testimony. ECF No. 176, Response to USG's Undisputed Material Facts, ¶ 48. Plaintiff also denies yelling during the meeting, but admits to using profanity and to saying, "Tell me why I shouldn't walk to F*** out of this room." ECF No. 150, ¶ 50.

On October 21, 2021, Plaintiff attended a Corporate Innovation Center (CIC) meeting with the executive leadership team and other top-level leaders. *Id.*, ¶ 54. Earll asked Plaintiff whether he would be interested in a position as senior director of talent management, diversity, and inclusion because she knew she had a passion for diversity. *Id.*, ¶ 55. Plaintiff responded that he was not interested because a transfer would involve leaving his more-visible leadership position, and because he could add more value to USG's diversity program by performing well as General Manager who "happens to be Black." ECF No. 176, Additional Disputed Facts, ¶ 34. Earll responded, "Okay. Just thought I'd ask." ECF No. 150, ¶ 55.

Tim Miller, Director of the Ceilings Laboratory, made a presentation to around 75 to 100 people about the work that CIC was doing with the Ceilings Division. *Id.*, ¶ 57. Afterward, Plaintiff stated in front of the attendees that there was no mention of Specialty. *Id.* Earll and at least ten other executives felt that Plaintiff's comments were unacceptable and that it was not the right time and place to challenge Miller about Specialty's exclusion. *Id.*, ¶ 59.

Also on October 21, 2021, Earll and two others had dinner with Dan Piche, the President and CEO of L&W, which is one of the Ceilings Division's largest customers. *Id.*, ¶ 60. Piche told Earll, unsolicited, that his team had positive comments about the changes

6

she had made to Ceilings, but that nobody on his team liked working with Plaintiff. *Id.*, ¶ 61.[5] On November 1, 2021,[6] Piche texted Earll with more detailed feedback, including that Plaintiff "is terrible," that he "doesn't seem to understand give and take," and that he has not "figured out the strategy" for Ceilings Plus. *Id.*, ¶ 62.[7]

On October 22, 2021, Earll called Plaintiff to discuss the CIC meeting and Piche's feedback. *Id.*, ¶ 63. She told Plaintiff that she, the CEO, and others thought that his comments were not necessary and that he should apologize to Miller and to Miller's boss. *Id.*, ¶ 64. Plaintiff was "very frustrated" that he was asked to apologize, and the call ended without them discussing Piche's comments. *Id.*, ¶ 65.

On October 29, 2021, an anonymous complaint was filed with USG's ethics hotline regarding Plaintiff's conduct at the Lake Geneva meeting. *Id.*, ¶ 66. During discovery it was disclosed that Megan Jude filed the complaint because she was upset by Plaintiff's conduct and the fact that no one addressed it. *Id.*, ¶ 67. Paul Haney, a member of USG's Ethics Committee, investigated the complaint. *Id.*, ¶ 68. Haney determined that Plaintiff's behavior was not an ethics concern, but many individuals that he interviewed described Plaintiff's unprofessional behavior. *Id.*, ¶ 70.[8]

Earll then decided to offer Plaintiff the choice to go on a PIP to address his behavior, or to resign. *Id.*, ¶ 71. Earll testified in her deposition that this decision was

---

[5] Plaintiff denies the admissibility of this statement, arguing that it is hearsay. However, it is not being offered for the truth of the matter asserted—that L&W genuinely did not like working with Plaintiff—but rather as an example of the feedback that Earll was receiving about Plaintiff that formed her beliefs about his performance. The statement is not hearsay.
[6] In the motion for summary judgment, Defendant states that these texts were sent on November 1, 2022. The date stamp on the text messages attached as Exhibit 31 reads Nov 1, 2021.
[7] Plaintiff again denied the admissibility of this statement as hearsay. For the same reasons as above, it is not hearsay.
[8] Plaintiff objects to the admissibility of the results of the investigation, again arguing that it is hearsay. For the same reasons described above, it is not hearsay. Plaintiff also denies the statement as an incomplete description of the investigation. However, the completeness of the investigation is irrelevant, as it is only relevant to show the basis for Earll's decision to place Plaintiff on a PIP.

based on the feedback she had received about Plaintiff's conduct, her observations of his conduct, and the feedback from L&W. *Id.* Plaintiff argues that these proffered reasons are pretext. ECF No. 176, Response to USG's Undisputed Material Facts, ¶ 71.

      On November 29, 2021, Earll and Haney met with Plaintiff to discuss the results of the investigation, because it raised broader management issues. ECF No. 150, ¶ 72–73.[9] Also at that meeting, Earll provided Plaintiff with the option to resign and receive separation benefits or to be on a PIP. *Id.*, ¶ 75. Plaintiff chose the PIP. *Id.* On December 13, 2021, Earll provided Plaintiff with a draft PIP that included the requirements to become an active listener and refrain from interrupting people, use professional language, collaborate with the team, embrace feedback from others, endeavor to rebuild relationships with USG employees, acknowledge his behavior at the Lake Geneva and CIC meeting was inappropriate, endeavor to rebuild customer relationships, and lead by example. *Id.*, ¶ 76. On December 21, 2021, Plaintiff returned the PIP with his comments. *Id.*, ¶ 77. His comments objected to some requirements as retaliation, harassment, and micro-aggressions, including: "This area of Focus you are describing is classic micro-aggression towards me with respect to me communicating differently than you do"; "This is USG RETALIATION – A violation of Earl's Protected Right to Complain about Discrimination"; "This is USG RETALIATION – A Violation of Earl's Protected Right to Complain about being treated differently"; and "This is USG RETALIATION. On Top of USG allowing L&W HARRASSMENT of E. Fenner." ECF No. 150-37 at 6–10. Defendant allegedly "reviewed Plaintiff's concerns and confirmed that the PIP requirements that

---

[9] Plaintiff denies in part this statement on the basis that he was not informed earlier of the results of the investigation. However, when he was informed is not relevant. Plaintiff similarly denies other statements of fact because he was not informed of their contents; however, this is not a valid basis for denying the validity of the statements.

Plaintiff complained about were based on legitimate, nondiscriminatory, and non-retaliatory factors." ECF No. 150, ¶ 79.

On January 6, 2021, Earll and Nelson met with Plaintiff to discuss the PIP. *Id.*, ¶ 80. Plaintiff raised questions about recording the PIP, having a witness, and editing notes about the PIP meetings. *Id.* Earll and Nelson ended the meeting because USG does not record employee meetings, and so they were not comfortable continuing. *Id.*, ¶ 80. Nelson testified that when she and Earll saw Plaintiff's retaliation complaint in the PIP draft, the matter was escalated to Haney and his team; after that, there were no more PIP meetings. ECF No. 176, Additional Disputed Facts ¶ 79. Earll decided to end Plaintiff's employment, and Plaintiff was terminated on January 11, 2022. *Id.*, ¶ 81. Defendant states that the reason for Plaintiff's termination was that "Based on Plaintiff's written comments disputing the substantive categories of the PIP and his focus on recording the PIP meetings, *rather* than the substance of the PIP, USG concluded that Plaintiff was not willing to engage in the PIP process." *Id.*

## II. LEGAL STANDARD

### A. Summary Judgment

Summary judgment is warranted when (1) the movant shows that there is no genuine dispute as to any material fact and (2) the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). "[T]he dispute is 'genuine' if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Allen v. Muskogee, Okla.*, 119 F.3d 837, 839 (10th Cir. 1997); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "A fact is material if under the substantive law it is essential to the proper disposition of the claim." *Wright ex rel. Tr. Co. of Kan. v. Abbott Lab'ys, Inc.*, 259 F.3d 1226, 1231–32 (10th Cir. 2001) (quoting *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d

9

664, 670 (10th Cir. 1998) (quotations omitted)). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson*, 477 U.S. at 248; *see also Stone v. Autoliv ASP, Inc.*, 210 F.3d 1132, 1136 (10th Cir. 2000).

"To defeat a motion for summary judgment, evidence, including testimony, must be based on more than mere speculation, conjecture, or surmise." *Bones v. Honeywell Int'l, Inc.*, 366 F.3d 869, 876 (10th Cir. 2004). The factual record and reasonable inferences must be construed in the light most favorable to the nonmoving party. *Self v. Crum*, 439 F.3d 1227, 1230 (10th Cir. 2006). The moving party bears "the initial burden of making a prima facie demonstration of the absence of a genuine issue of material fact and entitlement to judgment as a matter of law." *Adler*, 144 F.3d at 670–71. If met, "the burden shifts to the nonmovant to go beyond the pleadings and set forth specific facts that would be admissible in evidence in the event of trial from which a rational trier of fact could find for the nonmovant." *Id.* at 671 (citations and quotations omitted).

Ultimately, the Court's inquiry on summary judgment is whether the facts and evidence identified by the parties present "a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251–52. "[T]here is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Id.* at 249–50 (citations omitted).

### B. *McDonnell-Douglas* Burden Shifting

Each of Plaintiff's claims are governed by the *McDonnell-Douglas* burden shifting test, which applies to employment discrimination, hostile work environment, and

retaliation claims. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973); see *Garrett v. Hewlett-Packard Co.*, 305 F.3d 1210, 1216 (10th Cir. 2002) (Title VII); *McGowan v. Bd. of Tr's for Metropolitan St. Univ. of Denver,* 114 F. Supp. 3d 1129 (D. Colo. 2015) (race discrimination, hostile work environment, and retaliation). Under the test, the plaintiff must first establish a *prima facie* case. The burden then shifts to the defendant to put forward a legitimate, non-discriminatory basis for its adverse employment action. If the defendant does so, the burden shifts back to the plaintiff to show that the proffered reason was pretext or that the plaintiff's protected status was a determinative factor in the employment decision.

### III.  ANALYSIS

**A.  Motions on Plaintiff's Amended Declaration, Exhibit 19A, and Errata**

The Court first considers the motions related to Plaintiff's three improperly filed documents. Weeks after filing his response to the motion for summary judgment, Plaintiff filed three documents with the Court: an amended declaration, ECF No. 187-1; exhibit 19A, ECF No. 195; and errata, ECF No. 187. Defendant then moved to strike the three documents. ECF No. 188. Later, Plaintiff filed a motion for leave to file the three documents. ECF No. 205. For the reasons below, the Court grants Plaintiff's motion for leave to file the three documents and denies Defendant's motion to strike.

Plaintiff's motion is essentially a request for the Court to consider the three documents as it reviews Defendant's motion for summary judgment. ECF No. 205 at 1. Defendant argues that the three documents are untimely and noncompliant with the applicable rules, particularly Civil Practice Standard 7.1A(d). Plaintiff's summary judgment response was due on June 8, 2024, yet he filed the amended declaration on June 28—three weeks late. The Court agrees with Defendant but ultimately finds that

good cause exists to grant leave to file, and so, in the interests of justice, the Court will consider Plaintiff's amended declaration, exhibit 19A, and errata. The Court is aware that Plaintiff's counsel has been undergoing cancer treatments, and does not wish to penalize Plaintiff for errors that may be attributable to these treatments. The additional documents also serve primarily to correct prior errors and are not prejudicial to Defendant. More importantly, as discussed below, the documents do not alter the Court's analysis.

Plaintiff's original declaration, Exhibit 1A to his response to the motion for summary judgment, was deficient in numerous ways. The original declaration affirmed that "I have read Plaintiff's Response to Defendant's Motion for Summary Judgment," rather than Plaintiff's corrected/amended response. The new declaration fixes this error. The original declaration also affirmed, "I state that each contention is a reasoned statement with knowledge of the facts and surrounding circumstances and [sic] statement is true and correct to the best of my knowledge and belief." ECF No. 150-1A, ¶ 5. The Amended Declaration corrects this paragraph so that it reads, "each statement in this Amended Declaration is a reasoned statement with knowledge of the facts and surrounding circumstances and each statement is true and correct to the best of my knowledge and belief." The original declaration also did not reference any specific facts or show that Plaintiff was competent to testify, and so the facts in Plaintiff's response that referred to this declaration were unsupported. *See Aludo v. Denver Area Council*, Case No. 06-CV-2257, 2008 WL 2782734 (D. Colo. July 8, 2008). The Amended Declaration corrects this error by including factual statements.

Defendant is correct that Plaintiff's filing is late, that Plaintiff failed to request an extension of time or leave of the Court to file late, that Plaintiff failed to contact Defendant's counsel to discuss the filing, and that Plaintiff's corrected/amended response

still refers to Exhibit 1A, rather than the corrected/amended Exhibit 1A. ECF No. 188 at 2, 6. The Court reiterates that all of this is improper and in violation of the local rules. However, the interests of justice outweigh strict adherence to the rules in this instance. The previous deficiencies in the exhibit were significant, and the amended declaration, exhibit 19A, and the errata all serve to correct prior errors. The Court does not find that the additional filings are prejudicial to Defendant, because they do not offer new, material information, and so there is no need for Defendant to respond to these filings. Because good cause exists to grant Plaintiff leave to file these three documents, the Court grants the motion for leave to file, denies the motion to strike, and considers the three documents in its ruling on the motion for summary judgment.

### B. Plaintiff's Race Discrimination Claims Under Title VII and Section 1981 (Claims 2 and 4)

Plaintiff brings two race discrimination claims against USG, under Title VII and Section 1981. The standard for both is the same: to establish a *prima facie* case, Plaintiff must establish that (1) he is a member of a protected class; (2) he suffered an adverse action; and (3) the challenged action took place under circumstances giving rise to an inference of discrimination. *EEOC v. PVNF, LLC*, 487 F.3d 790, 800 (10th Cir. 2007); *Payan v. United Parcel Serv.*, 905 F.3d 1162, 1172 (10th Cir. 2018). Here, the first two elements are not in dispute: Plaintiff is a Black man, so is a member of a protected class, and he was placed on a PIP and terminated, which constitute adverse employment actions.

Defendant first argues that Plaintiff cannot meet his burden of establishing a *prima facie* race discrimination case because he cannot establish an inference of discrimination. Plaintiff argues that his termination itself gives rise to an inference of discrimination, relying on the Tenth Circuit's ruling that the "firing of a qualified minority employee raises

13

the inference of discrimination," because it rules out the two most common non-discriminatory reasons for termination: lack of qualification or the elimination of the job. *Perry v. Woodward*, 199 F.3d 1126, 1140 (10th Cir. 1999). Defendant argues that Plaintiff was not qualified, as shown by the proffered reasons for his termination. However, this argument is better addressed in the second and third steps of the analysis. The Court assumes here that Plaintiff was qualified for his position. He also was not terminated because the position was eliminated, so Plaintiff has established a *prima facie* case of racial discrimination.

Under the *McDonnell-Douglas* test, the burden then shifts to Defendant to provide a legitimate, non-discriminatory reason for terminating Plaintiff. Defendant does: sufficient evidence exists indicating that Earll believed that Plaintiff acted unprofessionally. ECF No. 150 at 20. Specifically, Earll points to Plaintiff's unprofessionalism during at least four work meetings, several USG employees providing negative feedback about Plaintiff's behavior at those work meetings, and the Ceilings Division's largest customer, L&W, providing unsolicited complaints about Plaintiff. *Id.* These are legitimate, non-discriminatory reasons for placing Plaintiff on a PIP and terminating him.

The bulk of the analysis thus rests on the third step: whether Plaintiff can show that Defendant's reasons were pretext for race discrimination. Defendants argue that there is no evidence of pretext. The Court agrees.

A plaintiff demonstrates pretext "by showing either that a discriminatory reason more likely motivated the employer or that the employer's proffered explanation is unworthy of credence." *Zamora v. Elite Logistics, Inc.*, 478 F.3d 1160, 1166 (10th Cir. 2007). Pretext may be established "by revealing weaknesses, implausibilities, inconsistencies, incoherence, or contradictions in the employer's proffered legitimate

14

reasons for its action." *Litzinger v. Adams Cnty. Coroner's Office*, 25 F.4th 1280, 1287 (10th Cir. 2022). In evaluating pretext, courts look at the facts "as they appear to the person making the decision to terminate, not the aggrieved employee." *Green v. New Mexico*, 420 F.3d 1189, 1191 n.2 (10th Cir. 2005). Similarly, it is "the manager's perception of the employee's performance that is relevant, not plaintiff's subjective evaluation of his own relative performance." *Furr v. Seagate Techs. Inc.*, 82 F.3d 980, 988 (10th Cir. 1996).

Plaintiff first argues that pretext is established because Earll made two job offers to Plaintiff, which she would not have done if his conduct was unprofessional, suggesting that her motivation in offering these jobs—and then of firing Plaintiff—was to remove him from her supervision. The Court agrees with Defendant that this theory fails. First, the evidence shows that Earll did not *offer* Plaintiff a job, but merely asked him about his interest in a different job. Plaintiff's assumption that Earll would not engage in this conversation if she thought Plaintiff had performance issues is just speculation, which is insufficient at this stage in litigation. One could just as easily speculate that Earll was motivated to remove Plaintiff from her supervision *because* he had performance issues, if there were any evidence of this being her motivation for the conversation. Second, this conversation occurred before additional instances of unprofessional conduct: before the L&W complaint, before the anonymous complaint, and before the investigation into the complaints. Therefore the fact that Earll discussed another position with Plaintiff is not evidence of an unlawful racial motivation for later terminating him, and nor does it call into question Earll's belief that Plaintiff had behaved unprofessionally.

Plaintiff also argues that USG's reliance on the complaint from L&W and the internal investigation demonstrates pretext. Primarily, Plaintiff argues that the L&W

15

complaint was "deficient" and that the investigation did not provide Plaintiff an opportunity to respond to the complaint. ECF No. 176 at 32. However, these arguments are irrelevant; they do not call into question Earll's belief that L&W's unsolicited complaints about Plaintiff warranted his placement on a PIP. Plaintiff's subjective belief that the complaint was deficient and the investigation unfair is irrelevant; the relevant inquiry is into his manager's perception of his performance. *Furr*, 82 F.3d at 988.

Plaintiff then argues that USG not providing his 2009 and 2019 evaluations demonstrates pretext. The Court agrees with Defendant that these evaluations are not relevant, because they occurred before Earll became Plaintiff's supervisor. *Metzler v. Fed. Home Loan Bank of Topeka*, 464 F.3d 1164, 1176 n.5 (10th Cir. 2006) (finding no pretext when new supervisor sets new standards). Because the decision-maker, Earll, became his supervisor after these evaluations, their alleged omission is not relevant and does not show that Defendant's asserted reasons were pretext for race discrimination.

In sum, Plaintiff does not offer any evidence of weaknesses, implausibilities, inconsistencies, incoherence, or contradictions in USG's proffered reasons for placing Plaintiff on a PIP. Because Plaintiff did not demonstrate pretext for race discrimination, he did not meet his burden under the *McDonnell-Douglas* balancing test. His race discrimination claims thus fail. The Court grants USG's motion for summary judgment as to these claims.

### C. Hostile Work Environment Claims (Claim 7, Section 1981; Claim 8, Title VII)

To survive summary judgment on hostile work environment claims, a plaintiff must show that "a rational jury could find that the workplace is permeated with discriminatory intimidation, ridicule, and insult" that is "sufficiently severe or pervasive to alter the

16

conditions of the victim's employment and create an abusive working environment." *Sandoval v. City of Boulder, Colo.*, 388 F.3d 1312, 1326 (10th Cir. 2004).

Plaintiff posits the following instances of pervasive discriminatory intimidation, ridicule, and insult: Earll calling Plaintiff angry, a slide presenter "subjecting him to the White/Non-White labeling," and making racially prejudicial conclusions in the investigation. ECF No. 176 at 34. Plaintiff also brings up other instances that are not tied to race, and so are not relevant to this claim. *See Chavez v. New Mexico*, 397 F.3d 826, 833 (10th Cir. 2005) (harassment must be based on protected characteristic). As to the remaining instances, Defendant argues that there is no evidence that they constitute discriminatory intimidation, ridicule, or insult. The Court agrees.

First, the Court agrees with Defendant that Earll's use of the term "angry" does not constitute discriminatory intimidation, ridicule, or insult. Earll testified that she did not know that her use of the word "angry" could be related to a racial stereotype, and she did not use the word again after Plaintiff alerted her to the connection. Earll also did not call him an "angry Black man," just that he appeared angry, which is enough removed from the degrading stereotype that it does not constitute discriminatory conduct.

Second, the term "Non-White" was not used to describe Plaintiff. It was displayed on a slide during a business discussion about the demographics of sales employees and promoting diversity. Plaintiff had seen the slide ahead of time and had not objected to the term before the presentation. After the presentation, when Plaintiff objected to the term, Earll apologized, and the company has not used the term again. There is no indication that the use of "Non-White" on a slide was discriminatory intimidation, ridicule, or insult; even if it was, it was not severe or pervasive enough to alter the conditions of Plaintiff's employment, because it only happened once and was not directed at him.

Even if these instances were discriminatory conduct, a hostile work environment claim requires "more than a few isolated incidents of prohibited conduct, such as a steady barrage of opprobrious comments." *Aramburu v. Boeing Co.*, 112 F.3d 1398, 1410 (10th Cir. 1997). Under the facts presented, these two instances are insufficient. Because Plaintiff does not meet his burden required to show a severe and pervasive racially hostile work environment, the Court grants summary judgment in Defendant's favor as to these claims.

### D.  Retaliation Claims (Claim 1, Title VII; Claim 3, Section 1981)

To establish a claim for retaliation under Title VII or Section 1981, Plaintiff must establish that (1) he engaged in protected opposition to discrimination; (2) he suffered an adverse action; and (3) a causal connection exists between the two. *Payan*, 905 F.3d at 1172. The burden then shifts to the defendant to show a legitimate, non-retaliatory reason for taking the adverse employment action. If it does, the plaintiff has the burden to show that the proffered reason is pretext. *Thomas v. Berry Plastics Corp.*, 803 F.3d 510, 514 (10th Cir. 2015).

Plaintiff establishes the *prima facie* retaliation case. First, he engaged in protected opposition to discrimination by conveying his concerns about unlawful discrimination in the draft of his PIP. In his comments, he alleges retaliation three times and harassment once; this is protected activity. ECF No. 150-37. Second, he was terminated shortly after he provided his supervisors with the draft PIP including his concerns. Third, the timing of his termination—six days after he provided the draft PIP—is close enough in time to create a genuine issue of material fact as to whether a causal connection exists between his allegations of retaliation and harassment and his termination.

The burden then shifts to Defendant, which provided a legitimate, non-discriminatory reason for terminating Plaintiff: that he was not engaged in the PIP process and was unwilling to work on the issues. Finally, the burden shifts back to Plaintiff to show that this proffered reason is pretext for retaliation. Plaintiff meets his burden. There is a genuine issue of fact as to whether Plaintiff was unwilling to engage in the PIP process or, as he claims, that USG terminated him because of his complaints of retaliation and harassment in his draft PIP. Indeed, the question is what motivated Defendant to move from a PIP to termination. Here, Plaintiff has established a question of fact as to that motivation. The timing of his termination, and the fact that there were no more discussions about his PIP after he raised his objections, are enough to create a genuine issue of material fact about whether Defendant's proffered reason for terminating him was mere pretext. The motion for summary judgment as to Plaintiff's retaliation claims regarding his termination is therefore denied.

### E. Failure to Mitigate

Finally, Defendant requests that the Court preclude Plaintiff from recovering lost wages because he failed to mitigate his damages. However, this appears to be a question of fact that is more appropriate for a jury. The Court declines to grant summary judgment on these grounds. Defendant is, of course, allowed to file a Rule 50 motion during trial if warranted.

### V. CONCLUSION

The Court GRANTS Plaintiff's Motion for Leave to File Motion to Admit Three Documents, ECF No. 205, and DENIES Defendant's Motion to Strike Plaintiff's Amended Declaration, ECF No. 188. The Court GRANTS Defendant's motion for summary judgment as to Plaintiff's race discrimination claims and hostile work environment claims,

and DENIES the motion for summary judgment as to the retaliation claims. ECF No. 150.

Dated this 11th day of October 2024.

BY THE COURT:

_____
Charlotte N. Sweeney
United States District Judge